1
2
3
4
5
6
7
8
9

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ORANGE COUNTY COASTKEEPER, a California nonprofit public benefit corporation,<br><br>        Plaintiff,<br>  vs.<br><br>SAN JUAN CAPISTRANO EQUESTRIAN CENTER, a California limited liability company,<br><br>        Defendant. | Civil Case No. 8:25-cv-00531<br><br>**CONSENT DECREE [19]**<br><br>**(Federal Water Pollution Control Act, <u>33 U.S.C. §§ 1251</u> _et seq._)** |

# CONSENT DECREE

The following consent decree ("Consent Decree") is entered into by and between Orange County Coastkeeper ("Coastkeeper") and San Juan Capistrano Equestrian Center ("SJCEC"). The entities entering this Consent Decree are each an individual "Settling Party" and collectively are the "Settling Parties."

WHEREAS, Orange County Coastkeeper is a nonprofit public benefit corporation;

WHEREAS, Coastkeeper's mission is to protect swimmable, drinkable, fishable water and promote watershed resilience throughout the southern California region;

WHEREAS, SJCEC is the operator of an establishment primarily engaged in the production of horses, Standard Industrial Classification ("SIC") Code 0272, located at 26282 Oso Road, San Juan Capistrano, CA 92675, (hereinafter, the "Facility") where it has stabled at all times relevant to this lawsuit approximately 420 horses;

WHEREAS, Coastkeeper alleges that SJCEC operations at the Facility result in discharges of pollutants into waters of the United States and are regulated by the Clean Water Act Sections 301(a) and 402. 33 U.S.C. §§ 1311(a), 1342;

WHEREAS, discharges from the Facility are regulated by the National Pollutant Discharge Elimination System ("NPDES") General Permit No. CAS000001 [State Water Resources Control Board] Water Quality Order No. 97-03-DWQ, as amended by Order No. 2014-0057-DWQ, as amended by Order No. 2015-0122-DWQ, as subsequently amended by Order No. 2018-0028-DWQ (effective July 1, 2020) (collectively, as amended, and as may be subsequently amended from time to time, the "General Permit" or the "Permit"), issued pursuant to Section 402 of the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 *et seq.* (the "Clean Water Act" or the "CWA");[1]

WHEREAS, the General Permit requires SJCEC, to comply with, *inter alia*, the

---

[1] The facility is regulated only if it has other activities on-site that are subject to the requirements of 40 Code of Federal Regulations, Chapter I, Subchapter N, Subparts A, C, or D. Only the portions of the facility involved in those activities are regulated. (See https://www.waterboards.ca.gov/water_issues/programs/stormwater/sicnum.html).

following mandates: (1) develop and implement a storm water pollution prevent plan ("SWPPP"), (2) develop and implement a nutrient management plan ("NMP"), (3) control pollutant discharges using, as applicable, best available technology economically achievable ("BAT") or best conventional pollutant control technology ("BCT") to prevent or reduce pollutants through the development and application of Best Management Practices ("BMPs"), which must be included and updated in the SWPPP, (4) when necessary, implement additional BMPs or other control measures as necessary to comply with any applicable receiving water limitations, and (5) implement a monitoring and reporting program designed to assess compliance with the Permit[2];

**WHEREAS**, on or about February 10, 2020, Coastkeeper sent the prior owner and operator of the Facility (Sycamore Trails and HTF1, LLC collectively, "Prior Owner/Operator") and relevant federal and state agencies a Notice Letter ("Original Notice Letter") under the CWA alleging substantive and procedural violations of the CWA occurring at the Facility.

**WHEREAS**, on or about September 8, 2020, Coastkeeper filed a complaint ("Original Complaint") against the Prior Owner/Operator in the United States District Court, Central District of California (Civil Case No. 8:20-cv-01694) alleging violations of § 301(a) of the CWA, 33 U.S.C. § 1311(a), and violation of the General Permit No. CAS000001, Water Quality Order No. 97-03-DWQ, as amended by Order No. 2014-0057-DWQ, as amended by Order No. 2015-0122-DWQ, as subsequently amended by Order No. 2018-0028-DWQ (effective July 1, 2020)) (hereinafter, the "General Permit" or "Permit")

**WHEREAS**, on or about November 25, 2020, Prior Owner/Operator and Coastkeeper entered into a Consent Decree ("Original Consent Decree") ordered by the Honorable James V. Selna (Civil Case No. 8:20-cv-01694-JVS-JDE) to resolve

---

[2] Any references to the "General Permit" or "Permit" herein shall be to the then-effective version, regardless of whether such changes are the result of amendments, revisions, reissuance, or similar modification of material terms. Any reference in this Consent Decree to specific sections or subsections of the General Permit that are moved, modified, or otherwise changed in a subsequent version of the General Permit shall be to such subsequent reference(s) as if set forth herein, *e.g.*, the current §XI.B.6.c may be renumbered as §XI.B.7.c, combined into the current §XI.B.6.d, or split into a new §XI.B.6.c and §XI.B.6.d.

Consent Decree                                                                                    Civil Case No. 8:25-cv-00531

Coastkeeper's allegations set forth in the Original Notice Letter and Original Complaint. The Original Consent Decree required Original Defendants to, inter alia, implement best management practices ("BMPs") to capture and retain the 10-year/24-hour storm event from the Concentrated Animal Feeding Operation ("CAFO") area or, in the alternative, provide a closure plan to cease equestrian activities.

WHEREAS, on or about December 30, 2022, Prior Owner/Operator: (i) transferred their interest in the Facility and (ii) assigned and transferred all their right, title, claims of interest in, to and under the Original Consent Decree to Rialto Equestrian, LLC ("Rialto") via an Assignment of Consent Decree dated on or about December 30, 2022.

WHEREAS, on or about November 25, 2023 the Original Consent Decree terminated on the terms set forth therein.

WHEREAS, on January 13, 2025, Coastkeeper issued a 60-day Notice of Violation and Intent to Sue letter (the "Notice Letter") to SJCEC, its registered agents, the Administrator of the United States Environmental Protection Agency ("EPA"), the Executive Director of the State Water Resource Control Board (the "State Water Board"), the Executive Officer of the San Diego Regional Water Quality Control Board (the "Regional Water Board"), the Regional Administrator of EPA Regional IX, and the U.S. Attorney General alleging violations of the General Permit and Clean Water Act at the Facility;

WHEREAS, on March 19, 2025, Coastkeeper filed a Complaint against SJCEC (the "Complaint") in the United States District Court for the Central District of California (Civil Case No. 8:25-cv-00531) (hereinafter, the "Action");

WHEREAS, on January 17, 2025, SJCEC filed a certified Level 2 ERA Action Plan on the California Stormwater Multiple Applications and Report Tracking System ("SMARTS") attached hereto and incorporated by reference as Exhibit A;

WHEREAS, on May 9, 2025, SJCEC amended their SWPPP to revise their SWPPP team information, production areas, sampling locations, required BMPs, and site

Consent Decree                                                    Civil Case No. 8:25-cv-00531

map consistent with their Level 2 Action Plan for TSS. The revised SWPPP is attached hereto and incorporated by reference as Exhibit B;

**WHEREAS**, on March 18, 2025, SJCEC submitted a Time Scheduled Order ("TSO") application on SMARTS pursuant to <u>California Water Code section 13300</u> for the San Diego Regional Water Quality Control Board's ("SDRWCB") consideration as part of its ERA Level 2 Action Plan for total suspended solids ("TSS"). The TSO Time Schedule (Appendix A) is attached hereto and incorporated by reference as Exhibit C or Performance Schedule.

**WHEREAS**, on March 13, 2025, SJCEC submitted an updated NMP to SMARTS, attached hereto as Exhibit D;

**WHEREAS**, on January 31, 2025, Governor Gavin Newsom issued Executive Order N-16-25 in which he proclaimed: "The Department of Water Resources, the State Water Resources Control Board, the Natural Resources Agency, and the Environmental Protection Agency are directed to identify any obstacles that would hinder efforts to maximize diversions to storage of excess flows that become available as a result of the anticipated winter storms, to remove or minimize such obstacles whenever possible, and to promptly report to my office any additional statutory or regulatory barriers that should be considered for suspension;"

**WHEREAS**, Coastkeeper alleges SJCEC is violating the substantive and procedural requirements of the General Permit and Clean Water Act;

**WHEREAS**, SJCEC denies each of Coastkeeper's claims in the Notice Letter and the Complaint;

**WHEREAS,** since its acquisition of the property in 2022, SJCEC has spent and anticipates further spending a total amount of at least $1,000,000 to improve stormwater management at the Facility and implement this Consent Decree**;**

**WHEREAS,** since its acquisition of the property in 2022, SJCEC has reduced to number of horses boarded at the property from approximately 475 to 275 to improve stormwater management at the Facility and implement this Consent Decree;

**WHEREAS**, the Settling Parties agree it is in their mutual interest to enter into a Consent Decree in this Action setting forth terms and conditions appropriate to resolve the allegations set forth in the Notice Letter and the Complaint without further proceedings;

**WHEREAS**, SJCEC agrees to comply with the current version of the General Permit as interpreted by the Supreme court of the United States and subsequent lawful iterations by implementing a series of Best Management Practices in conformity with Attachment I of the Permit and Executive Order N-16-25;

**WHEREAS**, capitalized terms used but not defined herein shall have the meanings ascribed to them in the General Permit; and

**WHEREAS**, all actions taken by SJCEC pursuant to this Consent Decree shall be made in compliance with all applicable Federal and State laws and local rules and regulations.

**NOW THEREFORE, IT IS HEREBY STIPULATED BETWEEN THE SETTLING PARTIES AND ORDERED AND DECREED BY THE COURT AS FOLLOWS:**

1.    The Court has jurisdiction over the subject matter of this action pursuant to Section 505(a)(1)(A) of the Clean Water Act, 33 U.S.C. § 1365(a)(1)(A).

2.    Venue is appropriate in the U.S. District Court for the Central District of California pursuant to Section 505(c)(1) of the Clean Water Act, 33 U.S.C. § 1365(c)(1), because the Facility is located within this District.

3.    The Complaint states claims upon which relief may be granted pursuant to Section 505(a)(1) of the Clean Water Act, 33 U.S.C. § 1365(a)(1).

4.    Coastkeeper has standing to bring the Clean Water Act claims raised in the Notice Letter and Complaint.

5.    The Court shall retain jurisdiction over this matter for the purpose of enforcing the terms of this Consent Decree for the Term of the Consent Decree, or as long thereafter as it is necessary for the Court to resolve any motion to enforce this Consent Decree.

## I.    AGENCY REVIEW OF CONSENT DECREE

6.    Coastkeeper shall submit this Consent Decree to the United States Department of Justice and EPA (collectively, the "Federal Agencies") within three (3) business days of the final signature of the Settling Parties for agency review consistent with 40 C.F.R. § 135.5. The Federal Agencies' review period expires forty-five (45) days after receipt of this Consent Decree by the Federal Agencies, as evidenced by certified mail return receipts or other tracking information, copies of which shall be provided to SJCEC upon request.

7.    Coastkeeper shall notify the Court of the receipt date by the Federal Agencies, as required by 40 C.F.R. § 135.5, to coordinate the Court's calendar with the forty-five (45) day review period.

8.    Following the expiration of the Federal Agencies' forty-five (45) day review period, Coastkeeper shall submit the Consent Decree to the Court for entry.

## II.    DEFINITIONS

9.    Whenever the terms listed below are used in this Consent Decree, whether or not capitalized, the following definitions apply:

a.    "BMPs" means Best Management Practices as defined in Attachment C (Glossary) of the General Permit.

b.    "Consent Decree" means this Consent Decree and any attachments or documents incorporated by reference.

c.    "Day" means a calendar day. In computing any period under this Consent Decree, where the last day of such period is a Saturday, Sunday, or Federal or State Holiday, the period runs until the close of business on the next day that is not a Saturday, Sunday, or Federal or State Holiday.

d.    "Discharge Point" means each outfall and discharge location designated in the then-current SWPPP and Site Map for the Facility.

6

e.    "Effective Date" means the effective date of this Consent Decree, which shall be the Entry Date.

f.    "Entry Date" means the day this Consent Decree is approved and entered by the Court.

g.    "Forecasted Rain Event" means a rain event with a probability of fifty percent or greater to cumulatively result in one half inches of rain within the next twenty-four hours as determined by the National Oceanic and Atmospheric Administration (http://forecast.weather.gov) for "92675, San Juan Capistrano, CA, USA."

h.    "PPT" means Pollution Prevention Team as described in General Permit Section X.D.1.

i.    "Production Area" shall mean:

    i.    Horse Stalls

    ii.    Manure Management Areas

    iii.    Feed Management Areas

j.    "Qualified Industrial Storm Water Practitioner" or "QISP" shall have the definition set forth in Section IX.A.1 of the General Permit.

k.    "Qualifying Storm Event" or "QSE" shall have the definition set forth in Section XI.B.1 of the General Permit.

l.    "Reporting Year" means the period from July 1 of a given calendar year to June 30 of the following calendar year.

m.    "Sampling Photographs" means photographs of storm water discharge when samples are collected from a Qualifying Storm Event.

n.    "SMARTS" means the California State Water Resources Control Board's Stormwater Multiple Application and Report Tracking

7

System, located at

https://smarts.waterboards.ca.gov/smarts/faces/SwSmartsLogin.xhtml.

o.  "Storm Resistant Shelter" shall have the definition set forth in Section XVII.B.5 of the General Permit.

p.  "SWPPP" means a Storm Water Pollution Prevention Plan as defined in Section X of the General Permit.

q.  "Term" means the period between the Effective Date and the Termination Date.

r.  "Termination Date" means the date that all accrued monetary obligations in this Consent Decree have been met and one of the following events has occurred:

  i.  One (1) full Reporting Year after the completion of installation of the BMPs defined in Paragraphs 14 and 15 below, if no proceeding or process to enforce this Consent Decree was initiated prior to the end of the Reporting Year after completion of installation of the BMPs defined in Paragraphs 14 and 15 below, or seven (7) calendar days from the conclusion of any proceeding or process to enforce the Consent Decree initiated prior to the end of the Reporting Year after completion of installation of the BMPs defined in Paragraphs 14 and 15 below; or

  ii.  SJCEC satisfies the requirements of, and the Regional Board approves, a Notice of Termination pursuant to Section II.C of the General Permit or a Notice of Non-Applicability pursuant to Section XX.C of the General Permit, or all portions of the Facility where Regulated Industrial Activities occur, and

SJCEC provides written notification to Coastkeeper of the Regional Board's approval.

s.    "Wet Season" means the seven-month period beginning October 1 of any given calendar year and ending April 30 of the following calendar year.

## III.    COMMITMENTS OF THE SETTLING PARTIES

### A. Storm Water Pollution Control Best Management Practices

10.    Non-Storm Water Discharge Prohibition. SJCEC shall eliminate all non-storm water discharges ("NSWDs") to surface waters except those permitted by Section IV of the Permit as more fully described in Exhibit B.

11.    Current and Additional Best Management Practices. In addition to maintaining the current BMPs described in the Facility's SWPPP attached hereto as Exhibit B, SJCEC shall develop and implement the BMPs necessary to comply with the provisions of this Consent Decree and the General Permit as more fully described in Exhibit C and Paragraph 14 and 15 below.

12.    Rain Gauge/Sensor: SJCEC shall install and maintain an electronic rain gauge or sensor at the Facility within ten (10) days of the Effective Date. The rain gauge/sensor shall be capable of measuring precipitation down to at least 0.1 inches, and record start/stop times and non-cumulative precipitation for each rain event. During the Term, SJCEC shall collect data using the gauge/sensor for all precipitation events to the nearest 0.1 inch, including start/stop times. Data from the rain gauge/sensor shall be conclusive of precipitation quantities and timing for purposes of this Consent Decree provided, however, that the Parties agree that the rain gauge data shall not be conclusive of whether a discharge of storm water associated with industrial activities occurred or when such discharge commenced for the purposes of determining SJCEC's compliance with its obligations under the General Permit or this Consent Decree. If SJCEC fails to collect and analyze samples from four (4) QSEs during a Reporting Year, SJCEC shall make these records available for Coastkeeper's review via email within ten (10) business

9

days of the request for said documents by Coastkeeper, provided that Coastkeeper shall request said documents no more than twice during each calendar year of this Consent Decree. Rain gauge data and all communications between the Settling Parties related thereto, described herein, shall be deemed confidential as between the parties. SJCEC shall not be required to upload the rain gauge data to SMARTS. Coastkeeper shall not use the rain gauge data for any purpose other than as confidential and informational communication, or necessary as evidence in any dispute resolution proceeding.

13.    Drainage Study and Hydrologic Study. SJCEC has conducted a drainage study delineating the Production Ares and non-Production Area portions of the site as shown on the Site Map incorporated in Exhibit B.

14.    Production Area BMPs for the Facility. SJCEC shall implement the following BMPs for the Production Area, by the dates set forth in Exhibit C:

    a.  Eliminate contact with storm water in the stabling areas by constructing Storm Resistant Shelters;

    b.  Install roof gutters or other appropriate infrastructure to capture or infiltrate roof runoff from the stable areas where feasible in in conformity with Executive Order N-16-25;

    c.  Construct Storm Resistant Shelters for manure management and bin storage areas to avoid contact with storm water or capture and/or infiltrate all storm water for up to the 10-year, 24-hour storm;

    d.  Ensure that the Manure and Stall Waste Bunker captures and/or infiltrates all storm water for up to the 10-year, 24-hour storm;

15.    Site-wide BMPs: SJCEC shall implement the following BMPs for all non-Production drainage areas described in Exhibit B:

    a.  Install infiltration basins and/or infiltration trenches designed to infiltrate the 85th percentile storm;

    b.  Utilize the three existing on-site groundwater wells for monitoring to address possible groundwater contamination from the infiltration basins;

Consent Decree                                         Civil Case No. 8:25-cv-00531

c.  Ensure that all non-production areas maintain their status as non-production areas by implementing good housekeeping practices as described in Exhibit D.

d.  Ensure that all walkways and infiltration basins are maintained in accordance with the Operations and Maintenance plan set forth in Exhibit B.

16.  <u>Confirmation of Completion</u>. SJCEC shall complete implementation of the BMPs described in Paragraphs 14 and 15 by the dates set forth in Exhibit C. SJCEC shall provide Coastkeeper with written documentation, including photographs, demonstrating that the required BMPs have been implemented in compliance with Paragraphs 14 and 15 above within thirty (30) days of completion in each case.

## B. <u>Storm Water Sampling</u>

17.  <u>Sampling</u>. The following storm water monitoring procedures shall be implemented at the Facility:

a.  <u>Frequency</u>. SJCEC shall develop a monitoring program consistent with the General Permit Section XI. During the Term, SJCEC shall collect samples of storm water discharge when feasible based on safety conditions to permit such collection from each Discharge Point from at least four (4) QSEs, including, at minimum, the first two (2) QSEs during the first half of the Reporting Year and the second two (2) QSEs during the second half of the Reporting Year. If SJCEC is unable to collect samples from at least two (2) QSEs during the first half of the reporting year due to safety conditions or a lack of QSEs, it shall make every effort to collect all four (4) samples in the second half of the reporting year. Such sampling shall take place within the four (4) hour period required by the General Permit, Section XI.B.5. Should SJCEC be unable to collect the requisite number of samples, it shall provide a written explanation pursuant to General Permit, Section XVI. Once SJCEC

1    is complying with the On-Site Compliance Option under Attachment I of the

2    General Permit, SJCEC shall comply with the applicable monitoring and

3    reporting requirements set forth in the General Permit, Attachment I § II.H.

4    b.    <u>Documentation</u>. To document the storm water discharge and discharge

5    location, a PPT Member shall take Sampling Photographs.

6    c.    <u>Parameters</u>. All samples collected pursuant to this section shall be analyzed

7    for the parameters listed in the SWPPP attached hereto as Exhibit B or any

8    revisions thereto.

9    d.    <u>Lab</u>. Except for pH samples, a laboratory accredited by the State of

10   California shall analyze all samples collected pursuant to this Consent

11   Decree. Unless otherwise required by the General Permit, analysis of pH

12   shall be completed onsite using a calibrated instrument for pH in accordance

13   with the manufacturer's instructions.

14   e.    <u>Detection Limits</u>. SJCEC shall require that the laboratory use analytical

15   methods adequate to detect the individual parameters at or below the values

16   specified in Table 1 or the General Permit, whichever is lower.

17   f.    <u>Holding Time</u>. All samples collected from the Facility shall be delivered to

18   the laboratory and analyzed within the holding times required in 40 C.F.R.

19   Part 136.

20   g.    <u>Results</u>. SJCEC shall request that sample-analysis results and associated

21   chain of custody forms be reported to them within thirty (30) business days

22   of laboratory receipt of the sample.

23   h.    <u>Reporting</u>. SJCEC shall upload and certify on SMARTS the complete

24   laboratory results, including a copy of the Quality Assurance/Quality

25   Control and the laboratory report, for all samples collected at the Facility

26   pursuant to Paragraph 17 above within ten (10) days of receiving the

laboratory results, and shall notify Coastkeeper that the foregoing has been uploaded to SMARTS and certified within five (5) days of certification.

### D. <u>Visual Observations</u>

18.    <u>Storm Water Discharge Observations</u>. During the Term of this Consent Decree, SJCEC's PPT members shall conduct visual observations during the Facility's operating hours pursuant to Section XI.A.2 of the General Permit.

19.    <u>Monthly Visual Observations</u>. During the Term of this Consent Decree, SJCEC's PPT members shall conduct monthly visual observations of the Facility pursuant to General Permit § XI.A and as further described in its SWPPP. In addition, SJCEC's PPT members shall conduct visual inspections to ensure compliance with Exhibit B and Exhibit D and document compliance with this paragraph by completing the checklist attached hereto as Exhibit E [NEC-like checklist site-wide, to ensure facility staff don't accidentally expand production area].

### E.    <u>Employee Training</u>

20.    Within thirty (30) days of the Effective Date, SJCEC shall develop and implement an employee training program that meets the following requirements and ensures: (1) there are a sufficient number of employees at the Facility designated to achieve compliance with the Storm Water Permit and this Consent Decree (hereinafter and in Exhibit B referenced as "Pollution Prevention Team" or "PPT"); (2) such PPT members are properly trained to perform the required activities to maintain compliance with the Storm Water Permit, the Facility's SWPPP, and this Consent Decree; and (3) all full-time regular (non-temporary) non-clerical SJCEC employees at the Facility (hereinafter referenced as "ALL Employees") receive basic information regarding storm water housekeeping and best practices (the "Training Program"). At a minimum, the Training Program shall include the following:

a.    <u>Non-Storm Water Discharges</u>. PPT members shall be trained on the Storm Water Permit's prohibition of non-storm water discharges so that PPT

13

1    members know what non-storm water discharges are, that non-storm water

2    discharges can result from improper surface washing or the release of any

3    substance from the property, and how to detect and prevent non-storm water

4    discharges.

5    b.    The SWPPP and BMPs. SJCEC shall train all PPT members on the SWPPP

6          and, specifically, BMP implementation and/or maintenance, as applicable, to

7          ensure BMPs are implemented effectively to prevent the exposure of

8          pollutants to storm water and prevent the discharge of contaminated storm

9          water from the Facility. PPT members shall be trained on proper operational

10         procedures and control measures. All training of PPT members must include

11         the requirements of the Storm Water Permit and this Consent Decree

12         including the additional BMPs outlined in Exhibit B and C attached hereto.

13   c.    Visual Observation. SJCEC shall designate and train an adequate number of

14         PPT members sufficient to collect storm water samples as described in its

15         SWPPP and as required by General Permit Section XI.B. Such training shall

16         include the proper sampling protocols, including chain of custody

17         requirements, to ensure storm water samples are properly collected, stored,

18         and submitted to a certified laboratory.

19   d.    Storm Water Sampling. SJCEC shall designate an adequate number of PPT

20         members necessary to collect storm water samples as required by this

21         Consent Decree and the Storm Water Permit. The Training Program shall

22         include training of PPT members sufficient to ensure: (i) proper sampling

23         protocols, including chain of custody requirements, are followed at all times

24         and (ii) storm water samples are properly collected, stored, and submitted to

25         a certified laboratory as set forth in Exhibit B.

26   e.    Training Implementation. Training of at least two (2) PPT members

27         (hereinafter referenced as "Designated Trainers" or "DT") shall be provided

28                                                14

by a Qualified Industrial Storm Water Practitioner (a "QISP," as defined in Section IX.A of the Permit) familiar with the requirements of this Consent Decree and the Storm Water Permit. The Designated Trainers and/or the QISP shall provide the training set forth in Exhibit B.

f.    <u>Language</u>. The Training Program shall be conducted, and all training materials shall be made available, in the language in which the employee(s) participating in the Training Program are fluent. If necessary to accomplish the foregoing or where translation would otherwise contribute to: (i) staff comprehension of the Training Program and/or, (ii) compliance with this Consent Decree and the Storm Water Permit, SJCEC shall provide translation services at all training sessions and of all training materials.

g.    <u>Training Program Frequency – PPT Members</u>. The Training Program shall be repeated annually or more frequently as necessary as set forth in Exhibit B to ensure all PPT members are familiar with the requirements of this Consent Decree and the Storm Water Permit. PPT members shall, in any event, receive training prior to assuming responsibilities under the Storm Water Permit or this Consent Decree.

h.    <u>Training Program Frequency – Other Employees</u>.  Employees who are not PPT members shall receive an annual training and educational materials on good housekeeping and manure management for purposes of maintaining compliance with the Facility's SWPPP, NMP, and the Permit at least once annually as described in Exhibit C Section 3.1.1. Distribution and receipt of educational materials will be documented.

i.    <u>Boarder Education</u>. SJCEC shall develop a boarder education protocol to educate SJCEC's boarders and trainers on good housekeeping and manure management for purposes of maintaining compliance with the facility SWPPP, NMP, and Permit. SJCEC shall distribute educational materials to

boarders and trainers in compliance with this paragraph no less than once annually.

### F. **Nutrient Management Plan**

21. <u>Nutrient Management Plan</u>. SJCEC and Coastkeeper have met and conferred about SJCEC's NMP attached hereto as Exhibit D, which the Settling Parties agree at this time fully complies with the requirements of 40 Code of Federal Regulations ("C.F.R.") Section 122.42(e). The NMP is currently under review by the SDRWQCB. SJCEC shall amend their NMP as necessary based on any comments received from the SDRWQCB.

22. <u>Additional NMP Revisions</u>: Within thirty (30) days after any changes in Production Activities or other activities requiring changes to the NMP, SJCEC shall revise the then-current NMP to reflect such changes and shall submit the revised NMP to the SDRWQCB for review and approval. SJCEC shall notify Coastkeeper that the foregoing has been submitted to the SDRWQCB within ten (10) days of submission.

23. <u>Review of NMP</u>. For any NMP updates pursuant to Paragraph 21, Coastkeeper shall have thirty (30) days upon notification that a NMP revision has been submitted to the SDRWQB to provide SJCEC with comments. Coastkeeper waives its right to comment on SJCEC's NMP after the thirty (30) days have run. Within thirty (30) days of receiving Coastkeeper's comments on the NMP, if any, SJCEC shall consider each of the comments and proposed changes and either accept them or justify in writing why a change is not incorporated. The Settling Parties agree to work in good faith to resolve any disputes with respect to the NMP, and any remaining disputes will be resolved through timely initiation of the dispute resolution procedures in Section V below. Following its incorporation of proposed modifications or additions (if any) into the revised NMP, SJCEC shall upload the revised NMP to SMARTS.

a. All communications between the Settling Parties related to NMP revisions, as described in Paragraphs 22 and 23, shall be deemed confidential. The Settling Parties shall not use NMP communications for any purpose other than as

confidential and informational communications, or as necessary as evidence in any dispute resolution proceeding.

## G. Storm Water Pollution Prevention Plan

24. SWPPP: SJCEC and Coastkeeper have met and conferred about SJCEC's SWPPP attached hereto as Exhibit B, which the Settling Parties agree fully complies with the requirements of the General Permit and this Consent Decree at this time.

25. Additional SWPPP Revisions. Within thirty (30) days after any changes in industrial activities or sources of pollutants, changes to Discharge Points, or changes to sections of the SWPPP identified in the SWPPP as requiring a SWPPP revision (including, but not limited to, changes in Facility contacts or PPT members, changes or additions of BMPs, changes in or additions of industrial activities that impact storm water discharge, or changes and documentation required in connection with the On-Site Compliance Option as specified in the General Permit, Attachment I, Section II.H.S), SJCEC shall revise the then-current SWPPP to reflect such changes and shall upload and certify on SMARTS the revised SWPPP. SJCEC shall notify Coastkeeper that the foregoing has been uploaded to SMARTS and certified within ten (10) days of certification.

26. Review of SWPPP. For any SWPPP updates pursuant to Paragraph 25, Coastkeeper shall have thirty (30) days upon notification that a SWPPP revision has been uploaded to SMARTS to provide SJCEC with comments. Coastkeeper waives its right to comment on SJCEC's SWPPP after the thirty (30) days have run. Within thirty (30) days of receiving Coastkeeper's comments to the SWPPP, if any, SJCEC shall consider each of the comments and proposed changes and either accept them or justify in writing why a change is not incorporated. The Settling Parties agree to work in good faith to resolve any disputes with respect to the SWPPP, and any remaining disputes will be resolved through timely initiation of the dispute resolution procedures in Section V below. Following its incorporation of proposed modification or additions (if any) into each revised SWPPP,

SJCEC shall upload the revised SWPPP to SMARTS.

   a.  All communications between the Settling Parties related to SWPPP revisions, as described in Paragraph 25, shall be deemed confidential. The Settling Parties shall not use such SWPPP or communications for any purpose other than as a confidential and informational communications, or as necessary as evidence in any dispute resolution proceeding.

**H.  Performance Schedule**

27.  Performance Schedule. SJCEC shall comply with the Performance Schedule attached hereto as Exhibit C. Failure to comply with the Performance Schedule, or revise the schedule as permitted below, shall result in the imposition of stipulated penalties described in Paragraph 34.

   a.  Performance Schedule Revisions. The Performance Schedule may be revised only for good cause and with written consent of Coastkeeper. Good cause shall not include the financial position of SJCEC. Should SJCEC need to revise the Performance Schedule, SJCEC shall notify Coastkeeper as soon as it becomes aware of good cause for the revision, and seek a revision in writing. Coastkeeper shall have ten (10) days to respond to SJCEC's request for a revision. Upon a showing of good cause, Coastkeeper shall not unreasonably deny a request for a revision. Coastkeeper waives its right to comment on SJCEC's SWPPP after the thirty days have run. With the exception of a Force Majeure event, as defined in Paragraph 42, no extension of deadlines to evaluate site areas, design additional cover(s), or submit documents to outside agencies including but not limited to the City of San Juan Capistrano shall be extended beyond the deadlines outlined in Appendix A of the TSO request attached hereto as Exhibit C.

   b.  All communications between the Settling Parties related to Performance Schedule revisions, as described in Paragraph 31, shall be deemed

confidential. The Settling Parties shall not use such communications for any purpose other than as confidential and informational communications, or as necessary as evidence in any dispute resolution proceeding.

## I.    **Compliance Monitoring and Reporting**

28.    <u>Site Inspections</u>. Coastkeeper and its representatives may conduct one (1) wet weather site inspection and one (1) dry weather site inspection per year at the Facility during the Term of this Consent Decree. In addition, Coastkeeper and its representatives may conduct one (1) inspection upon the completion of the BMPs described in Paragraphs 14 and 15. In the event of a dispute between the Settling Parties regarding SJCEC's compliance with this Consent Decree and provided a site inspection would be relevant to resolving such dispute, Coastkeeper shall be entitled to an additional site inspection. Coastkeeper shall not unreasonably request, and SJCEC shall not unreasonably deny the additional site inspection.

a.    The site inspections shall occur Monday through Friday, excluding Federal and religious holidays, during normal business hours. Coastkeeper shall provide SJCEC with no less than seventy-two (72) hours' notice before any site inspection. Notice will be provided via electronic mail to the notice recipient(s) designated in Paragraph 46 below. For any site inspection requested to occur in wet weather, Coastkeeper shall be entitled to adjust timing during normal business hours or reschedule the inspection for an alternative date during normal business hours if the forecast changes and anticipated precipitation appears unlikely, and thus frustrates the purpose of visiting the Facility in wet weather. As used throughout this Paragraph 28.a, "normal business hours" shall mean and refer to the Facility operating hours as identified in the Facility's SWPPP. For any site inspection requested to occur during dry weather, either party shall have the option to reschedule within a reasonable time-period, not to exceed thirty (30) days from the

19

requested date. The Parties agree to meet in good faith to accommodate the needs and schedules of both Parties and their representatives to facilitate any dry weather inspection.

b. During the site inspections, Coastkeeper shall be allowed access to the Facility's SWPPP, storm water visual observation records, storm water employee training records, and other storm water monitoring records, reports, Sampling Photographs, and storm water sampling data for the Facility.

29. During the site inspections, Coastkeeper may inspect and collect samples of storm water discharges from the Facility and take photos and/or videos related to Storm Water Permit and/or Consent Decree compliance. A certified California laboratory shall analyze samples collected by Coastkeeper and copies of the lab reports and photographs shall be provided to SJCEC upon request.[3]

30. <u>Reporting and Document Provision</u>. During the Term of this Consent Decree, SJCEC shall copy Coastkeeper on all non-privileged documents related to storm water quality at the Facility that SJCEC submits to or receives from the Regional Board, the State Board, and/or any Federal, State, or local agency, county, or municipality, which are not uploaded to SMARTS Additionally, SJCEC shall maintain records as set forth in this Consent Decree, and shall provide Coastkeeper with copies of any records that demonstrate compliance with this Consent Decree within fourteen (14) days of receipt of Coastkeeper's written request.

## IV. ENVIRONMENTAL MITIGATION PROJECT, LITIGATION FEES AND COSTS, AND STIPULATED PENALTIES AND INTEREST

31. <u>Compliance Monitoring and Oversight</u>. SJCEC agrees to partially defray costs associated with Coastkeeper's monitoring of SJCEC's compliance with this Consent Decree in the amount of Forty-Five Thousand Dollars ($45,000) for an

---

[3] Any photographs provided to Coastkeeper shall be deemed confidential. Coastkeeper shall not use the photographs for any purpose other than as confidential and informational communication, or as necessary as evidence in any dispute resolution proceeding without written permission from SJCEC.

Consent Decree                                    Civil Case No. 8:25-cv-00531

anticipated term of four (4) years from the Effective Date. Further, such payment shall be made within thirty (30) days of the Effective Date. Payment shall be delivered via certified mail or overnight delivery to: Orange County Coastkeeper, Attn: Legal Department, 3151 Airway Avenue, Suite F-110, Costa Mesa, CA 92626, unless made via wire transfer.

32. <u>Environmentally Beneficial Project</u>. To fund environmentally beneficial project activities that will reduce or mitigate the impacts of storm water pollution from industrial activities occurring in the Arroyo Trabuco Creek Watershed, SJCEC agrees to make a payment totaling Ten Thousand Dollars ($10,000) to be made within thirty (30) days of the Entry Date, payable to "Trout Unlimited South Coast, #923" and sent via overnight mail to Trout Unlimited South Coast, #923, 3154 Glendale Blvd, 117, Los Angeles, California 90039. Failure to submit payment as required under this Paragraph will constitute breach of the Consent Decree.

33. <u>Coastkeeper's Fees and Costs</u>. To partially reimburse Coastkeeper for its investigation fees and costs, expert/consultant fees and costs, reasonable attorneys' fees, and other costs incurred as a result of investigating and filing the lawsuit and negotiating resolution of this matter, SJCEC shall pay a total of Fifty Thousand Dollars ($50,000) within thirty (30) days of the Effective Date, delivered via certified mail or overnight delivery to: Orange County Coastkeeper, Attn: Legal Department, 3151 Airway Avenue, Suite F-110, Costa Mesa, CA 92626, unless made via wire transfer.

34. <u>Stipulated Payment</u>. For any missed deadline, Coastkeeper shall promptly notify SJCEC in writing of the missed deadline and provide SJCEC no fewer than five (5) business days to cure. SJCEC shall make a stipulated remediation payment of Five Hundred Dollars ($500) per day for any and each missed deadline specified in this Consent Decree not previously extended in writing by the Settling Parties or cured upon notice by Coastkeeper. Payments for a missed deadline shall be made for the restoration and/or improvement of the watershed in the area affected by SJCEC's discharges and

shall be made to Trout Unlimited South Coast, #923 identified above and delivered via check or wire transfer. SJCEC agrees to make the stipulated payment within thirty (30) days of the missed deadline. SJCEC shall provide Coastkeeper with a copy of each such payment at the time it is made.

## V.    DISPUTE RESOLUTION

35.    <u>Court Enforcement Authority</u>. This Court shall retain jurisdiction over this matter for the Term of this Consent Decree for the purposes of enforcing the terms and conditions and adjudicating all disputes among the Settling Parties that may arise under the provisions of this Consent Decree. The Court shall have the power to enforce this Consent Decree with all available legal and equitable remedies, including contempt.

36.    <u>Meet and Confer</u>. The Settling Parties shall at all times work informally in good faith to address any issues that might arise concerning SJCEC's compliance with the Storm Water Permit and the Clean Water Act occurring or arising after the Effective Date of the Consent Decree, however; a Settling Party shall be able to invoke the dispute resolution procedures of this Section V by notifying all other Settling Parties in writing of the matter(s) in dispute and the disputing party's proposal for resolution. The Settling Parties shall then meet and confer in good faith (either telephonically or in person) within fourteen (14) calendar days from the date of the notice in an attempt to fully resolve the dispute within thirty (30) days. The Settling Parties may, but are not required to, elect to extend these time periods to resolve the dispute without court intervention.

37.    <u>Formal Resolution</u>. If the Settling Parties cannot resolve a dispute through the meet and confer process discussed above, the Settling Party initiating the dispute resolution provision may invoke formal dispute resolution by filing a motion before the United States District Court for the Central District of California. The Settling Parties agree to request an expedited hearing schedule on the motion.

38.    <u>Fees and Costs</u>. If intervention by the District Court is required, civil penalties and litigation costs and fees incurred in conducting the meet and confer or

otherwise addressing and/or resolving any dispute, including an alleged breach of this Consent Decree, shall be awarded to the prevailing or substantially prevailing party in accordance with the standard established by Section 505 of the Clean Water Act, 33 U.S.C. §§ 1365(d) and 1319(d), applicable case law interpreting such provisions, or as otherwise provided for by statute and/or case law.

## VI.    MUTUAL RELEASE OF LIABILITY AND COVENANT NOT TO SUE

39.    <u>Coastkeeper's Release</u>. Upon the Effective Date of this Consent Decree, Coastkeeper, on its own behalf and on behalf of its current and former officers, directors, employees, and each of their successors and assigns, and its agents, attorneys, and other representatives, hereby releases SJCEC and each of their current and former officers, directors, managers, members, employees, parents, subsidiaries, divisions, affiliates, insurers, landlords, lenders, shareholders and each of their predecessors, successors and assigns, and each of their agents, attorneys, consultants, and other representatives of and from, from and waives all claims which were or could have been asserted in Coastkeeper's Notice Letter and Complaint up to and including the Termination Date of this Consent Decree.

40.    <u>SJCEC's Release</u>. Upon the Effective Date of this Consent Decree,  SJCEC, on their own behalf and on behalf of their current and former officers, directors, employees, members, and each of their successors and assigns, and their agents, attorneys, and other representatives, hereby release Coastkeeper (and its current and former officers, directors, employees, members, parents, subsidiaries, and affiliates, and each of their successors and assigns, and its agents, attorneys, and other representatives) of and from, and waives all claims which arise from or pertain to this action, including all claims for fees (including fees of attorneys, experts, and others), costs, expenses or any other sum incurred or claimed for matters related to, or which could have been asserted in response to, Coastkeeper's Complaint up to and including the Termination Date of this Consent Decree, except for fees, costs, expenses or any other sum incurred or claimed

23

pursuant to Paragraph 33 this Consent Decree.

## VII.    MISCELLANEOUS PROVISIONS

41.    <u>No Admission of Liability</u>. The Parties enter into this Consent Decree for the purpose of avoiding prolonged and costly litigation on disputed claims. Neither this Consent Decree, the implementation of additional BMPs, nor any payment made pursuant to this Consent Decree shall constitute or be construed as a finding, adjudication, admission, or acknowledgment of any fact, law, or liability, nor as an admission of violation of any law, rule, or regulation. SJCEC maintains and reserves all defenses it may have to any alleged violations that may be raised in the future.

42.    <u>Force Majeure</u>. No Settling Party shall be considered to be in default in the performance of any of its respective obligations under this Consent Decree when performance becomes impossible due to an event of Force Majeure. Force Majeure is any event arising from: war; fire; earthquake; windstorm; flood or natural catastrophe; civil disturbance; vandalism; pandemic or public health threat; sabotage or terrorism; restraint by court order or public authority or agency; or action or non-action by, or inability to obtain the necessary authorizations or approvals from, any governmental agency. A Force Majeure shall not include normal inclement weather, economic hardship, inability to pay, or employee negligence. Any Settling Party seeking to rely upon this paragraph to excuse or postpone performance shall have the burden of establishing that it could not reasonably have been expected to avoid the Force Majeure event and that despite the exercise of due diligence has been unable to overcome the failure of performance. The Settling Parties shall exercise due diligence to resolve and remove any Force Majeure event. Delay in compliance with a specific obligation under this Consent Decree due to Force Majeure as defined in this paragraph shall not excuse or delay compliance with any or all other obligations required under this Consent Decree.

43.    <u>Construction</u>. The language in all parts of this Consent Decree shall be construed according to its plain and ordinary meaning, except as to those terms defined in

the Storm Water Permit, the Clean Water Act, or specifically herein. The captions and paragraph headings used in this Consent Decree are for reference only and shall not affect the construction of this Consent Decree.

44.    <u>Choice of Law</u>. The laws of the United States shall govern this Consent Decree.

45.    <u>Severability</u>. If any provision, paragraph, section, or sentence of this Consent Decree is held by a court to be unenforceable, the validity of the enforceable provisions shall not be adversely affected.

46.    <u>Correspondence</u>. All documents and/or notices required herein or any other correspondence pertaining to this Consent Decree shall be sent by electronic mail or, if electronic mail transmission is not feasible, via certified U.S. Mail with return receipt, or courier, as follows:

<u>If to Coastkeeper:</u>

Orange County Coastkeeper
Attn: Davina Shoumer
Email: davina@coastkeeper.org
3151 Airway Avenue, Suite F-110
Costa Mesa, California 92626

<u>If to SJCEC:</u>

San Juan Capistrano Equestrian Center LLC
Attn: Denise Haunert-Marshall
Email: densie@sjcec.net
26282 Oso Road
San Juan Capistrano, California 92675

<u>With a copy to:</u>

Environmental Law Group LLP
Attn: S. Wayne Rosenbaum
225 Broadway, Suite 1900
San Diego, CA 92101
swr@envirolawyer.com

Consent Decree                                                        Civil Case No. 8:25-cv-00531

Any change of address or addresses shall be communicated in the manner described above for giving notice. Notifications of communications shall be deemed submitted immediately after receipt via email or the next business day after having been deposited with U.S. mail or courier service.

47. <u>Effect of Consent Decree</u>. Nothing in this Consent Decree shall be construed to affect or limit in any way SJCEC's obligation to comply with all Federal, State, and local laws and regulations governing any activity required by this Consent Decree. Compliance with this Consent Decree shall not be deemed to constitute compliance with the Storm Water Permit, the Clean Water Act, or any other law, rule, or regulation.

48. <u>SJCEC Assignment or Sale of Property</u>. Subject only to the express conditions contained in this Consent Decree, all the rights, duties, and obligations contained in this Consent Decree shall inure to the benefit of and be binding upon the Settling Parties, and their successors and assigns. In the event a SJCEC transferee or assign ("SJCEC Assignee") will continue CAFO and industrial operations at the Facility, SJCEC shall notify Coastkeeper ten (10) days in advance of the proposed transfer or assignment ("the Assignment Notice") and within ten (10) days following the Assignment Notice, SJCEC will provide Coastkeeper with a written assignment and assumption duly executed by SJCEC and the SJCEC Assignee assigning SJCEC's obligations under this Consent Decree to the SJCEC Assignee. In the event SJCEC transfers, sells, or otherwise disposes of the Facility and underlying real property, SJCEC shall notify Coastkeeper ten (10) days in advance of the proposed transfer, sale, or disposition (the "Property Transfer Notice") and within ten (10) days following the Property Transfer Notice, SJCEC will provide Coastkeeper with a written assignment duly executed and acknowledged by SJCEC and the Facility transferee ("Facility Transferee") assigning SJCEC's obligations under this Consent Decree to the Property Transferee.

49. <u>Counterparts</u>. This Consent Decree may be executed in any number of

counterparts, all of which together shall constitute one original document. Email of a .pdf signature, and/or facsimile copies of original signature shall be deemed to be originally executed counterparts of this Consent Decree.

50.    Modification of the Consent Decree. This Consent Decree, and any provisions herein, may not be changed, waived, discharged, extended, or terminated unless by a written instrument, signed by the Settling Parties.

51.    Full Settlement. This Consent Decree constitutes a full and final settlement of this matter.

52.    Negotiated Settlement. The Settling Parties have negotiated this Consent Decree and agree that it shall not be construed against the party preparing it but shall be construed as if the Settling Parties jointly prepared this Consent Decree, and any uncertainty and/or ambiguity shall not be interpreted against any one party.

53.    Integration Clause. This is an integrated Consent Decree. This Consent Decree is intended to be a full and complete statement of the terms of the agreement between the Settling Parties and expressly supersedes all prior oral or written agreements covenants, representations, and warranties (express or implied) concerning the subject matter of this Consent Decree.

54.    Authority. The undersigned representatives for each Settling Party each certify s/he is fully authorized by the Settling Party whom s/he represents to enter into the terms and conditions of this Consent Decree. The Settling Parties certify that their undersigned representatives are fully authorized to enter into this Consent Decree, to execute it on behalf of the Settling Parties, and to legally bind the Settling Parties to its terms.

55.    Validity. The Settling Parties agree to be bound by this Consent Decree and not to contest its validity in any subsequent proceeding to implement or enforce its terms.

[Remainder of this page intentionally left blank]

Consent Decree                                        Civil Case No. 8:25-cv-00531

**IN WITNESS WHEREOF**, the undersigned have executed this Consent Decree as of the date first set forth below.

APPROVED AS TO CONTENT

Dated: _____July 10_____, 2025      By: _____
                                          Garry Brown
                                          Founder & President
                                          Orange County Coastkeeper

Dated: _____07/10/2025_____, 2025      By: _____
                                          Denise Haunert-Marshall
                                          Managing Director
                                          San Juan Capistrano Equestrian Center LLC

APPROVED AS TO FORM

                                          ORANGE COUNTY COASTKEEPER

Dated: _____July 10_____, 2025      By: _____
                                          Sarah Spinuzzi
                                          Legal Director for Orange County
                                          Coastkeeper

Dated: ___July 7_____, 2025      By: _____
                                          S. Wayne Rosenbaum
                                          Attorney for SJCEC

**IT IS SO ORDERED.**                     UNITED STATES DISTRICT COURT
                                          CENTRAL DISTRICT OF CALIFORNIA

Dated: September 15, 2025                 _____
                                          Honorable Judge James V. Selna

28

# EXHIBIT A



# Level 2
# Exceedance Response Action (ERA) Action Plan

San Juan Capistrano Equestrian Center

**Prepared for:**

*Equestrian Services II, Inc. dba*

*San Juan Capistrano Equestrian Center*

*26282 Oso Road*

*San Juan Capistrano, CA*

*92675*

**Prepared by:**

*John Gleason, QISP*

*M. S. Hatch Consulting, LLC*

*Irvine, California*

**Preparation Date:**

**January 17, 2025**

## Table of Contents

1.0   Introduction ........................................................................................................... 1

2.0   Requirements ........................................................................................................ 1

3.0   Facility Information and Background ...................................................................... 2

4.0   QISP Information ................................................................................................... 2

5.0   Drainage Areas and Existing BMPs ...................................................................... 2

6.0   Numeric Action Level Exceedances ...................................................................... 3

      6.1   Level 1 Status................................................................................................ 3

      6.2   Level 2 NAL Exceedance ............................................................................... 3

7.0   Potential Pollutant Source Evaluation ................................................................... 4

8.0   Best Management Practices Evaluation ................................................................ 5

      8.1   Best Management Practices Improvements................................................... 5

      8.2   BMPs Revision to SWPPP ............................................................................ 6

9.0   Level 2 ERA Technical Report .............................................................................. 6

10.0  Implementation Schedule ...................................................................................... 7

11.0  Evaluation and Report Completion/Submittal Information ..................................... 7

Level 2
Exceedance Response Action (ERA)
Action Plan

## 1.0    Introduction

This Level 2 Exceedance Response Action (ERA) Action Plan was prepared for Equestrian Services II, Inc., a California Corporation, for the San Juan Capistrano Equestrian Center (SJCEC) facility to comply with the requirements of the National Pollutant Discharge Elimination System (NPDES) General Permit for Storm Water Discharges Associated with Industrial Activities Order No. 2014-0057-DWQ (Industrial General Permit (IGP)).

Storm water laboratory analytical results for the 2023-2024 reporting year indicated that levels of Total Suspended Solids (TSS) were above the General Permit annual average Numeric Action Levels (NALs). TSS NALs were also exceeded in the 2022-2023 reporting year. This Level 2 ERA Action Plan addresses TSS exceedance.

As required by the Industrial General Permit, SJCEC completed a Level 1 ERA Evaluation and Report for 2022-2023 by M. S. Hatch Consulting, LLC. After further exceedance, this Level 2 ERA Action Plan was prepared under the direction of a Qualified Industrial Storm Water Practitioner (QISP). This Level 2 ERA Action Plan summarizes the findings of the Level 1 ERA Report, including an evaluation of corresponding Best Management Practices (BMPs) in the facility's Storm Water Pollution Prevention Plan (SWPPP), Level 2 NAL exceedance, and any additional BMPs necessary to minimize the risk for future NAL exceedances and to comply with the requirements of the IGP.

## 2.0    Requirements

Industrial General Permit Section XII.A requires Dischargers to perform sampling, analysis, and reporting in accordance with the Industrial General Permit and compare the results to the two types of NALs to determine whether either type of NAL has been exceeded for each applicable parameter. The following are the two types of potential NAL exceedances:

- An annual NAL exceedance occurs when the average of all sampling results for a given parameter within a reporting year at an individual facility exceeds the applicable annual NAL.

- An instantaneous maximum NAL exceedance occurs when two or more analytical results from samples taken at an individual facility for a single parameter within a reporting year exceed the applicable instantaneous maximum NAL. The Industrial General Permit has established instantaneous maximum NALs for total suspended solids, oil and grease, and pH.

A Discharger's status changes from Level 1 to Level 2 for any given parameter if sampling results indicate an annual or instantaneous maximum NAL exceedance for that same parameter. Level 2 status commences on July 1 following the reporting year during which the exceedance(s) occurred. In accordance with the General Permit, a Discharger's Level 2 status for a parameter will return to Baseline status once a Level 2 ERA Report has been completed, all identified additional BMPs have been implemented, and results from four consecutive Qualifying Storm

Events (QSEs) that were sampled after BMP implementation indicate no additional NAL exceedances for that parameter.

## 3.0    Facility Information and Background

SJCEC, owned by Equestrian Services II, Inc, is located at 26282 Oso Road in San Juan Capistrano, California. It is located at 33.512932° and -117.670359° and is identified on the Site Location Map provided in Figure 1. The facility is bounded by a residential area to the east, an equestrian facility to the south, Arroyo Trabuco Creek to the west, and the Shea Center (an equestrian facility) to the north. The entire site is approximately sixteen acres and approximately 40% impervious. Industrial activities (manure management, feed storage and bedding storage) occur in two drainage areas A3 (formerly DA5) and A4 (formerly DA6). The facility is open year-round and provides equestrian services such as horse boarding, horse training and riding lessons.

The facility is comprised of horse boarding stalls, arenas, horse wash racks, material storage areas, administrative buildings, and parking lots. The majority of the site is unpaved and is covered in sandy loose materials, required for horse and staff safety. The site drains east to west towards Arroyo Trabuco Creek, ultimately discharging into the San Juan Creek which discharges to the Pacific Ocean at Dana Point. The site contains a series of infiltration pits throughout the site to reduce runoff to Arroyo Trabuco Creek.

Upon deeming the facility as a Medium Concentrated Animal Feeding Operation (CAFO), the San Diego Regional Water Quality Control Board requested SJCEC enroll into the Industrial General Permit.[1] The Site Location Map is attached as Figure 1.

Site information is summarized in Table 3.1 below:

**Table 3.1: Facility Information**

| | |
|---|---|
| Facility Name | San Juan Capistrano Equestrian Center (SJCEC) |
| Address | 26282 Oso Road, San Juan Capistrano, CA 92675 |
| Waste Discharge Identification Number | 9 30I030112 |
| SIC Code | 0272 – Horses and Other Equines |

## 4.0    QISP Information

Dischargers in Level 2 status are required to designate a QISP to prepare a Level 2 ERA Action Plan. John Gleason at M.S. Hatch Consulting, LLC, QISP No. 00042, email: john.gleason@mshatch.com, prepared this Level 2 ERA Action Plan.

## 5.0    Drainage Areas and Existing BMPs

Since the ERA Level 1 for this project was completed, this facility has undergone changes to eliminate production area exposure. This included removing sunning stalls and other confined

---

[1] A facility is a deemed a Medium Concentrated Animal Feeding Operation if it falls within the size range 150-499 horses, as found in 40 Code of Federation Regulations, Chapter I, Subchapter N, Part 412, Subpart A Horse and Sheep.

animal facilities. The revised facility flow patterns and drainage are shown in Figure 1. The facility is comprised of nine drainage areas, two of which fall within the Industrial General Permit coverage area. Drainage Area A3 includes the uncovered manure bin storage area.  Drainage Area A4 includes the uncovered manure bin sump.  Table 5.1 below summarizes each drainage area where the facility engages in industrial activities, type of runoff it receives, and current BMPs

**Table 5.1: Industrial Drainage Areas and Existing BMPs**

| Drainage Area | Main Facilities | Runoff Characterization | Existing BMPs |
|---|---|---|---|
| A3 (formerly DA5) | Manure Storage Bin Area | TSS, bacteria, nutrients | 3 Gravel-filled infiltration pits, 1 open infiltration basin (no gravel), downgradient silt fencing and fiber rolls along creek edge of property |
| A4 (formerly DA6) | Manure Collection Sump Area | TSS, bacteria, nutrients | 3 Gravel-filled infiltration pits, 1 Manure Collection Sump, downgradient silt fencing and fiber rolls along creek edge of property |

in place.

The Existing BMP Map and Drainage Conditions are attached as Figure 1.

Because of the existing BMPs at A3, there has not been discharge from that drainage area. The sampling location for A4 has been modified to be directly below the production area manure sump area. Samples were previously collected at the edge of the property which allowed water commingling from non-production areas. The new sampling location will more directly sample from the production area should water overflow. However, water has not discharged from the A4 manure sump area.

## 6.0    Numeric Action Level Exceedances

### 6.1    Level 1 Status

Storm water laboratory analytical results for the 2022-2023 reporting year indicated that levels of Total Suspended Solids (TSS) were above the General Permit instantaneous and annual average NALs. In accordance with the IGP requirements for facilities in Level 1 status, the facility completed a Level 1 Evaluation, a Level 1 Report, and updated the facility's Stormwater Pollution Prevention Plan (SWPPP). The Level 1 Report was prepared for exceedances in drainage areas DA7 and DA8 which are no longer determined to be production areas based on recent changes to the facility and re-evaluation of production areas.

### 6.2    Level 2 NAL Exceedance

During the 2023-2024 stormwater season, the facility collected and analyzed stormwater samples from two storm events, one in January 2024 and one in February 2024. The analytical

results of these samples resulted in annual average and Instantaneous Maximum Numeric Action Level (NAL) exceedances for TSS.[2] A summary of 2023-2024 stormwater sampling results from two rain events is provided in Table 6.1 below. Note that the Level 1 ERA was for exceedances of TSS in drainage areas DA7 and DA8 that are no longer determined to be industrial areas after site renovation removed outdoor stalls and based on definition of confined animal production areas considered industrial sources. This Level 2 ERA Action Plan addresses the second year of exceedance of TSS, but it addresses a different drainage area than Level 1 ERA.

**Table 6.1: 2023 - 2024 Stormwater Sampling Results**

| Parameter | TSS |
|---|---|
| Annual Maximum NAL | 100 mg/L |
| Instantaneous Maximum NAL | 400 mg/L |
| 1/22/24 – DA6 | 2300 |
| 2/1/24 – DA6 | 1700 |
| Annual Average | 2000 |
| Status | Level 2 |

For the 2023 – 2024 rainy season TSS annual average and Instantaneous Maximum NAL exceedances occurred at discharge point DA6 (now A4). Sample results obtained through laboratory analysis are attached in Appendix A.

It is important to note that the sample location for DA6 was at the facility boundary downgradient of the actual production area. There was commingling with non-production area water prior to discharge. In fact, the drainage area DA6 manure sumps which are the production area upgradient did not discharge.

## 7.0    Potential Pollutant Source Evaluation

Exceedances for TSS at the facility were evaluated under the direction of the QISP. The evaluation focused on TSS and included the following:

- A review of the existing SWPPP and existing BMPs;
- A visual inspection of potential pollutant sources for TSS throughout the facility; and
- A review of the sampling and monthly monitoring data.

---

[2] An instantaneous maximum NAL exceedance occurs when two or more analytical results from samples taken for any parameter within a reporting year exceed the applicable instantaneous NAL value, as found on page 6 of the Industrial General Permit Factsheet.

**Total Suspended Solids TSS**

The primary source of suspended solids comes from non-production areas including arena footing and dirt walkways prevalent throughout the facility. Uncovered non-production areas in A4 are potential sources of sediment discharges during rain events due to the loose footing in arenas needed for horse health when riding. There was no discharge from the A4 manure sump area during the rain events.

## 8.0   Best Management Practices Evaluation

A description of existing BMPs at the facility can be found in Section 5.0. In addition to the minimum BMPs described in Section X.H.1 of the Industrial General Permit, the facility employed the following during the 2023 – 2024 reporting year:

- Open pits, gravel infiltration pits, silt fencing, fiber rolls, floc rolls, and gravel bags are inspected monthly and maintained as needed;

- All raw materials are kept under a covered structure to prevent materials from being exposed to storm water;

- All manure and bedding waste receptacles are covered until rain has ceased to prevent storm water runoff contamination;

- Manure bins are covered prior to rain events and hauled offsite 5-6 times per week and the manure bin storage area is swept as needed;

- Manure and bedding are removed from all areas of the site daily and collected in the manure sump for disposal.

### 8.1   Best Management Practices Improvements

1. Immediate corrective actions will be implemented on the site based on the guidance of the QISP. Anticipated completion date provided for each identified immediate corrective action.

    - Confirm as Required Upstream Infiltration Maintenance by June 1, 2025

        - Remove sediment that has been deposited into areas adjacent/upstream of the infiltration basins as applicable.
        - Extend the gravel aprons by adding additional rock where feasible based on the on-site conditions.
        - Inspect and deploy flock logs based on manufacturer's recommendations

    - Confirm as Required Basin Maintenance Anticipated by June 1, 2025

        - Remove additional sediment that has been deposited into the basins.
        - Repair any erosion on the internal side slopes of the basins.

- Continue weed management within the infiltration basins to maintain the infiltration basin capacity.
- Confirm as Required Perimeter Control BMPs Maintenance by June 1, 2025
  - Dispose of any degrading sediment control BMPs.
  - Replace degrading silt fence and ensure all silt fence is appropriately trenched in pursuant to the California Storm Water Quality Association (CASQA) Construction Handbook sediment Control Best Management Practice SE-1 Silt Fence factsheet where necessary.
  - Replace, trench and stake fiber roll every four feet per the CASQA SE-5 Fiber Roll factsheet where necessary.

2. Prepare SWPPP Amendment by March 1, 2025, in conjunction with the Level 2 ERA Action Plan. Submit and certify the Change of Information (COI) in SMARTS by March 1, 2025.

3. Continue implementation of the Nutrient Management Plan.

4. Design, permit, construct and operate a series of BMPs intended to meet the onsite alternative compliance option set forth in IGP Attachment I by January 1, 2027.

5. Submit request for a Time Scheduled Order (TSO) to the RWQCB pursuant to California Water Code sections 133300 and 13263.3 to address schedule for implementation of IGP Attachment I requirements by March 1, 2025.

6. Progress on the implementation of this action plan will be documented in the ERA Level 2 Technical Report by January 1, 2026.

### 8.2    BMPs Revision to SWPPP

- The SWPPP will be revised based on discussion in section 8.1 to define the updated BMP details such as Upstream Infiltration Maintenance, Basin Maintenance, and Perimeter Control BMPs Maintenance in A3 and A4, as required.

- Site maps and figures will be updated to reflect the changes to the BMPs and regulated industrial areas (production areas).

- Change in sample location for A4 to be immediately at downgradient edge of production area to minimize commingling with non-production area water.

## 9.0   Level 2 ERA Technical Report

A Level 2 ERA Technical Report will be prepared that describes the BMPs implemented as a part of the Level 2 ERA Plan and evaluates their performance in achieving NALs. The Level 2 ERA Technical Report shall be prepared by a QISP and be certified and submitted via SMARTS.

Level 2
Exceedance Response Action (ERA)
Action Plan

## 10.0  Implementation Schedule

The implementation schedule for the Proposed Consolidation Plan is provided below. The dates provided are subject to change based on subcontractor and material availability, and other unforeseen conditions.

## 11.0  Evaluation and Report Completion/Submittal Information

Table 11.1 below denotes the dates for report completion, planned SWPPP revision, and planned implementation date for the completion of the Proposed Consolidation Plan.

**Table 11.1: Evaluation and Report Completion/Submittal Information**

| | |
|---|---|
| Level 2 ERA Action Plan | January 17, 2025 |
| Level 2 ERA Technical Report | January 1, 2026 |
| SWPPP Revisions Completed | March 1, 2025 |
| Submit Request for Time Scheduled order to RWQCB | March 1, 2025 |
| Implement IGP Attachment I requirements | January 1, 2027 |

Level 2
Exceedance Response Action (ERA)
Action Plan

# Figure 1:

## Site Location Map



SAN JUAN CAPISTRANO EQUESTRIAN CENTER
26282 OSO RD
SAN JUAN CAPISTRANO, CA 92675
EXISTING CONDITION DRAINAGE EXHIBIT
January 2025

M. S. HATCH CONSULTING, LLC

Level 2
Exceedance Response Action (ERA)
Action Plan

9

# Appendix A:

## 2023-2024 Stormwater Sample Results – Laboratory Report



Enthalpy Analytical
931 West Barkley Ave
Orange, CA 92868
(714) 771-6900

enthalpy.com

| | |
|---|---|
| Lab Job Number: | 501244 |
| Report Level: | II |
| Report Date: | 02/27/2024 |

**Analytical Report** *prepared for:*

Wayne Rosenbaum
The Environmental Law Group, LLP
225 Broadway
Suite 1900
San Diego, CA 92101

Location: SJCEC

*Authorized for release by:*

Taylor Nasu, Project Manager
Taylor.Nasu@enthalpy.com

This data package has been reviewed for technical correctness and completeness. Release of this data has been authorized by the Laboratory Manager or the Manager's designee, as verified by the above signature which applies to this PDF file as well as any associated electronic data deliverable files. The results contained in this report meet all requirements of NELAP and pertain only to those samples which were submitted for analysis. This report may be reproduced only in its entirety.

CA ELAP# 1338, NELAP# 4038, SCAQMD LAP# 18LA0518, LACSD ID# 10105



# Sample Summary

Wayne Rosenbaum
The Environmental Law Group, LLP
225 Broadway
Suite 1900
San Diego, CA 92101

Lab Job #:         501244
Location:          SJCEC
Date Received:  02/01/24

| Sample ID | Lab ID | Collected | Matrix |
|-----------|--------|-----------|--------|
| DA-6 | 501244-001 | 02/01/24 07:45 | Water |
| DA-7 | 501244-002 | 02/01/24 09:35 | Water |
| DA-8 | 501244-003 | 02/01/24 08:30 | Water |

# ENTHALPY ANALYTICAL

**Enthalpy Analytical - Orange**
931 W. Barkley Avenue, Orange, CA 92868
Phone 714-771-6900

## Chain of Custody Record

Lab No: 501244
Page: 1 of 1

**Matrix:** A = Air  S = Soil/Solid
Water  DW = Drinking Wate  SD = Sediment
PP = Pure Product  SEA = Sea Water
SW = Swab  T = Tissue  WP = Wipe  O = Other

### Turn Around Time (rush by advanced notice only)

Standard: X  2 Day:  3 Day:
5 Day:  1 Day:  Custom TAT:

**Sample Receipt Temp:** 3.9/0.6 (lab use only)

**Preservatives:** 1 = Na₂S₂O₃  2 = HCl  3 = HNO₃  4 = H₂SO₄  5 = NaOH  6 = Other  W = O = Other

### CUSTOMER INFORMATION

| | |
|---|---|
| Company: | Environmental Law Group |
| Report To: | Wayne Rosenbaum |
| Email: | swr@envirolawyer.com |
| Address: | 225 Broadway, Ste 1900 |
| | San Diego, CA 92101 |
| Phone: | 619-518-6618 |
| Fax: | |

### PROJECT INFORMATION

| | |
|---|---|
| Quote #: | |
| Proj. Name: | SICEC |
| Proj. #: | |
| P.O. #: | |
| Address: | |
| Global ID: | |
| Sampled By: | |

### Analysis Request

| # | Sample ID | Sampling Date | Sampling Time | Matrix | Container No. / Size | Pres. | BOD | Total Suspended Solids | Total Nitrogen (N+N) | Ammonia as N | Oil & Grease | Total Phosphorous | E-Coli | pH (Field measurement only) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | DA-6 | 2-1-24 | 0745 | W | 6 /Various | MP/6pu | X | X | X | X | X | X | X | 0 |
| 2 | DA-7 | 2-1-24 | 0935 | W | 6/various | | X | X | X | X | X | X | X | 0 |
| 3 | DA-8 | 2-1-24 | 0830 | W | 6/various | ↓ | X | X | X | X | X | X | X | 0 |
| 4 | | | | | | | | | | | | | | |
| 5 | | | | | | | | | | | | | | |
| 6 | | | | | | | | | | | | | | |
| 7 | | | | | | | | | | | | | | |
| 8 | | | | | | | | | | | | | | |
| 9 | | | | | | | | | | | | | | |
| 10 | | | | | | | | | | | | | | |

**Test Instructions / Comments:**
E.Coli should assume dilutions to quantify up to 50,000 CFU/100 ml
Send sample results to John Gleason john.gleason@mshatch.com, Seneca Dykes seneca.dykes@mshatch.com, and Wayne Rosenbaum swr@envirolawyer.com

| | Signature | Print Name | Company / Title | Date / Time |
|---|---|---|---|---|
| Relinquished By: | | Ryan Trevas | Blame Tech /Sampler | 2-1-24 1025 |
| Received By: | | Eleanor Silvestri | E.A | 2/1/24 10:35 |
| Relinquished By: | | | | |
| Received By: | | | | |
| Relinquished By: | | | | |
| Received By: | | | | |

GES 10



# ENTHALPY
## ANALYTICAL

### SAMPLE ACCEPTANCE CHECKLIST

**Section 1**

Client: Environmental Law Group                     Project: SJCEC

Date Received: 2/1/24                     Sampler's Name Present:  ☐ Yes  ☑ No

**Section 2**

Sample(s) received in a cooler? ☑ Yes, How many? 1     ☐ No (skip section 2)     Sample Temp (°C) (No Cooler) : _____

Sample Temp (°C), One from each cooler:  #1: 3.9     #2: _____   #3: _____   #4: _____

*(Acceptance range is < 6°C but not frozen (for Microbiology samples, acceptance range is < 10°C but not frozen). It is acceptable for samples collected the same day as sample receipt to have a higher temperature as long as there is evidence that cooling has begun.)*

Shipping Information: _____

**Section 3**

Was the cooler packed with:  ☑ Ice   ☐ Ice Packs   ☐ Bubble Wrap   ☐ Styrofoam
☐ Paper   ☐ None   ☐ Other _____

Cooler Temp (°C):   #1: 0.6     #2: _____     #3: _____     #4: _____

| Section 4 | YES | NO | N/A |
|---|---|---|---|
| Was a COC received? | ✓ | | |
| Are sample IDs present? | ✓ | | |
| Are sampling dates & times present? | ✓ | | |
| Is a relinquished signature present? | ✓ | | |
| Are the tests required clearly indicated on the COC? | ✓ | | |
| Are custody seals present? | | ✓ | |
| If custody seals are present, were they intact? | | | ✓ |
| Are all samples sealed in plastic bags? (Recommended for Microbiology samples) | | ✓ | |
| Did all samples arrive intact? If no, indicate in Section 4 below. | ✓ | | |
| Did all bottle labels agree with COC? (ID, dates and times) | ✓ | | |
| Were the samples collected in the correct containers for the required tests? | ✓ | | |
| Are the containers labeled with the correct preservatives? | ✓ | | |
| Is there headspace in the VOA vials greater than 5-6 mm in diameter? | | | ✓ |
| Was a sufficient amount of sample submitted for the requested tests? | ✓ | | |

**Section 5  Explanations/Comments**




**Section 6**

For discrepancies, how was the Project Manager notified? ☐ Verbal  PM Initials: _____ Date/Time _____
☐ Email     (email sent to/on): _____ / _____

Project Manager's response:




Completed By: *Ofeena Sylvestine*     Date: **FEB 01 2024**

Enthalpy Analytical, a subsidiary of Montrose Environmental Group ,Inc.
931 W. Barkley Ave, Orange, CA 92868 • T: (714) 771-6900 • F: (714) 538-1209
www.enthalpy.com/socal
Sample Acceptance Checklist – Rev 4, 8/8/2017



# Analysis Results for 501244

Wayne Rosenbaum
The Environmental Law Group, LLP
225 Broadway
Suite 1900
San Diego, CA 92101

Lab Job #: 501244
Location: SJCEC
Date Received: 02/01/24

| Sample ID: DA-6 | Lab ID: 501244-001 | Collected: 02/01/24 07:45 |
|---|---|---|
| | Matrix: Water | |

| 501244-001 Analyte | Result | Qual | Units | RL | DF | Batch | Prepared | Analyzed | Chemist |
|---|---|---|---|---|---|---|---|---|---|
| **Method: EPA 1664A** | | | | | | | | | |
| Prep Method: METHOD | | | | | | | | | |
| Total Oil and Grease | ND | | mg/L | 4.9 | 0.97 | 333211 | 02/16/24 | 02/17/24 | CKN |
| **Method: EPA 351.2** | | | | | | | | | |
| Prep Method: METHOD | | | | | | | | | |
| Nitrogen, Total Kjeldahl | **9.3** | | mg/L | 0.80 | 2 | 333947 | 02/27/24 | 02/27/24 | JTS |
| **Method: EPA 353.2** | | | | | | | | | |
| Prep Method: METHOD | | | | | | | | | |
| Nitrogen, Nitrate/Nitrite | **0.71** | | mg/L | 0.10 | 1 | 332926 | 02/13/24 | 02/13/24 | DAD |
| **Method: SM 4500-H+ B** | | | | | | | | | |
| Field pH | **6.0** | | SU | | 1 | 332559 | 02/01/24 07:45 | 02/01/24 07:45 | 000 |
| **Method: SM 4500-NH3-G** | | | | | | | | | |
| Ammonia-N | **0.29** | | mg/L | 0.10 | 1 | 333660 | 02/23/24 | 02/23/24 | JTS |
| **Method: SM 4500-P-B5-E** | | | | | | | | | |
| Phosphorus | **2.9** | | mg/L | 0.10 | 5 | 332504 | 02/08/24 | 02/15/24 | JAK |
| **Method: SM 9223Bb** | | | | | | | | | |
| Coliform, Total | **>120,000** | | MPN/100ml | 50 | 50 | 332023 | 02/01/24 11:28 | 02/02/24 12:36 | ELV |
| Coliform, E. Coli | **>120,000** | | MPN/100ml | 50 | 50 | 332023 | 02/01/24 11:28 | 02/02/24 12:36 | ELV |
| **Method: SM2540D** | | | | | | | | | |
| Prep Method: METHOD | | | | | | | | | |
| Total Suspended Solids | **1,700** | | mg/L | 0.5 | 1 | 332120 | 02/03/24 | 02/05/24 | DXA |
| **Method: SM5210B** | | | | | | | | | |
| Prep Method: METHOD | | | | | | | | | |
| Biochemical Oxygen Demand | **6.6** | | mg/L | 3.0 | 1 | 332033 | 02/02/24 14:56 | 02/07/24 14:00 | WWC |
| **Method: TOTAL NITROGEN** | | | | | | | | | |
| Total Nitrogen | **10** | | mg/L | | 1 | 334056 | 02/27/24 | 02/27/24 | JTS |

Results for any subcontracted analyses are not included in this section.



# Analysis Results for 501244

| Sample ID:  DA-7 | Lab ID:  501244-002 | Collected:  02/01/24 09:35 |
|---|---|---|
| | Matrix:  Water | |

| 501244-002 Analyte | Result | Qual | Units | RL | DF | Batch | Prepared | Analyzed | Chemist |
|---|---|---|---|---|---|---|---|---|---|
| **Method: EPA 1664A** | | | | | | | | | |
| Prep Method: METHOD | | | | | | | | | |
| Total Oil and Grease | ND | | mg/L | 4.9 | 0.98 | 333211 | 02/16/24 | 02/17/24 | CKN |
| **Method: EPA 351.2** | | | | | | | | | |
| Prep Method: METHOD | | | | | | | | | |
| Nitrogen, Total Kjeldahl | **5.4** | | mg/L | 0.40 | 1 | 333947 | 02/27/24 | 02/27/24 | JTS |
| **Method: EPA 353.2** | | | | | | | | | |
| Prep Method: METHOD | | | | | | | | | |
| Nitrogen, Nitrate/Nitrite | **1.4** | | mg/L | 0.10 | 1 | 332926 | 02/13/24 | 02/13/24 | DAD |
| **Method: SM 4500-H+ B** | | | | | | | | | |
| Field pH | **6.0** | | SU | | 1 | 332559 | 02/01/24 09:35 | 02/01/24 09:35 | 000 |
| **Method: SM 4500-NH3-G** | | | | | | | | | |
| Ammonia-N | **0.25** | | mg/L | 0.10 | 1 | 333660 | 02/23/24 | 02/23/24 | JTS |
| **Method: SM 4500-P-B5-E** | | | | | | | | | |
| Phosphorus | **2.7** | | mg/L | 0.10 | 5 | 332504 | 02/08/24 | 02/15/24 | JAK |
| **Method: SM 9223Bb** | | | | | | | | | |
| Coliform, Total | **>120,000** | | MPN/100ml | 50 | 50 | 332023 | 02/01/24 11:28 | 02/02/24 12:36 | ELV |
| Coliform, E. Coli | **99,000** | | MPN/100ml | 50 | 50 | 332023 | 02/01/24 11:28 | 02/02/24 12:36 | ELV |
| **Method: SM2540D** | | | | | | | | | |
| Prep Method: METHOD | | | | | | | | | |
| Total Suspended Solids | **1,100** | | mg/L | 0.5 | 1 | 332120 | 02/03/24 | 02/05/24 | DXA |
| **Method: SM5210B** | | | | | | | | | |
| Prep Method: METHOD | | | | | | | | | |
| Biochemical Oxygen Demand | ND | | mg/L | 3.0 | 1 | 332033 | 02/02/24 15:00 | 02/07/24 14:00 | WWC |
| **Method: TOTAL NITROGEN** | | | | | | | | | |
| Total Nitrogen | **6.8** | | mg/L | | 1 | 334056 | 02/27/24 | 02/27/24 | JTS |

Results for any subcontracted analyses are not included in this section.



# Analysis Results for 501244

| Sample ID: DA-8 | Lab ID: 501244-003 | Collected: 02/01/24 08:30 |
|---|---|---|
| | Matrix: Water | |

| 501244-003 Analyte | Result | Qual | Units | RL | DF | Batch | Prepared | Analyzed | Chemist |
|---|---|---|---|---|---|---|---|---|---|
| **Method: EPA 1664A** | | | | | | | | | |
| Prep Method: METHOD | | | | | | | | | |
| Total Oil and Grease | ND | | mg/L | 4.8 | 0.96 | 333211 | 02/16/24 | 02/17/24 | CKN |
| **Method: EPA 351.2** | | | | | | | | | |
| Prep Method: METHOD | | | | | | | | | |
| Nitrogen, Total Kjeldahl | **3.0** | | mg/L | 0.40 | 1 | 333947 | 02/27/24 | 02/27/24 | JTS |
| **Method: EPA 353.2** | | | | | | | | | |
| Prep Method: METHOD | | | | | | | | | |
| Nitrogen, Nitrate/Nitrite | **0.88** | | mg/L | 0.10 | 1 | 332926 | 02/13/24 | 02/13/24 | DAD |
| **Method: SM 4500-H+ B** | | | | | | | | | |
| Field pH | **6.0** | | SU | | 1 | 332559 | 02/01/24 08:30 | 02/01/24 08:30 | 000 |
| **Method: SM 4500-NH3-G** | | | | | | | | | |
| Ammonia-N | **0.41** | | mg/L | 0.10 | 1 | 333660 | 02/23/24 | 02/23/24 | JTS |
| **Method: SM 4500-P-B5-E** | | | | | | | | | |
| Phosphorus | **0.96** | | mg/L | 0.020 | 1 | 332504 | 02/08/24 | 02/15/24 | JAK |
| **Method: SM 9223Bb** | | | | | | | | | |
| Coliform, Total | **>120,000** | | MPN/100ml | 50 | 50 | 332023 | 02/01/24 11:28 | 02/02/24 12:36 | ELV |
| Coliform, E. Coli | **87,000** | | MPN/100ml | 50 | 50 | 332023 | 02/01/24 11:28 | 02/02/24 12:36 | ELV |
| **Method: SM2540D** | | | | | | | | | |
| Prep Method: METHOD | | | | | | | | | |
| Total Suspended Solids | **230** | | mg/L | 0.5 | 1 | 332120 | 02/03/24 | 02/05/24 | DXA |
| **Method: SM5210B** | | | | | | | | | |
| Prep Method: METHOD | | | | | | | | | |
| Biochemical Oxygen Demand | **6.8** | | mg/L | 3.0 | 1 | 332033 | 02/02/24 15:01 | 02/07/24 14:00 | WWC |
| **Method: TOTAL NITROGEN** | | | | | | | | | |
| Total Nitrogen | **3.9** | | mg/L | | 1 | 334056 | 02/27/24 | 02/27/24 | JTS |

> Value exceeds indicated concentration
ND Not Detected



# Batch QC

| Type: | **Blank** | Lab ID: | **QC1128800** | Batch: | **333211** |
|---|---|---|---|---|---|
| Matrix: | **Water** | Method: | **EPA 1664A** | Prep Method: | **METHOD** |

| QC1128800 Analyte | Result | Qual | Units | RL | Prepared | Analyzed |
|---|---|---|---|---|---|---|
| Total Oil and Grease | ND | | mg/L | 5.0 | 02/16/24 | 02/17/24 |

| Type: | **Lab Control Sample** | Lab ID: | **QC1128801** | Batch: | **333211** |
|---|---|---|---|---|---|
| Matrix: | **Water** | Method: | **EPA 1664A** | Prep Method: | **METHOD** |

| QC1128801 Analyte | Result | Spiked | Units | Recovery | Qual | Limits |
|---|---|---|---|---|---|---|
| Total Oil and Grease | 36.60 | 40.00 | mg/L | 92% | | 78-114 |

| Type: | **Lab Control Sample Duplicate** | Lab ID: | **QC1128802** | Batch: | **333211** |
|---|---|---|---|---|---|
| Matrix: | **Water** | Method: | **EPA 1664A** | Prep Method: | **METHOD** |

| QC1128802 Analyte | Result | Spiked | Units | Recovery | Qual | Limits | RPD | RPD Lim |
|---|---|---|---|---|---|---|---|---|
| Total Oil and Grease | 34.70 | 40.00 | mg/L | 87% | | 78-114 | 5 | 18 |

| Type: | **Lab Control Sample** | Lab ID: | **QC1131663** | Batch: | **333947** |
|---|---|---|---|---|---|
| Matrix: | **Water** | Method: | **EPA 351.2** | Prep Method: | **METHOD** |

| QC1131663 Analyte | Result | Spiked | Units | Recovery | Qual | Limits |
|---|---|---|---|---|---|---|
| Nitrogen, Total Kjeldahl | 5.384 | 5.000 | mg/L | 108% | | 90-110 |

| Type: | **Blank** | Lab ID: | **QC1131664** | Batch: | **333947** |
|---|---|---|---|---|---|
| Matrix: | **Water** | Method: | **EPA 351.2** | Prep Method: | **METHOD** |

| QC1131664 Analyte | Result | Qual | Units | RL | Prepared | Analyzed |
|---|---|---|---|---|---|---|
| Nitrogen, Total Kjeldahl | ND | | mg/L | 0.40 | 02/27/24 | 02/27/24 |

| Type: | **Matrix Spike** | Lab ID: | **QC1131705** | Batch: | **333947** |
|---|---|---|---|---|---|
| Matrix (Source ID): | **Water (503024-001)** | Method: | **EPA 351.2** | Prep Method: | **METHOD** |

| QC1131705 Analyte | Result | Source Sample Result | Spiked | Units | Recovery | Qual | Limits | DF |
|---|---|---|---|---|---|---|---|---|
| Nitrogen, Total Kjeldahl | 5.608 | 0.4107 | 5.000 | mg/L | 104% | | 90-110 | 1 |

| Type: | **Matrix Spike Duplicate** | Lab ID: | **QC1131706** | Batch: | **333947** |
|---|---|---|---|---|---|
| Matrix (Source ID): | **Water (503024-001)** | Method: | **EPA 351.2** | Prep Method: | **METHOD** |

| QC1131706 Analyte | Result | Source Sample Result | Spiked | Units | Recovery | Qual | Limits | RPD | RPD Lim | DF |
|---|---|---|---|---|---|---|---|---|---|---|
| Nitrogen, Total Kjeldahl | 5.620 | 0.4107 | 5.000 | mg/L | 104% | | 90-110 | 0 | 20 | 1 |



# Batch QC

| Type: | **Matrix Spike** | Lab ID: | **QC1131707** | Batch: | **333947** |
|---|---|---|---|---|---|
| Matrix (Source ID): | **Water (503093-003)** | Method: | **EPA 351.2** | Prep Method: | **METHOD** |

| QC1131707 Analyte | Result | Source Sample Result | Spiked | Units | Recovery | Qual | Limits | DF |
|---|---|---|---|---|---|---|---|---|
| Nitrogen, Total Kjeldahl | 5.614 | 0.2239 | 5.000 | mg/L | 108% | | 90-110 | 1 |

| Type: | **Matrix Spike Duplicate** | Lab ID: | **QC1131708** | Batch: | **333947** |
|---|---|---|---|---|---|
| Matrix (Source ID): | **Water (503093-003)** | Method: | **EPA 351.2** | Prep Method: | **METHOD** |

| QC1131708 Analyte | Result | Source Sample Result | Spiked | Units | Recovery | Qual | Limits | RPD | RPD Lim | DF |
|---|---|---|---|---|---|---|---|---|---|---|
| Nitrogen, Total Kjeldahl | 5.630 | 0.2239 | 5.000 | mg/L | 108% | | 90-110 | 0 | 20 | 1 |

| Type: | **Blank** | Lab ID: | **QC1127879** | Batch: | **332926** |
|---|---|---|---|---|---|
| Matrix: | **Water** | Method: | **EPA 353.2** | Prep Method: | **METHOD** |

| QC1127879 Analyte | Result | Qual | Units | RL | Prepared | Analyzed |
|---|---|---|---|---|---|---|
| Nitrogen, Nitrate/Nitrite | ND | | mg/L | 0.10 | 02/13/24 | 02/13/24 |

| Type: | **Lab Control Sample** | Lab ID: | **QC1127880** | Batch: | **332926** |
|---|---|---|---|---|---|
| Matrix: | **Water** | Method: | **EPA 353.2** | Prep Method: | **METHOD** |

| QC1127880 Analyte | Result | Spiked | Units | Recovery | Qual | Limits |
|---|---|---|---|---|---|---|
| Nitrogen, Nitrate/Nitrite | 1.032 | 1.000 | mg/L | 103% | | 80-120 |

| Type: | **Matrix Spike** | Lab ID: | **QC1127881** | Batch: | **332926** |
|---|---|---|---|---|---|
| Matrix (Source ID): | **Water (501244-001)** | Method: | **EPA 353.2** | Prep Method: | **METHOD** |

| QC1127881 Analyte | Result | Source Sample Result | Spiked | Units | Recovery | Qual | Limits | DF |
|---|---|---|---|---|---|---|---|---|
| Nitrogen, Nitrate/Nitrite | 1.668 | 0.7104 | 1.000 | mg/L | 96% | | 80-120 | 1 |

| Type: | **Matrix Spike Duplicate** | Lab ID: | **QC1127882** | Batch: | **332926** |
|---|---|---|---|---|---|
| Matrix (Source ID): | **Water (501244-001)** | Method: | **EPA 353.2** | Prep Method: | **METHOD** |

| QC1127882 Analyte | Result | Source Sample Result | Spiked | Units | Recovery | Qual | Limits | RPD | RPD Lim | DF |
|---|---|---|---|---|---|---|---|---|---|---|
| Nitrogen, Nitrate/Nitrite | 1.677 | 0.7104 | 1.000 | mg/L | 97% | | 80-120 | 1 | 20 | 1 |

| Type: | **Lab Control Sample** | Lab ID: | **QC1130254** | Batch: | **333660** |
|---|---|---|---|---|---|
| Matrix: | **Water** | Method: | **SM 4500-NH3-G** | | |

| QC1130254 Analyte | Result | Spiked | Units | Recovery | Qual | Limits |
|---|---|---|---|---|---|---|
| Ammonia-N | 2.262 | 2.500 | mg/L | 90% | | 80-120 |



# Batch QC

| Type: Blank | Lab ID: QC1130255 | Batch: 333660 |
|---|---|---|
| Matrix: Water | Method: SM 4500-NH3-G | |

| QC1130255 Analyte | Result | Qual | Units | RL | Prepared | Analyzed |
|---|---|---|---|---|---|---|
| Ammonia-N | ND | | mg/L | 0.10 | 02/23/24 | 02/23/24 |

| Type: Matrix Spike | Lab ID: QC1130256 | Batch: 333660 |
|---|---|---|
| Matrix (Source ID): Water (501793-001) | Method: SM 4500-NH3-G | |

| QC1130256 Analyte | Result | Source Sample Result | Spiked | Units | Recovery | Qual | Limits | DF |
|---|---|---|---|---|---|---|---|---|
| Ammonia-N | 4.577 | 0.1545 | 5.000 | mg/L | 88% | | 80-120 | 2 |

| Type: Matrix Spike Duplicate | Lab ID: QC1130257 | Batch: 333660 |
|---|---|---|
| Matrix (Source ID): Water (501793-001) | Method: SM 4500-NH3-G | |

| QC1130257 Analyte | Result | Source Sample Result | Spiked | Units | Recovery | Qual | Limits | RPD | RPD Lim | DF |
|---|---|---|---|---|---|---|---|---|---|---|
| Ammonia-N | 4.708 | 0.1545 | 5.000 | mg/L | 91% | | 80-120 | 3 | 20 | 2 |

| Type: Blank | Lab ID: QC1126586 | Batch: 332504 |
|---|---|---|
| Matrix: Water | Method: SM 4500-P-B5-E | |

| QC1126586 Analyte | Result | Qual | Units | RL | Prepared | Analyzed |
|---|---|---|---|---|---|---|
| Phosphorus | ND | | mg/L | 0.020 | 02/08/24 | 02/15/24 |

| Type: Lab Control Sample | Lab ID: QC1126587 | Batch: 332504 |
|---|---|---|
| Matrix: Water | Method: SM 4500-P-B5-E | |

| QC1126587 Analyte | Result | Spiked | Units | Recovery | Qual | Limits |
|---|---|---|---|---|---|---|
| Phosphorus | 0.3650 | 0.4000 | mg/L | 91% | | 80-120 |

| Type: Matrix Spike | Lab ID: QC1126588 | Batch: 332504 |
|---|---|---|
| Matrix (Source ID): Water (501397-003) | Method: SM 4500-P-B5-E | |

| QC1126588 Analyte | Result | Source Sample Result | Spiked | Units | Recovery | Qual | Limits | DF |
|---|---|---|---|---|---|---|---|---|
| Phosphorus | 0.3940 | ND | 0.4000 | mg/L | 95% | | 75-125 | 1 |

| Type: Matrix Spike Duplicate | Lab ID: QC1126589 | Batch: 332504 |
|---|---|---|
| Matrix (Source ID): Water (501397-003) | Method: SM 4500-P-B5-E | |

| QC1126589 Analyte | Result | Source Sample Result | Spiked | Units | Recovery | Qual | Limits | RPD | RPD Lim | DF |
|---|---|---|---|---|---|---|---|---|---|---|
| Phosphorus | 0.4100 | ND | 0.4000 | mg/L | 99% | | 75-125 | 4 | 20 | 1 |

# Batch QC

| Type: | **Blank** | Lab ID: | **QC1125403** | Batch: | **332120** |
|---|---|---|---|---|---|
| Matrix: | **Water** | Method: | **SM2540D** | Prep Method: | **METHOD** |

| QC1125403 Analyte | Result | Qual | Units | RL | Prepared | Analyzed |
|---|---|---|---|---|---|---|
| Total Suspended Solids | ND | | mg/L | 0.5 | 02/03/24 | 02/05/24 |

| Type: | **Sample Duplicate** | Lab ID: | **QC1125404** | Batch: | **332120** |
|---|---|---|---|---|---|
| Matrix (Source ID): | **Water (501207-001)** | Method: | **SM2540D** | Prep Method: | **METHOD** |

| QC1125404 Analyte | Result | Source Sample Result | Units | Qual | RPD | RPD Lim | DF |
|---|---|---|---|---|---|---|---|
| Total Suspended Solids | 276.2 | 275.0 | mg/L | | 0 | 5 | 1 |

| Type: | **Sample Duplicate** | Lab ID: | **QC1125405** | Batch: | **332120** |
|---|---|---|---|---|---|
| Matrix (Source ID): | **Water (501244-001)** | Method: | **SM2540D** | Prep Method: | **METHOD** |

| QC1125405 Analyte | Result | Source Sample Result | Units | Qual | RPD | RPD Lim | DF |
|---|---|---|---|---|---|---|---|
| Total Suspended Solids | 1,692 | 1739 | mg/L | | 3 | 5 | 1 |

| Type: | **Blank** | Lab ID: | **QC1125077** | Batch: | **332033** |
|---|---|---|---|---|---|
| Matrix: | **Water** | Method: | **SM5210B** | Prep Method: | **METHOD** |

| QC1125077 Analyte | Result | Qual | Units | RL | Prepared | Analyzed |
|---|---|---|---|---|---|---|
| Biochemical Oxygen Demand | ND | | mg/L | 3.0 | 02/02/24 14:30 | 02/07/24 14:00 |

| Type: | **Lab Control Sample** | Lab ID: | **QC1125078** | Batch: | **332033** |
|---|---|---|---|---|---|
| Matrix: | **Water** | Method: | **SM5210B** | Prep Method: | **METHOD** |

| QC1125078 Analyte | Result | Spiked | Units | Recovery | Qual | Limits |
|---|---|---|---|---|---|---|
| Biochemical Oxygen Demand | 193.0 | 198.0 | mg/L | 97% | | 84.6-115.4 |

| Type: | **Sample Duplicate** | Lab ID: | **QC1125079** | Batch: | **332033** |
|---|---|---|---|---|---|
| Matrix (Source ID): | **Water (500971-001)** | Method: | **SM5210B** | Prep Method: | **METHOD** |

| QC1125079 Analyte | Result | Source Sample Result | Units | Qual | RPD | RPD Lim | DF |
|---|---|---|---|---|---|---|---|
| Biochemical Oxygen Demand | 1,178 | 1257 | mg/L | | 6 | 30 | 1 |

ND   Not Detected

# EXHIBIT B

# SAN JUAN CAPISTRANO EQUESTRIAN CENTER

## STORM WATER POLLUTION PREVENTION PLAN (SWPPP)

### CITY OF SAN JUAN CAPISTRANO
### ORANGE COUNTY, CALIFORNIA

### WASTE DISCHARGE IDENTIFICATION (WDID): 9 30I030112

**PREPARED FOR:**

SAN JUAN CAPISTRANO EQUESTRIAN CENTER
26282 Oso Road, San Juan Capistrano, CA 92675
San Juan Capistrano, CA 92675

**REVISED SWPPP PREPARED BY:**

M.S. Hatch Consulting
14252 Culver Drive, Suite A, Mailbox #276
Irvine, CA 92604
www.mshatch.com

**DATE PREPARED:  FEBRUARY 2, 2023**

**DATE REVISED:  MARCH 21, 2023, JUNE 13, 2023, JULY 1, 2025**

# TABLE OF CONTENTS

1.0     INTRODUCTION ................................................................................. 5

    1.1     Plan Objectives ............................................................ 6
    1.2     Regulatory Background ................................................. 6
    1.3     Plan Compliance Modifications (General Permit Section X.D.2) ............... 6
    1.4     Plan Availability and Records Retention (General Permit Section XXI.J and Section XXI.H) ..................................................... 7
    1.5     Permit Registration Documents and Signed Certification (General Permit Section II.A) ...................................................... 7
    1.6     Temporary Suspension of Activities ................................ 8

2.0     STORM WATER POLLUTION PREVENTION TEAM (GENERAL PERMIT SECTION X.D.1) ... 9

3.0     FACILITY INFORMATION........................................................11

    3.1     Site Storm Water Drainage ..........................................11
    3.2     Production Storm Water Drainage Areas ........................12

4.0     POLLUTANT SOURCE ASSESSMENT / POTENTIAL POLLUTANT SOURCES (GENERAL PERMIT SECTION X.G)........................................................13

    4.1     Material Handling and Storage Areas ...........................13
    4.2     Erodible Surfaces ..........................................................13
    4.3     Non-Stormwater Discharges .........................................13
    4.4     Significant Spill and Leaks ...........................................14

5.0     LIST OF PRODUCTION MATERIALS (GENERAL PERMIT SECTION X.F) WITHIN PRODUCTION AREAS ........................................................15

6.0     MINIMUM AND OTHER SOURCE-SPECIFIC OPERATIONAL BMPS FOR PRODUCTION AND NON-PRODUCTION AREAS........................................................15

    6.1     Good Housekeeping BMPs ...........................................16
    6.2     Preventative Maintenance ............................................17
    6.3     Spill Prevention and Reporting and Emergency Cleanup ...........................17
    6.4     Material Handling and Waste Management.....................18
    6.5     Erosion and Sediment Controls....................................18
    6.6     Employee and Boarder Training Program .....................19
    6.7     Quality Assurance and Record Keeping BMPs (General Permit Section X.H.g) ...........................................20

7.0     ADVANCED BMPS AND TREATMENT CONTROL BMPS (SECTION X.H.2)....................21

    7.1     Exposure Minimization BMPs (Section X.H.2.b.i)....................21
    7.2     Storm Water Containment and Discharge Reduction BMPs (Section X.H.2.b.ii) and Treatment Control BMPs (Section X.H.2.b.iii) for IGP Regulated Drainage Areas (Production Areas)....................21
    7.3     Storm Water Containment and Discharge Reduction BMPs and Treatment Control BMPs for Non-IGP Regulated Drainage Areas (Non-Production Areas) ...........................................25
    7.4     Other Advanced BMPs (Section X.H.2.b.iv)....................26
    7.5     Post-Implementation Field Monitoring and Observations within IGP Regulated Drainage Areas (Production Areas)...........................................26

7.6     TMDL Compliance (Section VII.B.) ....................................................26

8.0     MONITORING IMPLEMENTATION PLAN (MIP) (GENERAL PERMIT SECTION X.I) .........27

8.1     Monitoring Team Members (General Permit Section X.I.1) ..........................27
8.2     Production Area Discharge Locations (General Permit Section X.I.1) ........27
8.3     Representative Sampling Reduction or Qualified Combined Samples (General Permit Sections XI.C.4 and XI.C.5) ...................................................28
8.4     Inspections and Visual Observation Requirements and Procedures .........28
8.5     Sample Collection and Handling Procedures (General Permit Section XI.B) ...........................................................................................................29

        8.5.1   Sampling Events ........................................................29
        8.5.2   Sample Collection and Analysis .........................................30
        8.5.3   Sample Analysis........................................................30
        8.5.4   Sample Handling Procedures ............................................32

8.6     Field Equipment Calibration Procedures (General Permit XI.C.2) .............32
8.7     Chain of Custody Record (General Permit Section X.I.5) ...........................33
8.8     Data Evaluation and Reporting (General Permit Section XI.B.11).............33
8.9     Annual Facility Evaluation (General Permit Section XV) .............................34
8.10    Annual Report (General Permit Section XVI)..............................................35

9.0     BMP SUMMARY TABLE....................................................................36

10.0    STORM WATER POLLUTION PREVENTION PLAN CERTIFICATION ...................37

**Appendices**

Appendix A – Permit Registration Documents (PRDs)

Appendix B – SWPPP Drainage and BMP Site Plan Exhibit

Appendix C – Horse Path Infiltration BMP Detail

Appendix D – Visual Observation Forms and Tracking Logs

Appendix E – Operations and Maintenance Manual for Horse Path Infiltration BMPs and Infiltration Basin BMPs

Appendix F – Housekeeping Checklist Form

Appendix G – Chain of Custody Record Form

## REVISION SHEET

All revisions to the Storm Water Pollution Prevention Plan must be documented. Presented below is a listing, by date, of the sections that have been revised.

| Revision Date | Section Revised | Purpose of Revision | Revised By |
|---|---|---|---|
| 3-21-23 | 10.0, Appendix B, Appendix C | Revised site map, monthly observation checklist and certification page | J. Gleason |
| 6-13-2023 | Cover page, Section 3, Appendix B | Added WDID to cover page, amended production area acreage in section 3, added a figure to Appendix B, added drainage areas throughout SWPPP that had been removed, revised site map to include sample locations, completed certification page | J. Gleason |
| 2-14-2025 | Sections 2, 3, 4, 5, 7, 8, Appendix B and C | Revised SWPPP Team Information, production areas, sampling locations, required BMPs, and site maps consistent with the Level 2 ERA Action Plan for TSS. | J. Gleason |
| 7-01-25 | | Update requirements for IGP regulated areas vs non-IGP regulated areas; revise permit coverage based on production area vs non-production area since removal of exposed horse stalls and horse population reduction; Add Appendix F Housekeeping Checklist Form. | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

| | | | |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |

## 1.0    INTRODUCTION

This is the Storm Water Pollution Prevention Plan (SWPPP) for the San Juan Capistrano Equestrian Center (SJCEC), the horse stabling and training Facility located at 26282 Oso Road, San Juan Capistrano, California (Facility or Stables). The SWPPP was prepared in accordance with the requirements of the California State Water Resources Control Board (SWRCB), National Pollutant Discharge Elimination System (NPDES) General Permit for Storm Water Discharges Associated with Industrial Activities dated April 1, 2014 (General Permit or 2014-0057-DWQ). A copy of the General Permit is kept with this SWPPP as Appendix E. Appendix E is excluded from the Storm Water Multiple Application and Report Tracking System (SMARTS) submittal pursuant to the SWRCB's Request.

SJCEC is an establishment primarily engaged in the production of horses (Standard Industrial Classification (SIC) 0272) where it stables approximately 249 horses. As such, SJCEC is a medium Confined Animal Feeding Operation (CAFO) that engages in the following industrial activities herein after designated as Production Area Activities that are subject to regulation under the General Permit:

1. Horse stall management

2. Manure management

3. Feed management

4. Bedding Management

This SWPPP identifies and evaluates sources of pollutants associated with Production Area Activities in drainage areas (DA) 3 and DA 4[1] and summarizes site-specific BMPs to reduce or prevent pollutants associated with Production Area Activities in storm water discharges and authorized non-storm water discharges. All horse stables and feeding and bedding storage areas throughout the entire site are fitted with Storm-Resistant Shelters. Appendix 2.B.2.e. of IGP defines Storm-Resistant Shelters as "1) completely roofed and walled buildings or structures, 2) structures with only a top cover (no side coverings) supported by permanent supports, provided material within the structure is not subject to wind dispersion (sawdust, powders, etc. or being tracked out of the Facility, and is not a source of pollutants in the industrial storm water discharge." The only sources of pollutants

---

[1] While Production Area Activities are present in other drainage areas, they are all located in Storm Resistant Shelters and thus do not create or result in exposure of storm water to pollutants associated with Production Area Activities.

associated with Production Area Activities are the uncovered Manure Bin Storage Area and the Manure and Stall Waste Bunker.

This SWPPP also incorporates best management practices for non-production areas not covered under the permit. Where applicable, production area BMPs (IGP regulated areas) are summarized separately from non-production area BMPs (non-IGP regulated areas). Within certain non-production areas of the site, infiltration basins were previously implemented to improve water quality. These infiltration BMPs will remain and be maintained to function each rainy season but they are not part of the permit and overflow discharges are not subject to the IGP.

## 1.1    Plan Objectives

This SWPPP is designed to:

- Identify and evaluate sources of pollutants associated with Production Area Activities that may affect the quality of storm water discharges and authorized non-storm water discharges (NSWDs) from Production Area Activities at the Facility;

- Identify and describe the minimum Best Management Practices (BMPs) (General Permit Section X.H.1) and any advanced BMPs (Section X.H.2) implemented to reduce or prevent pollutants in storm water discharges and authorized NSWDs associated with Production Area Activities; and

- Identify and describe conditions or circumstances which may require future revisions to this SWPPP.

## 1.2    Regulatory Background

The United States Environmental Protection Agency (U.S. EPA) developed the storm water regulatory program through the authority of the Clean Water Act amendments of 1987. The U.S. EPA's goal was to reduce discharges of contaminated storm water from Production Area Activities at medium and large Confined Animal Feeding Operations (CAFOs). The U.S. EPA, through the NPDES permitting program, regulates discharges of potentially contaminated wastewater and storm water into Waters of the United States. California has been delegated NPDES general permitting authority by the U.S. EPA. On April 1, 2014, the SWRCB adopted Order 2014-0057-DWQ (IGP). This General Permit became effective on July 1, 2015. This SWPPP was written pursuant to the requirements set forth in Order 2014-0057-DWQ.

## 1.3    Plan Compliance Modifications (General Permit Section X.D.2)

The SWPPP shall be reviewed annually and revised as necessary based on the review, or after Facility modifications or changes to best management practices, whichever is sooner. SWPPP revisions shall be completed when:

- BMPs require significant changes;
- There is a physical or operational change at the Facility which may affect storm water discharges;
- Otherwise deemed necessary by the Pollution Prevention Team members based on visual observations (General Permit XI.A.3);

- Upon entering Level 1 or Level 2 status (General Permit XII.1.C);
- Additional pollutant source is identified;
- Modification is made to the Monitoring Implementation Plan (MIP);
- Change is needed to prevent Numeric Action Level (NAL) exceedances;
- Annual Comprehensive Facility Compliance Evaluation (ACFCE) identifies necessary changes;
- Modifications required to be consistent with applicable municipal, state, and federal requirements pertaining to the General Permit;
- Directed to do so by the Regional Board Water Quality Control Board (RWQCB); or
- There are changes to alternative discharge location identification (General Permit XI.C.3.b), Representative Sampling Reduction justifications (General Permit XI.C.4.c), or Qualified Combined Samples justification (General Permit XI.C.5.c).

Significant SWPPP revisions are required to be certified and submitted via SMARTS within 30 days of the significant revision. Other revisions (other than typographical errors) are required to be submitted within three (3) months. The Pollution Prevention Team will assess what is considered significant. If no changes are made to the SWPPP, there are no resubmittal requirements. A revision sheet has been provided to track revisions made within this SWPPP.

Per Section XV of the General Permit, the Discharger shall revise the SWPPP, as appropriate, and implement the revisions within 90 days of the Annual Evaluation.

### 1.4 Plan Availability and Records Retention (General Permit Section XXI.J and Section XXI.H)

The SWPPP and associated records will be retained on-site for a minimum of five (5) years and be made immediately available to RWQCB, SWRCB, U.S. EPA and local Municipal Separate Storm Sewer System (MS4) agency personnel when requested. A copy of the SWPPP will be provided within two (2) weeks of receiving a request from any of the above listed entities.

San Juan Capistrano Equestrian Center will maintain records of all visual observations. Records shall include the date, approximate time, locations observed, presence and probable source of any observed pollutants, name of person(s) that conducted the observations, and any response actions and/or additional SWPPP revisions necessary in response to the visual observations.

No records should be destroyed, discarded, or removed from record unless the records are beyond the five-year retention requirement.

### 1.5 Permit Registration Documents and Signed Certification (General Permit Section II.A)

Permit Registration Documents (PRDs) are to be submitted through the SMARTS by the Legally Responsible Person (LRP), or authorized personnel (i.e., Duly Authorized Representative) under the direction of the LRP. PRDs include:

- Notice of Intent (NOI);

- Signed Certification Statement (LRP Certification is provided electronically with SMARTS PRD submittal);

- Site Map(s);

- SWPPP; and

- Annual Fee.

The individual designated as the LRP and other authorized personnel are identified in Appendix A.  SMARTS submittal documentation, including a copy of NOI and Signed Certification Statement, is attached in Appendix A of this SWPPP. The Facility Site Map(s) is included in Appendix B.

## 1.6    Temporary Suspension of Activities

The General Permit includes a provision for facilities that temporarily suspend Production Area Activities for ten (10) or more consecutive calendar days during a reporting year. In the event the Facility's operations are temporarily suspended, the SWPPP will be revised to include stabilization BMPs within Section 6.  In addition, the date the Facility is fully stabilized and projected start date will be documented. If monitoring is infeasible, justification for not monitoring will be provided. The revised SWPPP will be uploaded via SMARTS within seven (7) calendar days prior to suspension of activities. Based on the resident horse populations at San Juan Capistrano Equestrian Center, no temporary suspension of activities is anticipated.

## 2.0    STORM WATER POLLUTION PREVENTION TEAM (GENERAL PERMIT SECTION X.D.1)

The Pollution Prevention Team responsible for assisting with the implementation of the requirements of this SWPPP is summarized below. In the event that a regularly assigned Pollution Prevention Team member is temporarily unavailable, Team members are cross-trained to assist with the various activities summarized in the SWPPP Team responsibilities (listed in tables below) as they pertain to storm water discharge monitoring and BMP implementation. New Pollution Prevention Team members will be assigned in the event that a Team Member is no longer employed by San Juan Capistrano Equestrian Center.

**Legally Responsible Person (LRP)**

| Name | Title |
|------|-------|
| Denise Haunert-Marshall | Managing Director |

**Duly Authorized Representative**

| Name | Title |
|------|-------|
| TBD | |
| | |

**Pollution Prevention Team (PPT)**

| Name | Title | Contact Number | Responsibilities/Duties |
|------|-------|----------------|-------------------------|
| Denise Haunert-Marshall | Managing Director | (949)-661-1755 | SWPPP Implementation |
| Morley Abey | General Manager | (949)-661-1755 | SWPPP Implementation, Inspections, Sampling |
| Dave Provence | General Manager Assistant | (949)-637-2552 | SWPPP Implementation, Inspections, Sampling |
| John Gleason, Qualified Industrial Storm Water Practitioner (QISP) | Stormwater Consultant | (949)-981-3867 | SWPPP Amendments / Site Inspections / SMART Uploads / Annual Reports |
| Blaine Tech Services | Environmental Sampling | (310)-885-4455 | Sampler consultant for rain events |
| Samin Adib | Stormwater Consultant | (949)-429-9753 | Inspections/SWPPP Amendments/SMARTS/Annual Reports |

**Alternate PPT Members**

| Name | Title | Contact Number | Responsibilities/Duties |
|------|-------|----------------|-------------------------|
| Jorge Rodriguez | Stormwater Consultant | (949)-300-5902 | Inspections /Sampling |
| Bruce Kane | Stormwater Consultant | (949)-233-9082 | Inspections/Sampling |
| Jordan Hatch | Stormwater Consultant | (949)-838-7875 | Inspections/Sampling |
| | | | |
| | | | |
| | | | |
| | | | |

Morley Abey is taking a lead role for the field stormwater team. He will conduct the routine inspections and conduct sampling as required. Dave Provence is his backup on the field team. Both have been trained on site how to use the pH meter and how to collect samples and get them to the lab. They will work with consultants to assist as needed. A training form for the field team is included in the onsite files.

A Qualified Industrial SWPPP Practitioner (QISP) is overseeing compliance for this facility.

An employee and boarder training program is implemented at the Facility. Training program details are summarized in Section 6.6 of the SWPPP, including details related to task-specific training and training frequency for employees engaged in activities that have the potential to cause storm water pollution.

## 3.0    FACILITY INFORMATION

| | |
|---|---|
| **IGP Permit WDID No.** | 9 30I030112 |
| **Address** | 26282 Oso Road, San Juan Capistrano, CA 92675 |
| **Facility Size** | 16.0 acres |
| **Production Area (Production Activity Area) Size Covered by Permit** | 0.12 acres (5,200 SF): 3,200 SF Manure Bin Storage Area; 2,000 SF Manure & Stall Waste Bunker |
| **Percent of Production Area Impervious** | 19% (980 SF concrete bottom of manure and stall waste bunker) |
| **SIC Code** | 0272 – Boarding Horses (Average horse population: 249) Production Area Activities for this SIC code at Facility include manure management, storage, and disposal |
| **Description of operations performed at site** | The Facility is open year-round and provides services that include horse boarding, horse training, and riding lessons. The Facility includes horse boarding stalls, arenas, horse wash racks, material storage areas, administrative buildings, and parking lots. |
| **Hours of Operation** | Monday – Sunday: 10AM – 7 PM |
| **Description of neighboring operations/ properties** | The project site is bounded by a residential area to the east, an equestrian Facility to the south, Arroyo Trabuco Creek to the west, and the Shea Center and another stable neighbor to the north. |
| **Receiving Water** | Arroyo Trabuco Creek |

### 3.1    Site Storm Water Drainage

The SWPPP Drainage and BMP Site Plan Exhibit shows the non-production areas (DA 1-2, 5-7) and the Production Area Activities (DA 3 and DA 4). Refer to Appendix B for the exhibit. Production areas are areas covered by the IGP because a Facility may have exposed Production Area Activities defined as exposed stalls (pipe stalls) and/or manure storage and disposal areas, and/or feed storage areas, and/or bedding storage areas exposed to stormwater. For this Facility, all stalls and feed and bedding storage areas are protected with storm-resistant shelters and the only production areas on-site subject to the IGP are the Manure Bin Storage Area (DA 3) and the Manure and Stall Waste Bunker (DA 4).

The site generally slopes from north to south.  The elevation of the project site ranges from approximately 150.0 to 130.0 feet above mean sea level (msl).  Surface drainage at the site currently flows south and west toward discharge locations along Arroyo Trabuco Creek. Stormwater is conveyed primarily through surface runoff through the drainage

INDUSTRIAL STORM WATER POLLUTION PREVENTION PLAN (SWPPP)
SAN JUAN CAPISTRANO EQUESTRIAN CENTER                                                    JULY 2025

areas to the floodplain of Arroyo Trabuco Creek. In addition, there are existing pipes at the Facility that drain roof flows directly to the creek.

The Production Area Activities are labelled based on the type of activities conducted within the drainage areas in order to differentiate between areas of the site that are subject to the General Permit and areas that are not. Recent renovations at the Facility to remove uncovered stalls have resulted in limiting the exposure of storm water to Production Areas. It also reduced the average horse population from 474 horses to 249 horses, a reduction of approximately 47%. The remaining Production Areas are located in DA 3 (previously DA 5), and DA 4 (previously DA 6), which contain the storage area for the uncovered manure bins (DA 3) and the exposed manure and waste stall bunker (DA 4). Drainage areas that include fully covered stalls with only roof runoff are considered Non-Production Areas (Appendix B).

## 3.2    Production Storm Water Drainage Areas

| Number | Drainage Area Description and Potential Pollutants |
|--------|---------------------------------------------------|
| DA 3 | DA 3 (previously DA 5) consists of a 2.37-acre area in the north-central portion of the project site with uncovered Manure Bin Storage Area. Potential pollutants include sediment, nutrients, bacteria, and trash. The manure bin storage is approximately 0.07 acres within the drainage area. Under the proposed conditions, this drainage area will increase by 0.85 acres to accept diverted flows from DA 4 for a total of 3.22 acres. |
| DA 4 | DA 4 (previously DA 6) consists of a 2.76-acre area in the north-central portion of the project site that includes the manure and stall waste bunker. Potential pollutants include sediment, nutrients, bacteria, and trash. The manure and waste stall bunker is approximately 0.04 acres within the drainage area.   Under the proposed conditions, a portion of this drainage area (0.85 acres) will be diverted to DA 3 to reduce the amount of runoff entering the manure and waste stall bunker for a total of 1.91 acres. |

## 4.0    POLLUTANT SOURCE ASSESSMENT / POTENTIAL POLLUTANT SOURCES (GENERAL PERMIT SECTION X.G)

This section presents descriptions of the Production Activity potential pollutant sources at the Facility. The pollutants likely to be present in storm water discharge from these areas are included below.

### 4.1    Material Handling and Storage Areas

Waste Bedding/ Manure Accumulation Areas

| Area/ Process Description: | Waste bedding material generated from stables throughout the site (hay, wood shavings, manure) is temporarily accumulated in the Manure and Stall Waste Bunker before being transferred into waste bins before being hauled offsite by CR&REnvironmental Services |
|---|---|
| Designation on Site Map: | Manure and Stall Waste Bunker (DA 4) and Manure Bin Storage Area (DA 3) |
| General Description of Materials Handled: | The primary material handled is waste bedding, comprised of either hay or wood shavings mixed with manure. |
| Shipping, Receiving, and Loading Procedures: | Bedding material is collected manually on a daily basis. It is shipped offsite 5-6 times/week. |
| Describe Containment Structures and Capacity, if applicable: | Waste bedding material is gathered daily and stored in covered, enclosed roll top bins in the Manure and Stall Waste Bunker. Full bins are moved to the Manure Bin Storage Area for removal. Materials are always covered with plastic lids and protected from rain events. |

### 4.2    Erodible Surfaces

There are no Production Areas at the Facility where soil erosion may occur as a result of Production Area Activities, storm water discharges associated with Production Area Activities, or authorized non-storm water discharges.

### 4.3    Non-Stormwater Discharges

No authorized non-stormwater discharges occur at the Facility. There have been no noted unauthorized non-stormwater discharges at the site. Potential non-stormwater discharges will be captured on-site and addressed by Staff.

## 4.4    Significant Spill and Leaks

Presented below is information on significant spills or leaks that have occurred at the Facility in the past 5 years. This includes materials associated with Production Area Activities that have spilled or leaked in significant quantities and have discharged from the facility's storm water conveyance, toxic chemicals (listed in 40 CFR, Part 302) that have been discharged to storm water as reported on US EPA Form R, oil and hazardous substances in excess of reportable quantities (see 40 CFR, Parts 110, 117, and 302), and industrial materials that have spilled or leaked in significant quantities and had the potential to discharge. If no significant spills or leaks have occurred, identify "none" in the first row.

| Industrial/Production Material | Material Physical Characteristics | Location of Spill or Leak | Quantity Spilled or Leaked | Quantity Discharged from Site | Remaining Quantity with Potential for Discharge |
|---|---|---|---|---|---|
| None | | | | | |

## 5.0 LIST OF PRODUCTION MATERIALS (GENERAL PERMIT SECTION X.F) WITHIN PRODUCTION AREAS

Presented below is a list of Production Materials that are handled, stored, shipped and received at the Facility. Production Materials include raw materials, intermediate products, final or finished products, recycled materials, and waste or disposed materials. The primary Production Materials are fresh hay and bedding and waste bedding materials within the Production Area Activities. Other materials exist in small quantities including paint, stain, hydraulic fluid, gasoline, oxygen, and acetylene but are permanently stored inside the hay barn and only removed from the barn for specific maintenance purposes and are returned to the hay barn when the maintenance activity is complete. The hay barn is not exposed to any stormwater.

| Material | Storage Location(s); Typical Quantity Stored; and Typical Frequency of Storage | Receiving Location(s); Typical Quantity Received; and Typical Frequency of Receiving | Shipping Location(s); Typical Quantity Shipped; and Typical Frequency of Shipping | Handling Location(s); Typical Quantity Handled; and Typical Frequency of Handling |
|---|---|---|---|---|
| Waste Bedding Materials (hay, wood shavings, manure) | Temporarily accumulated in stables or containment bins and in on-site Manure and Stall Waste Bunker. Stored daily. | Not received from off-site sources, Storage Area is used for on-site receiving of spent bedding. | Collected and shipped off-site in enclosed trailers, (approx. 475 tons/month.), shipped off-site 5-6 times/week. | Temporarily accumulated in stables and Manure and Stall Waste Bunker, handled daily. |
| Hay and Bedding | Stored in hay barns fitted with storm-resistant shelters, approximately 23 tons of bedding at a time. | Hay and bedding materials are delivered to the site monthly or as needed. Materials are received at the Storage Barn and loaded directly to the barns. | Not shipped from the site. | Hay and bedding are handled at hay barns and within stable areas. Handled daily. |

## 6.0 MINIMUM AND OTHER SOURCE-SPECIFIC OPERATIONAL BMPS FOR PRODUCTION AND NON-PRODUCTION AREAS

The Facility is required to implement and maintain the minimum BMPs described in Section X.H.1 of the General Permit to the extent feasible for all Production Areas. In addition, the site proactively manages non-production areas to remove sources of pollutants. The extent feasible requirement reflects best industry practice considering technological availability

and economic practicability and achievability. Presented below are the minimum BMP requirements, areas where the minimum BMP requirement is applicable, and site-specific BMP description used to comply with the minimum BMPs.

## 6.1    Good Housekeeping BMPs

| Site Specific BMP Description | Person(s) Responsible |
|---|---|
| **Minimum Good Housekeeping BMPs (Section X.H.1.a)** | |
| The Facility contains and cleans up solid and liquid pollutant leaks and spills. Spill response material, including solid absorbents, are staged strategically in areas where maintenance occurs. | Managing Director |
| Manure throughout the site is removed upon observation with muck shovels and muck buckets and/or wheelbarrows. | Managing Director |
| Drainage systems and BMPs (gravel infiltration BMPs and fiber roll) are regularly inspected and cleaned / maintained, as necessary. | Managing Director |
| If damage to secondary containment areas/ berms, pipes, valves, or other drainage infrastructure is noted during inspections, repairs are scheduled and performed. | Managing Director |
| The Facility implements signage to promote maintenance and manure pickup | Managing Director |
| **Other Good Housekeeping and Source Control BMPs** | |
| Manure and waste-bedding are temporarily accumulated in the manure and waste stall bunker and hauled offsite regularly by a private contractor. Surrounding paved areas are swept as needed. | Managing Director |
| Wheelbarrows are used to transport manure to the manure and waste stall bunker are moved under cover during pre-rain inspections and are kept under cover until the rain event has passed. | Managing Director |

## 6.2    Preventative Maintenance

| Site Specific BMP Description | Person(s) Responsible |
|---|---|
| **Minimum Preventive Maintenance BMPs (General Permit Section X.H.1.b))** | |
| Solid wastes are accumulated in waste bins that are equipped with plastic lids or are enclosed. Leaking containers are replaced to avoid potential leaks/spills. | Managing Director |
| The Facility implements emergency spill response and cleanup procedures (see applicable spill control BMPs) and has a designated trained person(s) available either on site or on call to promptly respond to cleanup spills. Cleanup materials, such as dry absorbent materials, are on site for use in the event of a spill. Spills or leaks are cleaned up as soon as practicable, once observed. | Managing Director |
| Trucks, front-end loaders and forklifts are inspected weekly and appropriately maintained to minimize leaks. | Managing Director |
| **Other Preventive Maintenance BMPs** | |
| Appropriate San Juan Capistrano Equestrian Center employees are trained to minimize pollutants site-wide to help prevent uncontrolled releases to the air, ground, or water. | Managing Director |

## 6.3    Spill Prevention and Reporting and Emergency Cleanup

| Site Specific BMP Description | Person(s) Responsible |
|---|---|
| **Minimum Spill Prevention BMPs (General Permit Section X.H.1.c)** | |
| The Facility stops, contains, and cleans up spills upon discovery. Spill response materials are located near areas where there is a potential for fluid spills. The absorbent materials are readily accessible to personnel responsible for spill response. | Managing Director |
| Liquid/solid spills in the parking/loading area cleaned-up as soon as practicable once observed. | Managing Director |

## 6.4    Material Handling and Waste Management

| Site Specific BMP Description | Person(s) Responsible |
|---|---|
| **Minimum Material Handling BMPs (General Permit Section X.H.1.d)** | |
| Manure and waste-bedding is temporarily contained in a dedicated storage area and hauled offsite 5-6 times/week by a private contractor. | Managing Director |
| Tight-fitting lids are placed on manure containers and are inspected regularly for corrosion, structural failure, spills, and leaks. | Managing Director |
| Waste maintenance materials are stored in appropriate containment inside the covered and enclosed Storage Barn. | Managing Director |

## 6.5    Erosion and Sediment Controls

| Site Specific BMP Description | Person(s) Responsible | Replacement Schedule |
|---|---|---|
| **Minimum Erosion Control BMPs (General Permit Section X.H.1.e)** | | |
| Controls are maintained in DA 3, including fiber rolls and an earthen berm to ensure flows enter the infiltration basin and do not bypass. | Managing Director | Annually (Prior To Rainy Season) |
| Run-on is diverted away from Production Areas, where feasible. | Managing Director | Annually (Prior To Rainy Season) |
| Perimeter control and erosion control BMPs are visually inspected on a monthly basis in the production area. | Managing Director | Annually (Prior To Rainy Season) |

## 6.6    Employee and Boarder Training Program

The Facility will develop and implement an employee training program that meets the following requirements and ensures: (1) there are a sufficient number of employees at the Facility designated to achieve compliance with the Permit and this SWPPP; (2) such PPT members are properly trained to perform the required activities to maintain compliance with the Permit, and the Facility's SWPPP; and (3) all full-time regular (non-temporary) non-clerical Facility employees, boarders, and trainers receive basic information regarding storm water housekeeping and best practices via the Training Program. The Training Program includes the following:

1. **Non-Storm Water Discharges.** PPT members shall be trained on the Storm Water Permit's prohibition of non-storm water discharges so that PPT members know what non-storm water discharges are, that non-storm water discharges can result from improper surface washing or the release of any substance from the property, and how to detect and prevent non-storm water discharges.

2. **The SWPPP and BMPs.** Facility shall train all PPT members on the SWPPP and, specifically, BMP implementation and/or maintenance, as applicable, to ensure BMPs are implemented effectively to prevent the exposure of pollutants to storm water and prevent the discharge of contaminated storm water from the Facility. PPT members shall be trained in proper operational procedures and control measures. All training of PPT members must include the requirements of the Permit and this SWPPP.

3. **Visual Observation.** Facility shall designate and train an adequate number of PPT members sufficient to collect storm water samples as described in this SWPPP and as required by Permit section XI.B. Such training shall include the proper sampling protocols, including chain of custody requirements, to ensure storm water samples are properly collected, stored, and submitted to a certified laboratory.

4. **Storm Water Sampling.** Facility shall designate an adequate number of PPT Members necessary to collect storm water samples as required by the Permit. The Training Program shall include training of PPT Members sufficient to ensure: (i) proper sampling protocols, including chain of custody requirements, are followed at all times and (ii) storm water samples are properly collected, stored, and submitted to a certified laboratory.

5. **Training Implementation.** Training of at least two PPT Members (hereinafter referenced as "Designated Trainers" or "DT") shall be provided by a Qualified Industrial Storm Water Practitioner ("QISP") familiar with the requirements the Permit and this SWPPP.

6. **Language.** The Training Program shall be conducted, and all training materials shall be made available, in the language in which the employee(s) participating in the Training Program are fluent. If necessary to accomplish the foregoing or where translation would otherwise contribute to: (i) staff comprehension of the Training Program and/or,

(ii) compliance with this Consent Decree and the Storm Water Permit, Facility shall provide translation services at all training sessions and of all training materials.

7. **Training Program Frequency – PPT Members.** The Training Program shall be repeated annually or more frequently as necessary.

8. **Training Program Frequency – Other Employees.** Facility Employees who are not PPT Members shall receive educational materials on good housekeeping and manure management for purposes of maintaining compliance with the Facility SWPPP, Nutrient Management Plan (NMP) and the Permit at least once annually. Distribution and receipt of educational materials will be documented.

9. **Boarder Education.** Facility shall develop a boarder education protocol to educate Facility boarders and trainers on good housekeeping and manure management for purposes of maintaining compliance with the Facility SWPPP, NMP, and Permit. Facility shall distribute educational materials to boarders and trainers no less than once annually.

**6.7    Quality Assurance and Record Keeping BMPs (General Permit Section X.H.g)**

| Site Specific BMP Description | Person(s) Responsible |
|---|---|
| The Facility will maintain records required by this Order on-site for a period of 5 years from the date they are created. Records maintained will include:<br><br>• A current version of the SWPPP;<br>• Records documenting all inspections;<br>• Records documenting any actions taken to correct deficiencies found during inspections of the Facility; | Managing Director |

## 7.0    ADVANCED BMPS AND TREATMENT CONTROL BMPS (SECTION X.H.2)

General Permit Section X.H.2 requires advanced BMPs that must be implemented if the minimum BMPs are inadequate to achieve compliance with technology-based effluent limitations (TBEL). Advanced BMPs include Exposure Minimization, Storm water Containment and Discharge Reduction, Treatment Control, and Other Advanced BMPs. Exposure minimization BMPs include storm resistant shelters to prevent the contact of storm water with Production Area Activities and Production Materials. Stormwater Containment and Discharge Reduction BMPs include BMPs that divert, reuse, contain, or reduce the volume of storm water runoff.  Treatment control BMPs include one or more mechanical, chemical, biologic, physical, or any other treatment process technology.

The Facility has implemented Advanced BMPs and Treatment Control BMPs within both Production Areas and Non-Production Areas in order to control, reduce and treat runoff to the best of its ability prior to exiting the site. Per the IGP requirements, samples will be collected when runoff discharges from Production Area locations to evaluate current Advanced BMP deployment and will be used to determine if the site requires moving to a different Level status.

### 7.1    Exposure Minimization BMPs (Section X.H.2.b.i)

The following Advanced BMPs have been implemented:

- **Covered Stables, Barns, and Storage Areas:** All exposed stalls were removed from the Facility and only fully covered stalls remain. This resulted in a reduction of average annual horse population by 47%. Storage areas (Tack Sheds and Storage Barn) are covered to prevent rainfall from reaching any potentially pollutant-generating materials.
- **Manure and Bedding Removal and Stall Cleaning:** Stalls, and other manure and bedding-generating areas are cleaned daily. Waste is temporarily stored in the manure and waste stall bunker (sunken area with concrete bottom with no outlet) Within the bunker, the manure is then transferred into manure waste bins (roll off bins) and moved to the manure waste bin storage area.
- **Bedding Storage:** Fresh bedding and feed are covered in the Storage Barn and protected from stormwater runoff prior to rain events.

### 7.2    Storm Water Containment and Discharge Reduction BMPs (Section X.H.2.b.ii) and Treatment Control BMPs (Section X.H.2.b.iii) for IGP Regulated Drainage Areas (Production Areas)

The following Advanced BMPs have been implemented in production areas:

- **Infiltration / Retention BMPs:** Infiltration and retention BMPs to address runoff from Production Areas have been implemented in DA 3 and DA 4. DA 3 has an infiltration basin for storage and infiltration of stormwater. DA 4 has a concrete bottom sump for retention of stormwater.

   DA 3: The Manure Bin Storage Area has an infiltration basin immediately downgradient to capture runoff. The infiltration basin is fitted with upstream fiber rolls to check the flow entering the basin and serve as pre-treatment for sediment

INDUSTRIAL STORM WATER POLLUTION PREVENTION PLAN (SWPPP)
SAN JUAN CAPISTRANO EQUESTRIAN CENTER                                    JULY 2025

removal prior to entering the infiltration basin. The upstream area was re-graded to ensure flows enter the basin. The basin has not discharged to the creek based on observations over the past several rainy seasons. That being said, the basin does not have sufficient capacity to meet the 85th percentile storm event with the proposed 0.85 acre drainage diversion from DA 4 so additional improvements are required.  As part of the improvements for the manure bin storage area, a fully covered shelter with a raised concrete pad with berms will be constructed to provide storage for the manure bins and eliminate all exposure to stormwater during rain events. All upstream drainage will be designed to bypass or go around the structure and the existing infiltration basin (downgradient of the proposed shelter) will remain in place to accommodate any nuisance flows that could arise from rain events.

As part of the drainage improvements, infiltration trenches will be implemented upstream within DA 3 in the primary horse pathways herein referred to as horse path infiltration BMPs to reduce runoff. The horse path infiltration BMPs are proposed to be approximately 4 feet deep by 7-14' feet wide and backfilled with gravel aggregate, filter course (pea gravel), and washed coarse sand consistent with the guidelines of OC Technical Guidance Document (TGD) for South Orange County for infiltration trenches.  See Appendix C for horse path infiltration BMP detail. The purpose of implementing the horse path infiltration BMPs will serve the following benefits:

- Provide treatment for the additional 0.85 acres of runoff from the proposed drainage diversion from DA 4.
- Reduce standing water following rain events within the horse pathways.
- Reduce sediment transport during rain events within the horse pathways.
- Increase infiltration capacity throughout the drainage area to supplement the infiltration capacity of the existing infiltration basin.

The following table summarizes the proposed BMPs to meet the 85th percentile volume for DA 3.

| DMA ID | Drainage Area (acres) | Assumed % Imp. | Design Storm Depth (in) | 85th Percentile Storm Event (CF) | Horse Path Infiltration Volume (CF) | Existing Infiltration Basin | Total Retention Volume (CF) |
|---|---|---|---|---|---|---|---|
| DA 3 | 3.22 | 54% | 0.85 | 5,514 | 3,420 | 2,095 | 5,515 |

DA 4: The manure and stall waste bunker is a concrete-lined sunken basin (sump) located in DA 4 in which waste bedding and manure is stored until transferred into the manure bins.  The basin acts as a sump for the entire area of DA 4 and all runoff from the tributary area drains into the manure and stall waste bunker. The basin previously drained to Arroyo Trabuco Creek through a subsurface pipe at the bottom of the basin, but the pipe entrance in the basin was plugged several years

INDUSTRIAL STORM WATER POLLUTION PREVENTION PLAN (SWPPP)
SAN JUAN CAPISTRANO EQUESTRIAN CENTER                                    JULY2025

ago (2020), as shown in Photo 1 below. Water has not discharged from the sump to the creek since the pipe was plugged.



**Photo1:** Former Manure and Stall Waste Bunker outlet to creek plugged

Under the existing conditions, all runoff from DA 4 enters the manure and stall waste bunker sump and ponds at the bottom. As the stall waste is loaded into the manure bins, the water is absorbed to the waste material and is ultimately transferred into the manure bins. Due to the weight of the water, each bin must be filled to a lesser amount to accommodate the extra weight. This process slows down the waste removal operations during large rain events.

Under the existing conditions, the manure and stall waste bunker does not have the capacity to retain the 10-year, 24 hour rain event runoff volume associated with DA 4. The 10-year, 24-hour rain event runoff volume for DA 4 based on a NOAA rainfall depth of 3.89" is 0.38 acre-ft (16,475 cubic feet) and would exceed the total available capacity of the sump.

In order to improve drainage conditions, reduce the volume of runoff entering the sump, and meet the 10-year, 24-hour retention objective for DA 4, the following improvements will be implemented:

- Divert approximately 0.85 acres of upstream parking lot runoff to DA 3 through minor berming in the upstream area. Infiltration BMPs within DA 3 will be sized to accommodate the additional runoff from DA 4.
- Implement a series of horse path infiltration BMPs within the upstream areas of DA 4 to infiltrate the majority of the runoff associated with the 10-year, 24 hour storm event.
- Significantly reduce the volume of runoff entering the manure and stall waste bunker from the tributary area. Upon completion of the upstream improvements, runoff will be significantly reduced, thereby increasing the effective capacity of the bunker to meet the aforementioned storm event standards.

The tributary area to the Manure and Stall Waste Bunker has been identified and the volume capacity of the Manure and Stall Waste Bunker has been calculated based on the site-specific aerial topography updated in 2023. Field visits occurred during the 2020-2024 rainy seasons and verified that stormwater did not bypass or overtop the Manure and Stall Waste Bunker, and no runoff flowed to Arroyo Trabuco Creek. Additionally, the field visits also verified that water ponded up in the bunker and did not enter the existing plugged subsurface pipe at the bottom of the basin. The table below summarizes estimated volume capacity calculations for elevations within the Manure and Stall Waste Bunker.

| Manure and Stall Waste Bunker Volume Capacity | | | |
|---|---|---|---|
| Elevation | Area (SF) | Incremental Volume (CF) | Total Volume (CF) |
| 130 | 617 | 472 | 472 |
| 131 | 989 | 802 | 1260 |
| 132 | 1,488 | 1,1,239 | 2,490 |
| 133 | 2,2,183 | 1,836 | 4,315 |

The following table summarizes the proposed BMPs to meet the 10-year, 24-hour storm event for DA 4.

| DMA ID | Drainage Area (acres) | Assumed % Imp. | Design Storm Depth (in) | 10-year, 24-hour Storm Event (CF) | Horse Path Infiltration Volume (CF) | Waste Bunker (DA 4) SUMP Volume (CF) | Total Retention Volume (CF) |
|---|---|---|---|---|---|---|---|
| DA 4 | 1.91 | 57% | 3.89 | 16,475 | 12,160 | 4,315 | 16,475 |

The total retention volume for DA 4 will be designed to meet the 10-year volume standard through the combination of the horse path infiltration BMPs and the existing waste bunker sump volume. Horse Path infiltration volumes are provided below:

INDUSTRIAL STORM WATER POLLUTION PREVENTION PLAN (SWPPP)
SAN JUAN CAPISTRANO EQUESTRIAN CENTER                    JULY2025

| Drainage Area | Surface Area of Horse Path (square-feet) | Void Space | Depth (Feet) | Total Volume (Cubic Feet) |
|---|---|---|---|---|
| DA 3 | 2,250 | 0.38 | 4 | 3,420 |
| DA 4 | 8,000 | 0.38 | 4 | 12,160 |

### 7.3 Storm Water Containment and Discharge Reduction BMPs and Treatment Control BMPs for Non-IGP Regulated Drainage Areas (Non-Production Areas)

Infiltration BMPs will also be implemented into the non-IGP / non-CAFO drainage areas within the site including DA 1, DA 2, DA 5, DA 6 and DA 7. For DA 1 & 2, two existing infiltration basins have been implemented for several years and exhibit high infiltration rates. Overtopping of the basins has never been observed and are empty within 24-48 hours of a rain event. For DA 5, 6 & 7, the proposed horse path infiltration BMPs will be implemented within flow lines to address the 85th percentile volumes. The following table summarizes the existing and proposed BMPs for the non-CAFO drainage areas.

| DMA ID | Drainage Area (acres) | Assumed % Imp. | Design Storm Depth (in) | Simple Method DCV (ft³) | Horse Path Infiltration Volume (ft³) | Existing Basin Infiltrated Volume Within 48 hrs (ft³) | Total Volume Addressed (ft³) |
|---|---|---|---|---|---|---|---|
| DA 1 | 0.47 | 43% | 0.85 | 680 | - | 685 | **685** |
| DA 2 | 0.84 | 41% | 0.85 | 1,183 | - | 1,200 | **1,200** |
| DA 5 | 1.40 | 49% | 0.85 | 2,242 | 2,300 | - | **2,300** |
| DA 6 | 0.76 | 70% | 0.85 | 1,591 | 1,600 | - | **1,600** |
| DA 7 | 0.54 | 66% | 0.85 | 1,081 | 1,100 | - | **1,100** |

Horse Path infiltration BMPs are provided below:

| Drainage Area | Surface Area of Horse Path (square-feet) | Void Space | Depth (Feet) | Total Volume (Cubic Feet) |
|---|---|---|---|---|
| DA 5 | 1,513 | 0.38 | 4 | 2,300 |
| DA 6 | 1,052 | 0.38 | 4 | 1,600 |
| DA 7 | 723 | 0.38 | 4 | 1,100 |

All areas of the site require continual housekeeping to ensure exposed pollutants are removed in a timely manner and limit contact with stormwater runoff. A checklist (Appendix F) has been developed for use by the facility to help with housekeeping and minimize exposure of pollutants to stormwater. The checklist shall be used prior to forecasted rain events which are defined as rain events with a greater than 50% probability above 0.1 inches forecasted at least 24 hours prior to its occurrence as

determined by the National Oceanic and Atmospheric Administration for ZIP Code 92675.

Each year the infiltration basins are maintained and cleaned out prior to the rainy season to restore their infiltration capacity. Several inches of the sediment bottom are removed each year and slide slopes are recompacted. The process has been successfully working and will continue to be followed. If the performance of the infiltration basins decreases over time, additional pre-treatment control BMPs will be implemented upstream of the basins.

## 7.4    Other Advanced BMPs (Section X.H.2.b.iv)

There are no additional advanced BMPs.

## 7.5    Post-Implementation Field Monitoring and Observations within IGP Regulated Drainage Areas (Production Areas)

Following the completion of the proposed improvements within the Production Areas, the effectiveness of the improvements will be monitored, observed and documented. During and after storm events, the effectiveness of the horse path infiltration BMPs will be observed to determine how quickly they become free of standing water. Observations will also occur during storm events to review drainage patterns and effectiveness of delivering flows to the horse path BMP. The downstream basins will also be observed in the same manner including observing ponding depths and drawdown times. For the manure and waste stall bunker, the effectiveness will be identified through documenting depth of accumulated water twenty four (24) hours after a Qualifying Storm Event (QSE) and the reduced weight of the bins via monthly invoices in the winter season months.

All notes and observations will be documented by using the existing inspection forms related to rain events. The forms will be re-evaluated following implementation of the improvements and potentially updated to reflect more specific observations or notes.

## 7.6    TMDL Compliance (Section VII.B.)

A draft revision to Attachment E of the General Permit and associated fact sheets were released in February 2016. These revisions were associated with TMDL compliance in Region 9, notably the Bacteria Project I TMDL. The fact sheets indicate that discharges in compliance with General Permit Requirements must meet the requirements of the Bacteria Project I TMDL.

## 8.0     MONITORING IMPLEMENTATION PLAN (MIP) (GENERAL PERMIT SECTION X.I)

This document presents the MIP for the Facility. This MIP was prepared to address the following objectives.

1. Identify team members assisting with implementation of the monitoring program;

2. Describe discharge locations;

3. Provide justification for representative sampling reduction, sample frequency reduction, and/or qualified combined samples, as applicable;

4. Describe visual observation requirements;

5. Describe visual observation response procedures;

6. Describe sample collection and handling procedures;

7. Describe sampling and analysis requirements, including storm water effluent limits

8. Procedures for field instrument calibration;

9. Provide an example Chain of Custody Record to be used when handling and shipping water quality samples to the laboratory.

### 8.1     Monitoring Team Members (General Permit Section X.I.1)

Team members assigned to conduct the monitoring requirements (i.e., perform visual observations, sample collection, laboratory coordination) are identified in Section 2.0 of this SWPPP. Samples will be submitted to a State-certified Lab and pH readings will be taken in the field.

### 8.2     Production Area Discharge Locations (General Permit Section X.I.1)

A description of the Facility's storm water discharge locations associated with Production Areas are described within Section 3.2 of this SWPPP, summarized below, and are included on the Site Map(s). If there are discharge locations at the Facility that are affected by run-on from surrounding areas as described in Section 3.1 of this SWPPP, or that are difficult or unsafe to sample, an alternative monitoring location can be selected.

The Facility includes two discharge points from the Production area and are listed in the following table.

| Sampling Location / Drainage Sub-Area ID | Description of Tributary Area and Sampling Location (include lat/long for each discharge point) |
|---|---|
| 1 / DA 3 | Lat/Long: 33°51'33.87", - 117°67'13.22"<br><br>Description: DA 3 includes the Manure Bin Storage Area. Sampling will occur at the existing basin downgradient of the manure bin storage area, if discharge occurs. |
| 2 / DA 4 | Lat/Long: 33°51'26.91", - 117°67'09.63"<br><br>Description: DA 4 includes the Manure and Stall Waste Bunker. Sampling will occur at the downgradient earthen berm location of the manure collection sump area, if discharge occurs. |

### 8.3    Representative Sampling Reduction or Qualified Combined Samples (General Permit Sections XI.C.4 and XI.C.5)

The Facility will not pursue representative sampling reduction or combined samples at this time. In the event the Facility wishes to pursue in the future, all required documentation will be prepared.

### 8.4    Inspections and Visual Observation Requirements and Procedures

The General Permit requires visual observations as described below:

**Monthly Visual Observations (General Permit Section XI.A.2.b)**

At least once per calendar month, the Facility will visually observe each drainage area for the following:

- Presence or indications of prior, current, or potential unauthorized NSWDs and their sources;
- Authorized NSWDs, sources, and associated BMPs;
- Condition of Storm Resistant Shelters, BMPs, and all other potential sources of pollutants associated with Production Area Activities.

Monthly visual observations will be completed during daylight hours, under dry conditions, and during scheduled Facility operating hours in accordance with General Permit Section XI.A.1.b. Monthly visual observations will be documented on the Monthly Visual Observation Form in Appendix C. The observation form includes a section on response actions and additional SWPPP revisions necessary in response to the visual observations as required in General Permit Section XI.A.3. If response actions are necessary (as described on the forms), BMPs will be revised and addressed within this SWPPP in accordance with the General Permit (Section XI.A.4)

**Sampling Event Visual Observations (General Permit Section XI.A.2.c)**

At each discharge location where a sample is obtained, the Facility will observe the discharge of storm water associated with Production Area Activities. As described in the General Permit (Section XI.A.2):

- The Discharger shall ensure that visual observations of storm water discharged from containment sources (e.g., secondary containment or storage ponds) are conducted at the time that the discharge is sampled.
- Any Discharger employing volume-based or flow-based treatment BMPs shall sample any bypass that occurs while the visual observations and sampling of storm water discharges are conducted.
- The Discharger shall visually observe and record the presence or absence of:
  o floating and suspended materials,
  o oil and grease,
  o discolorations,
  o turbidity,
  o odors,
  o trash/debris,
  o and source(s) of any discharged pollutants
- In the event that a discharge location is not visually observed during the sampling event, the location of the discharge and reasoning for not obtaining observations must be recorded.
- During a rain event when there is no discharge and sampling is not required, it will be documented that there was no discharge.

Sampling event visual observations will be documented on the Sampling Event Visual Observation Form within Appendix C. The observation form includes a section on response actions and additional SWPPP revisions necessary in response to the visual observations as required in General Permit Section XI.A.3. If response actions are necessary (as described on the forms), BMPs will be revised and addressed within this SWPPP in accordance with the General Permit Section XI.A.4.

In addition, to rain event and monthly inspections described in Paragraphs 24 and 25 below, PPT personnel will conduct an annual Pre-Rain Inspection at the beginning of the reporting year. The inspection will include the following elements:

- Inspection of the site for any areas of dirt and debris accumulation.
- Removal of dirt and debris from targeted areas.
- Inspect for any spills or leaks and cleanup immediately as necessary.
- Confirm all waste/trash/recycle bins are closed or covered.

## 8.5    Sample Collection and Handling Procedures (General Permit Section XI.B)

### 8.5.1    Sampling Events

In accordance with General Permit Section XI.B, storm water discharge samples will be collected from QSEs four times per year: twice during the first half of the year (July 1 through December 31) and twice during the second half of the year (January 1 through June 30). The General Permit describes a QSE as a precipitation event that:

- Produces a discharge from at least one drainage area, and

- Is preceded by 48-hours with no discharges from any of the drainage areas.

Storm water discharge samples should be collected under the following conditions by properly trained personnel:

- Within 4 hours of the start of discharge.

- The start of operations during regularly scheduled business hours if the QSE occurs within the previous 12-hour period.

- When weather and site conditions are safe.

### 8.5.2    Sample Collection and Analysis

Samples should be collected at the designated sampling locations shown on the Site Map and listed in Section 10.2. Samples will be collected, maintained and shipped in accordance with the requirements in the following sections.

To maintain grab sample integrity and prevent cross-contamination, sample collection personnel will follow the protocols below.

- Collect samples (for laboratory analysis) only in analytical laboratory-provided sample containers;

- Wear clean, powder-free nitrile gloves when collecting samples;

- Change gloves between sites; and

- Decontaminate equipment (e.g., bucket, tubing) prior to sample collection using a trisodium phosphate water wash, distilled water rinse, and final rinse with distilled water. (Dispose of wash and rinse water appropriately, i.e., do not discharge to storm drain or receiving water). Do not decontaminate laboratory provided sample containers.

Typically, samples are collected by dipping the collection container in the runoff flow paths and streams as noted below.

- For small streams and flow paths, dip the bottle facing upstream until full;

- For larger streams that can be safely accessed, collect a sample in the middle of the flow stream by directly dipping the mouth of the bottle. The opening of the bottle should be facing upstream to avoid any contamination by the sampler;

- Avoid collecting samples from ponded or stagnant water; and

- Do not stand upstream of the sampling point within the flow path.

Some containers may contain preservatives. These containers should never be dipped into the stream but filled indirectly from the collection container.

### 8.5.3    Sample Analysis

Presented below are the parameters selected for analysis and reason for including the parameter, as well as the analytical sampling requirements.

**San Juan Capistrano Equestrian Center Sampling Constituents**

| Constituent | Justification |
|---|---|
| pH | IGP Required Constituent |
| Oil and Grease(O&G) | IGP Required Constituent |
| Total Suspended Solids(TSS) | IGP Required Constituent |
| E. Coli | 303(d) Listed Impairment |
| Phosphorus | 303(d) Listed Impairment |
| Nitrate + Nitrite as N | 303(d) Listed Impairment |
| Ammonia as N | 303(d) Listed Impairment |

The sampling constituents consist of the three IGP required parameters (pH, O&G, TSS)
and several additional parameters will be monitored based on 303(d) listed
impairments for Trabuco Creek.

## Analytical Sampling Methods

| Constituent | Analytical Method | Minimum Sample Volume | Sample Containers | Sample Preservation | Reporting Limit | Maximum Holding Time |
|---|---|---|---|---|---|---|
| Field pH | Calibrated pH meter | N/A | N/A | None | 1 SU | 15 Minutes |
| TSS | SM2540D | 1 Liter (L) | 1 L plastic | None | 1.0 mg/L | 7 days |
| O&G | EPA 1664A | 1 L | 1 L amber glass | Hydrochloric acid | 5.0 mg/L | 28 days |
| Nitrate + Nitrite Nitrogen | SM 4500-NO3-F | 500 mL | Plastic | H2SO4 & 4°C | 0.20 mg/L | 48 hours |
| Ammonia as N | SM 4500-NH3-G | 500 mL | Plastic | H2SO4 to pH < 2 | 0.0200 mg/L | 28 days |
| Total Phosphorus | SM 4500 | 500 mL | Plastic | H2SO4 to pH < 2 | 0.0500 mg/L | 28 days |
| E. Coli | SM 9221 FC E | 250 mL | Poly | Sodium Thiosulfate | 2 MPN/100 mL | 6 hours |

### 8.5.4    Sample Handling Procedures

Samples for laboratory analysis will be handled as follows:

- Each sample container will be labeled immediately following sample collection with a unique sample identification;
- Field logs sheets included within Appendix C will be completed;
- Chain of Custody record will be completed. A completed example is included in Appendix D and described below;
- Cooler will be packaged with sufficient ice or blue ice to maintain samples between 0 and 6 degrees Celsius;
- Sample bottles will be packaged to reduce the chance of breakage during transit; and
- Samples will be delivered to the analytical laboratory promptly. Analytical laboratory should receive samples within 48 hours of the physical sampling unless required to be delivered sooner based on hold times.

### 8.6    Field Equipment Calibration Procedures (General Permit XI.C.2)

Field pH measurements will be conducted within fifteen minutes of sample collection. Do not store pH samples for later measurement. If using a designated sample container for field pH, rinse the container with two or three volumes of storm water from the flow at the discharge point prior to filling. Field pH will be monitored using:

•      Calibrated portable instrument for pH; or

•      Methods in accordance with 40 Code of Federal Regulations 136 for testing storm water.

If a calibrated portable instrument for pH is used, field measurements should be conducted in accordance with the portable instrument accompanying manufacturer's instructions. An equipment calibration will be performed prior to forecast rain events that the Facility plans to monitor. The pH measurement will be recorded on the Sampling Event Visual Observation Form within Appendix C.

## 8.7      Chain of Custody Record (General Permit Section X.I.5)

The Chain of Custody Record is a legal document used to track the samples from collection through analysis. The Chain of Custody Record must be signed by the sampler and the person taking custody of the samples. An example chain of custody record is included in Appendix D.

## 8.8      Data Evaluation and Reporting (General Permit Section XI.B.11)

The designated member of the Pollution Prevention Team should complete an evaluation of the water quality sample analytical results once received from the laboratory.

A designated member of the Pollution Prevention Team will complete the evaluation listed below. The sampling analysis reporting requirements may also be found in General Permit Section XI.B.11:

- All sampling and analytical results for all individual samples will be submitted via SMARTS within 30 days of obtaining all results for each sampling event.

- The method detection limit will be provided when an analytical result from samples taken is reported by the laboratory as a "non-detect" or less than the method detection limit. A value of zero will not be reported.

- Analytical results that are reported by the laboratory as below the minimum level (often referred to as the reporting limit) but above the method detection limit will be provided.

Reported analytical results will be averaged automatically by SMARTS at the end of the reporting year. For any calculations required by the General Permit, a value of zero shall be used when effluent sampling analytical results are reported by the laboratory as "non-detect" or reported as less than the Method Detection Limit (MDL).

In addition to the reporting requirements above, the designated member of the Pollution Prevention Team will:

- Compare each distinct sample (individual or combined) to the corresponding instantaneous maximum Numeric Action Level (NAL) included in Table 2 of the General Permit; and

- Calculate the average of the analytical results and compare the average to the NALs included in Table 2 of the General Permit.

If an NAL exceedance occurs in a given reporting year, a Level 1 Exceedance Response Action (ERA) Evaluation and a Level 1 ERA Report will be required in the following year,

or, if in a subsequent year, a Level 2 ERA Action Plan and a Level 2 ERA Report will be required in accordance with the General Permit.

An instantaneous maximum NAL exceedance occurs when two (2) or more analytical results from samples taken for any single parameter within a reporting year exceed the instantaneous maximum NAL or are outside the range for pH. An annual NAL exceedance occurs when the average of all the analytical results for a parameter from samples taken within a reporting year exceeds the annual NAL value for that parameter listed in Table 2.

The results of either of the ERA reports may require that the SWPPP be amended. ERA related documents, if applicable, are maintained with the hardcopy SWPPP files in Exhibit C.

- The Facility is currently in the following ERA Level for TSS:

| ERA Level | Date Entered |
|---|---|
| Level 2 for TSS | February 1, 2024 |

If the Facility is in ERA Level 1 or Level 2, the following person has been designated as the QISP.

| QISP Name | QISP Cert Number | Contact Information (phone/ email address) |
|---|---|---|
| John Gleason | 00042 | (949)-981-3867 john.gleason@mshatch.com |

## 8.9    Annual Facility Evaluation (General Permit Section XV)

The General Permit (Section XV) requires the Facility to conduct one (1) Annual Comprehensive Facility Compliance Evaluation (ACFCE) for each reporting year (July 1 to June 30). The ACFCE should be conducted at least eight (8) months and not more than sixteen (16) months after the previous ACFCE. The SWPPP should be revised, as appropriate based on the results of the ACFCE, and the revisions shall be implemented within 90 days of the ACFCE Evaluations shall include the following:

- A review of all visual observation records, inspection records, and sampling and analysis results.
- A visual inspection of all potential pollutant sources for evidence of, or the potential for, pollutants entering the drainage system.
- A review and evaluation of all BMPs (both structural and non-structural) to determine whether the BMPs are adequate, properly implemented and maintained, or whether additional BMPs are needed. A visual inspection of equipment needed to implement the SWPPP, such as spill response equipment, shall be included.
- An evaluation report that includes, (i) identification of personnel performing the evaluation, (ii) the date(s) of the evaluation, (iii) necessary SWPPP revisions, (iv) schedule, for implementing SWPPP revisions, and (v) any incidents of noncompliance and the corrective actions taken. If the above certification

cannot be provided, explain in the evaluation report why the Facility operator is not in compliance with this General Permit. The evaluation report shall be submitted as part of the annual report.

## 8.10    Annual Report (General Permit Section XVI)

The Annual Report should be prepared, certified, and electronically submitted no later than July 15th following each reporting year using the standardized format and checklists in SMARTS. The Annual Report (completed through SMARTS) should include:

- A Compliance Checklist that indicates whether a Discharger complies with, and has addressed all applicable requirements of this General Permit.
- An explanation for any non-compliance of requirements within the reporting year, as indicated in the Compliance Checklist.
- An identification, including page numbers and/or sections, of all revisions made to the SWPPP within the reporting year.
- The date of the ACFCE.

INDUSTRIAL STORM WATER POLLUTION PREVENTION PLAN (SWPPP)
SAN JUAN CAPISTRANO EQUESTRIAN CENTER

JULY, 2025

## 9.0    BMP SUMMARY TABLE

| Production Activity/ Pollutant Source | Potential Pollutants | BMPs Implemented |
|---|---|---|
| Manure Bin Storage Area | Solids (TSS, settleable solids) Nutrients (nitrogen, phosphorous), Pathogens, Trash | • Manure is removed from the site daily by a private contractor.<br>• Manure and trash bins are covered prior to rain to avoid stormwater runoff.<br>• Visual observations for housekeeping deficiencies are conducted weekly.<br>• Manure is picked up on a continuous basis when observed by staff, trainers, owners or other on-site personnel.<br>• Treatment BMPs are installed downgradient including infiltration basin with fiber roll check at the inflow. |
| Manure and Stall Waste Bunker | Solids (TSS, settleable solids) Nutrients (nitrogen, phosphorous), Pathogens, Trash | • Manure bins are removed from the waste bunker prior to rain to avoid discharge.<br>• Visual observations for housekeeping deficiencies are conducted weekly.<br>• Treatment BMPs are installed including a sump with an earthen berm to prevent discharge. |
| Hay Storage | Solids (TSS, settleable solids) | • Feed and bedding are stored in covered areas and are not exposed to stormwater.<br>• Storage areas are inspected for leaks, runoff, and proper storage techniques by staff. |

## 10.0     STORM WATER POLLUTION PREVENTION PLAN CERTIFICATION

I certify under penalty of law that this document and all attachments were prepared under my direction or supervision in accordance with a system designated to ensure that qualified personnel properly gather and evaluate the information submitted. Based on my inquiry of the person or persons who manage the system, or those persons directly responsible for gathering the information, the information submitted is, to the best of knowledge and belief, true, accurate, and complete.  I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations.

Signature: _____    Date: _____

Printed Name: _____

Title: _____

NOTE:  All reports, certification, or other information required by the General Permit or requested by the Regional Water Quality Control Board, the State Board, U.S. EPA, or local storm water management agency shall be signed by the above signatory or by a duly authorized representative. This SWPPP may be certified online at the Water Board website SMARTS.

## Appendix A: Permit Registration Documents



State Water Resources Control Board
# NOTICE OF INTENT
GENERAL PERMIT TO DISCHARGE STORM WATER
ASSOCIATED WITH INDUSTRIAL ACTIVITY (WQ ORDER No. 2014-0057-DWQ)
(Excluding Construction Activities)



GAVIN NEWSOM
GOVERNOR

JARED BLUMENFELD
SECRETARY FOR
ENVIRONMENTAL PROTECTION

| WDID: | | Status: | Submitted to Water Board |
|---|---|---|---|

## Operator Information

Type: Private Business

| Name: | San Juan  Capistrano Equestrian Center | Contact Name: | Denise HauertMarshall |
|---|---|---|---|
| Address: | 26282 Oso Rd | Title: | Managing Director |
| Address 2: | | Phone Number: | 858-735-8580 |
| City/State/Zip: | San Juan Capistrano CA 92675 | Email Address: | Denise@sjcec.net |
| Federal Tax ID: | | | |

## Facility Information

Level:

| Contact Name: | Denise HauertMarshall | Title: | Managing Director |
|---|---|---|---|
| Site Name: | San Juan  Capistrano Equestrian Center | | |
| Address: | 26282 Oso Rd | | |
| City/State/Zip: | San Juan Capistrano CA 92675 | Site Phone #: | 858-735-8580 |
| County: | Orange | Email Address: | Denise@sjcec.net |
| Latitude: 33.51523 | Longitude: -117.67057 | Site Size: | 12.7 Acres |
| | Industrial Area Exposed to Storm Water: | | 11.6 Acres |
| | Percent of Site Impervious (Including Rooftops): | | 40 % |

## SIC Code Information

1. 0272    Horses and Other Equines
2. _____
3. _____

## Additional Information

| Receiving Water: | Arroyo Trabuco Creek | Flow: | Directly |
|---|---|---|---|
| Storm Drain System: | | | |
| Compliance Group: | | | |

RWQCB Jurisdiction: Region 9 - San Diego
Phone: 619-516-1990          Email: r9_stormwater@waterboards.ca.gov

## Certification

Name: Denise HaunertMarshall          Date: February 11, 2023
Title: Managing Director

**Attachments Meta Data Information:**

| Attachment ID | File Name | File Description | File Hash | File Size | Date Attached | Attachment Type |
|---|---|---|---|---|---|---|
| 3290418 | Site Map 2023 | SWPPP Site Map | ea9b5b0898e60f4a43b4c43b2ac19459fc52a7826889c38aad177a2353541 | 3381218 | 2023-02-10 17:04:59.0 | Facility/Site Map |
| 3290420 | San Juan Capistrano Equestrian Center Industrial SWPPP_2-10-2023 | SWPPP | fefba186cd228951757472cbd9a54a7df1509f6777983a58687a1c99289ad19d | 4935005 | 2023-02-10 17:06:19.0 | SWPPP |

**\* Does your facility storm water flow to one or more TMDL water bodies or watersheds listed in Attachment E? Yes**

**\* TMDL Parameters Information**

| TMDL | Waterbody/Watershed Name | Parameter Name | Discharges ? |
|---|---|---|---|
| Twenty Beaches and Creeks Indicator Bacteria | Pacific Ocean Shorelines: (901.11), (901.12), (901.13), (901.14), (901.27), (901.30), (903.00) | Enterococci MPN | N |
| Twenty Beaches and Creeks Indicator Bacteria | Pacific Ocean Shorelines: (901.11), (901.12), (901.13), (901.14), (901.27), (901.30), (903.00) | Fecal Coliform | Y |
| Twenty Beaches and Creeks Indicator Bacteria | Pacific Ocean Shorelines: (901.11), (901.12), (901.13), (901.14), (901.27), (901.30), (903.00) | Total Coliform | Y |





**State Water Resources Control Board**

February 11, 2023

**Fee Statement**
**Application Id #**    558109

<u>Facility/Site</u>

San Juan  Capistrano Equestria
26282 Oso Rd
San Juan Capistrano CA 92675

Thank you for submitting the Permit Registration Documents (PRDs) for the facility/site referenced above. The application fee for this submittal is:  $1,738.00

The application is considered incomplete until all PRDs, including the application fee, are received. Only after all PRDs are received, will the WDID Number be assigned. Permit coverage begins once the WDID Number is assigned to the facility/site.

Note: The submitted application will be automatically returned as incomplete if all PRDs, including the application fee and the original signed electronic authorization form, are not received within 60 days from the date of submission.

Please make checks payable to: SWRCB

Mail this Fee Statement and  $1,738.00  to:

<u>**Regular Mailing Address:**</u>
SWRCB
Storm Water Section
PO Box 1977
Sacramento, CA  95812-1977

<u>**Overnight Mailing Address:**</u>
SWRCB
Storm Water Section
1001 I Street – 15th Floor
Sacramento, CA  95814

If you have questions or want to check on the status of the application, email us at stormwater@waterboards.ca.gov or call 1-866-563-3107.

Thank You,
Storm Water Help Desk

JOAQUIN ESQUIVEL, CHAIR  |  EILEEN SOBECK, EXECUTIVE OFFICER

1001 I Street, PO Box 1977, Sacramento, California, 95812  |  www.waterboards.ca.gov, ph:1-866-563-3107, fax:(916) 341-5543

♻ RECYCLED PAPER

## Appendix B:  SWPPP Drainage and BMP Exhibit



## Appendix C:  Horse Path Infiltration BMP Detail



6" WASHED ASTM NO.8 PEA GRAVEL

Existing Dirt Surface

Existing Dirt Surface

Finished Sand Surface

WIDTH VARIES (7' - 14')

18"

24"

18" WASHED ASTM C33 COARSE FILTER SAND

24" WASHED AASHTO NO.57 AGGREGATE GRAVEL LAYER

HORSE PATH INFILTRATION BMP
N.T.S.

TYPICAL
CROSS SECTION
SAN JUAN CAPITRANO EQUESTRIAN CENTER
SAN JUAN CAPISTRANO, CA

Not-to-Scale

MAY 2025

FUSCOE

## Appendix D: Visual Observation Forms and Tracking Logs

# MONTHLY VISUAL OBSERVATION CHECKLIST

## San Juan Capistrano Equestrian Center
26282 Oso Road
San Juan Capistrano, CA 92630

## INSTRUCTIONS:

This checklist is to be used on a routine monthly basis and can be used to ensure that San Juan Capistrano Equestrian Center is prepared for a rain event. The checklist should be filled out at least once per calendar month.

**DATE OF INSPECTION:** _____

**TIME OF INSPECTION:** _____

**EMPLOYEE NAME:** _____

**TYPE OF INSPECTION:**   Routine Monthly Inspection ☐   Pre-Rain Event Inspection ☐
Post-Rain Event Inspection ☐   Rainfall Depth _____(in)

Date/Time of expected rain event: _____

| NON-STORMWATER DISCHARGES | | |
|---|---|---|
| Were any authorized or unauthorized non-stormwater discharges occurring? | Y ☐ | N ☐ |
| If yes, describe the discharges (floating material, discolorations, trash, turbidity, etc.): | | |

## Monthly / Pre-Rain Event Checklist

### OVERALL FACILITY

| Best Management Practice | | | Comments |
|---|---|---|---|
| Are stored sand and dirt stockpiles covered with tarp prior to rain? | Y ☐ | N ☐ | |
| | | | ☐ Photo Attached: # |
| Are solid waste dumpster covers closed? | Y ☐ | N ☐ | |
| | | | ☐ Photo Attached: # |
| Is any damage to perimeter control devices and structural BMPs evident upon visual inspection (e.g., broken gravel bags, flattened fiber roll, etc.)? | Y ☐ | N ☐ | |
| | | | ☐ Photo Attached: # |

**STALL AREAS**

| Best Management Practice | | | Comments |
|---|---|---|---|
| Are interim manure collection devices not actively in use for stall clean outs stored under cover? | Y ☐ | N ☐ | ☐ Photo Attached: # |
| Are stalls maintained to prevent run-on of stormwater and run-off of discharges? | Y ☐ | N ☐ | ☐ Photo Attached: # |
| Do stalls show an accumulation of manure? | Y ☐ | N ☐ | ☐ Photo Attached: # |
| Is any manure / waste bedding present on walkways outside of overhangs or in drainage conveyance systems (i.e. concrete gutter)? | Y ☐ | N ☐ | ☐ Photo Attached: # |

**MANURE STORAGE**

| Best Management Practice | | | Comments |
|---|---|---|---|
| Are all full manure storage bins covered? | Y ☐ | N ☐ | ☐ Photo Attached: # |
| Is any manure / waste bedding present in area around manure storage bins? | Y ☐ | N ☐ | ☐ Photo Attached: # |

**STORAGE BARN**

| Best Management Practice | | | Comments |
|---|---|---|---|
| Is all feed is stored under cover? | Y ☐ | N ☐ | ☐ Photo Attached: # |
| Are all potentially hazardous materials (e.g., paint thinner, stain, etc.) stored under cover? | Y ☐ | N ☐ | ☐ Photo Attached: # |
| Are any containers leaking? | Y ☐ | N ☐ | ☐ Photo Attached: # |
| Are spill containment and clean up materials readily available? | Y ☐ | N ☐ | ☐ Photo Attached: # |

| ARENAS | | | |
|---|---|---|---|
| *Best Management Practice* | | | *Comments* |
| Have the arenas been evened out/compacted as much as the stable's tractor can accomplish? | Y ☐ | N ☐ | ☐ Photo Attached: # |
| Is there evidence of recent footing soil discharges onto the road or near the creek? | Y ☐ | N ☐ | ☐ Photo Attached: # |

| TACK SHEDS | | | |
|---|---|---|---|
| *Best Management Practice* | | | *Comments* |
| Are washing materials (e.g., shampoo) properly stored in individual tack sheds? | Y ☐ | N ☐ | ☐ Photo Attached: # |

# ANNUAL COMPREHENSIVE FACILITY COMPLIANCE EVALUATION

| Part I:  General Information | |
|---|---|
| Date and Time of Evaluation: | Weather Conditions: |
| Name of Inspector: | Signature/Certification: |

| Part II:  Records Review | | |
|---|---|---|
| *Review the Following Records to and identify potential compliance deficiencies* | *Deficiency Noted? (Y or N)* | *If yes, describe deficiency and action taken* |
| Visual Observation Records (monthly, re-storm, storm, and sampling event) | | |
| Manure transfer logs / receipts | | |
| Storm water sample results | | |
| Mortality records | | |

| Part II:  Inspection of Operations and BMP Implementation | | |
|---|---|---|
| *Visually Observe the Following Areas to Identify Potential BMP Deficiencies (use SWPPP to confirm BMPs are implemented)* | *Deficiency Noted? (Y or N)* | *If yes, describe deficiency and action taken. If deficiencies cannot be immediately addresses, provide a schedule for completion* |
| Production Areas/Stalls | | |
| Wastewater collection systems (Wash Station sewer connections) | | |
| Parking Lots | | |
| Covered Manure Containments | | |
| Storage Areas (Raw Materials, hay, feed, bedding) | | |
| Spill Response Materials | | |
| Discharge Points | | |

**ANNUAL COMPREHENSIVE FACILITY COMPLIANCE EVALUATION**

| | | |
|---|---|---|
| Production area stormwater diversion, collection, pretreament retention, and application system | | |

**ANNUAL COMPREHENSIVE FACILITY
COMPLIANCE EVALUATION**

| Part III:  SWPPP Revision/Corrective Actions |
|---|

Based on this evaluation, are revisions to the SWPPP necessary?   Yes ☐ No ☐   If Yes, summarize revisions below.




Additional Comments:

**SAMPLING EVENT VISUAL OBSERVATION**
**San Juan Capistrano Equestrian Center**

| Part I:  General Information | |
|---|---|
| Date of Inspection: | Inspector Name: |
| Predicted % Chance of Rain: | Estimate Time Discharge Began: |
| Onsite Rain Gauge Reading (inches): | |
| Estimate time since last rain event producing discharge (days or hours): | |
| Identify discharge points where samples were collected: A  ☐  A  ☐ | |

**Part II:  Sampling Event Observations** (If discharge occurs, observe drainage area to identify source)

**Discharge Point A3**:  Observation time:             D       r   e   Y  N       Time Discharge Started:

| Odors:  Yes ☐  No ☐ | Trash/Debris:     Yes ☐  No ☐ | Suspended Material:     Yes ☐  No ☐ |
|---|---|---|
| Sheen:     Yes ☐  No ☐ | Discolorations:     Yes ☐  No ☐ | Turbidity:     Yes ☐  No ☐ |
| pH: | Additional Comments: | |

**Discharge Point A4**:  Observation time:             D       r   e   Y  N       Time Discharge Started:

| Odors:  Yes ☐  No ☐ | Trash/Debris:     Yes ☐  No ☐ | Suspended Material:     Yes ☐  No ☐ |
|---|---|---|
| Sheen:     Yes ☐  No ☐ | Discolorations:     Yes ☐  No ☐ | Turbidity:     Yes ☐  No ☐ |
| pH: | Additional Comments: | |

## Appendix E:  Operations and Maintenance Plan for Horse Path Infiltration BMPs and Infiltration Basin BMPs

OPERATION AND MAINTENANCE PLAN

## Horse Path Infiltration BMP

| Activity | Frequency |
|---|---|
| **GENERAL INSPECTIONS** | |
| Identify erosion and scour of the top sand layer, where applicable | Four times per year during wet season, including inspection just before the wet season and within 24 hours after at least two storm events ≥ 0.5 inches |
| Observe and record excessive surface ponding that persists greater than 48 hours | |
| Estimate degree of sediment accumulation on horse path BMP surface. Determine if sediment removal of sand layer is required to restore original design infiltration rate through observations (through multiple storm observations) | |
| Identify if sediment deposition is occurring along the length of the horse path way due to run-on contributions from various sources | |
| Observe elevation difference between Horse Path Infiltration BMP and adjacent ground surface. Maintain a shallow, positive-drainage depression adjacent to the BMP to ensure stormwater consistently follows the designed flow path into the infiltration facility. Regrade or remove accumulated sediment as needed to preserve intended flow direction and prevent bypass. | |
| **ROUTINE MAINTENANCE** | |
| **Sediment, Trash, Debris and Vegetation** | |
| Remove sediment, trash and debris from surface | Four times per year during wet season, including inspection just before the wet season |
| Remove undesirable vegetation that may have established along length as well as immediately adjacent to Horse Path Infiltration BMP | Four times per year during wet season, including inspection just before the wet season |
| Remove approximately top 4" sand upon observation of ponding exceeding 48 hrs at the localized area and replace with clean washed sand | As observed |

OPERATION AND MAINTENANCE PLAN

| Horse Path Infiltration BMP | |
|---|---|
| **Activity** | **Frequency** |
| **MAJOR ROUTINE MAINTENANCE** | |
| | |
| Replace top 6" of sand layer | Estimated every 10 years (highly site specific) |
| Replace full depth of media (Sand, pea gravel and aggregate) | Estimated every 20 years (highly site specific) |
| | |
| CORRECTIVE (MAJOR) MAINTENANCE | |
| Document major maintenance activities | As performed |
| Take photographs before and after from the same vantage point | As performed |

OPERATION AND MAINTENANCE PLAN

## Infiltration Basin BMP

| Activity | Frequency |
|----------|-----------|
| **GENERAL INSPECTIONS** | |
| Identify erosion and scour, if applicable | Four times per year during wet season, including inspection just before the wet season and within 24 hours after at least two storm events ≥ 0.5 inches |
| Observe and record excessive ponding that persists greater than 48 hours | |
| Check for signs of clogging or surface sealing (e.g., sediment crusts, algae). | |
| Identify any needed corrective maintenance that will require site-specific planning or design | |
| Ensure stormwater consistently follows the designed flow path into the infiltration basin. Regrade or remove accumulated sediment as needed to preserve intended flow direction and prevent bypass. | |
| Identify erosion or scouring on infiltration basin side slopes as well as in the area immediately adjacent to the infiltration basin. | |
| **ROUTINE MAINTENANCE** | |
| **Sediment, Trash, and Debris** | |
| Remove trash from surface | Each visit; as needed |
| Remove visible debris, manure, or organic material. | |
| **Vegetation** | |
| Remove undesirable vegetation | Annually before the wet season. |
| Confirm the basin perimeter fence or signage (if used) is intact and visible. Repair fence or signage damaged by livestock or equipment. | |
| **Surface** | |
| Remove fines (top 1-2") from basin bottom and scarify surface if compaction or clogging is observed. | Annually |
| Regrade basin bottom if uneven or localized ponding issues develop. | Bi-Annually |

OPERATION AND MAINTENANCE PLAN

## Infiltration Basin BMP

| Activity | Frequency |
|---|---|
| **CORRECTIVE (MAJOR) MAINTENANCE** | |
| Over-excavate bottom 12″ and replace with clean washed course sand | Every 5-10 years based on standing water observations |
| Document major maintenance activities | As performed |
| Take photographs before and after from the same vantage point | As performed |

## Appendix F: Housekeeping Checklist

# SAN JUAN CAPISTRANO EQUESTRIAN CENTER

# HOUSEKEEPING CHECKLIST

26282 Oso Road
San Juan Capistrano
CA 92675

| Date/Time | | **Is a storm event predicted?** **Storm Event Criteria:** Rain events with a greater than 50% probability above 0.1 inches forecasted at least 24 hours prior to its occurrence as determined by the National Oceanic and Atmospheric Administration for zip code 92675. | Y/N |
|---|---|---|---|
| **Inspector Name & Signature** | | | |

| Housekeeping Checklist for Non-CAFO Areas | | | |
|---|---|---|---|
| **Activity & Source** | **Yes** | **No** | **Notes** |
| **Horse Pathways** | | | |
| Exposed manure | | | |
| Exposed Bedding | | | |
| Exposed Feed Materials | | | |
| Exposed maintenance materials | | | |
| Spills / Leaks | | | |
| Dry weather discharges | | | |
| | | | |
| | | | |
| **Uncovered Arenas** | | | |
| Exposed manure | | | |
| Exposed Bedding | | | |
| Exposed Feed Materials | | | |
| Exposed maintenance materials | | | |
| Spills / Leaks | | | |
| Dry weather discharges | | | |
| | | | |
| | | | |

1

## Appendix G: Chain of Custody Record Form

# Chain of Custody Record

**ENTHALPY ANALYTICAL**

**Enthalpy Analytical - Orange**
931 W. Barkley Avenue, Orange, CA 92868
Phone 714-771-6900

**Lab No:**

**Page:** 1 of 1

**Matrix:** A = Air   S = Soil/Solid   Water   DW = Drinking Wate   SD = Sediment   PP = Pure Product   SEA = Sea Water   SW = Swab   T = Tissue   WP = Wipe   O = Other

## Turn Around Time (rush by advanced notice only)

| Standard: | X | 5 Day: | | 3 Day: | |
| 2 Day: | | 1 Day: | | Custom TAT | |

**Preservatives:** W =   1 =
Na₂S₂O₃   2 = HCl   3 = HNO₃
4 = H₂SO₄   5 = NaOH   6 = Other

**Sample Receipt Temp:**

(lab use only)

## CUSTOMER INFORMATION

| Company: | Environmental Law Group |
| Report To: | Wayne Rosenbaum |
| Email: | swr@envirolawyer.com |
| Address: | 225 Broadway, Ste 1900 |
| | San Diego, CA 92101 |
| Phone: | 619-518-6618 |
| Fax: | |

## PROJECT INFORMATION

| Quote #: | |
| Proj. Name: | SJCEC |
| Proj. #: | |
| P.O. #: | |
| Address: | |
| Global ID: | |
| Sampled By: | |

## Analysis Request

**Test Instructions / Comments**

E.Coli should assume dilutions to quantify up to 50,000 CFU/100 ml
Send sample results to John Gleason
john.gleason@mshatch.com,
Samin Adib
samin.adib@mshatch.com, and
Wayne Rosenbaum
swr@envirolawyer.com

| Sample ID | Sampling Date | Sampling Time | Matrix | Container No. / Size | Pres. | BOD | Total Suspended Solids | Total Nitrogen (N+N) | Ammonia as N | Oil & Grease | Total Phosphorous | E-Coli | pH (Field measurement only) | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | | | | | | | | | | | | | | |
| 2 | | | | | | | | | | | | | | |
| 3 | | | | | | | | | | | | | | |
| 4 | | | | | | | | | | | | | | |
| 5 | | | | | | | | | | | | | | |
| 6 | | | | | | | | | | | | | | |
| 7 | | | | | | | | | | | | | | |
| 8 | | | | | | | | | | | | | | |
| 9 | | | | | | | | | | | | | | |
| 10 | | | | | | | | | | | | | | |

| | Signature | Print Name | Company / Title | Date / Time |
|---|---|---|---|---|
| ¹ Relinquished By: | | | | |
| ¹ Received By: | | | | |
| ² Relinquished By: | | | | |
| ² Received By: | | | | |
| ³ Relinquished By: | | | | |
| ³ Received By: | | | | |

# EXHIBIT C



Time Schedule Order (TSO)
Application

for

Total Suspended Solids (TSS)
Numeric Action Level (NAL)
IGP Compliance

for

San Juan Capistrano Equestrian Center
San Juan Capistrano, CA

Prepared by:
John Gleason, QISP
M.S. Hatch Consulting
(949) 981-3867

March 2025

# Table of Contents

1    INTRODUCTION ................................................................................................................. 1

2    DESCRIPTIONS OF PRODUCTION ACTIVITIES AT FACILITY ................................................. 1

3    ANALYSIS OF POLLUTANT SOURCES ................................................................................ 2

4    POLLUTION PREVENTION ALTERNATIVES ANALYSIS ........................................................ 2

5    IMPLEMENTATION PLAN ................................................................................................... 4

# 1    INTRODUCTION

This Time Schedule Order Application (Application) was prepared pursuant to <u>California Water Code section 13300</u> for the San Diego Regional Water Quality Control Board's (SDRWQCB) consideration. Pursuant to Industrial General Permit (IGP) Fact Sheet paragraph II.E.2.d this Application is being prepared as a request to the SDRWQCB for San Juan Capistrano Equestrian Center (SJCEC or Facility) to fully implement the Level 2 ERA Action Plan for Total Suspended Solids (TSS) by January 1, 2027. The Application will be uploaded to the SMARTS database as an accompanying document to the SJCEC IGP Storm Water Pollution Prevention Plan (SWPPP) upon review and approval by the SDRWQCB. For all areas covered under the IGP, a detailed SWPPP in accordance with IGP requirements has been prepared and is being implemented. This Application outlines operations and site-specific procedures implemented, as well as future improvements to minimize Confined Animal Feeding Operation (CAFO) Production Area discharges from entering surface waters adjacent to the facility. By implementing the Best Management Practices (BMPs) outlined in this Application, as well as following recommendations for future improvements, it is the goal to protect beneficial uses of nearby water resources. Additionally, this proposed BMP will serve to augment groundwater resources and help achieve the Governor's goal of adding 500,000-acre feet to California's groundwater supply by 2030.

# 2    DESCRIPTIONS OF PRODUCTION ACTIVITIES AT FACILITY

The SJCEC is a horse stable and training facility determined to be a CAFO with 420 horses. As a Medium CAFO, the Facility has portions that are within the "*Production Area*", defined in <u>40 C.F.R. § 122.23</u> as "*That part of an animal feeding operation (AFO) that includes the animal confinement area, the manure storage area, the raw materials storage area, and the waste containment areas.*" The Production Area includes Drainage Areas A3 and A4 as shown in Figure 1. The Facility operations are described by SIC Code 0272 – Boarding Horses. The Facility is 16 acres in total and the Production Area is 5.4 acres.  The Facility has a Stormwater Pollution Prevention Plan (SWPPP) that was updated in March 2025 to include recent renovations that removed exposed stalls and other operations that dramatically decreased the Production Area footprint.

The Facility discharges to the Arroyo Trabuco Creek which is impaired for nitrogen, bacteria, phosphorus, and ammonia. The Facility is a potential source of nitrogen bacteria, phosphorus, and ammonia from its manure handling, storage and waste management areas. No numeric effluent limits were identified for these parameters.

In addition to the impairment parameters listed above, the Facility also monitors Oil & Grease, pH and Total Suspended Solids (TSS). A Level 2 exceedance response action (ERA) Action Plan was prepared for exceedances of TSS. The Level 2 ERA Action Plan included SWPPP revisions to implement more specific BMPs, limit the Production Area and evaluate additional BMPs for the manure management areas.

# 3    ANALYSIS OF POLLUTANT SOURCES

SJCEC has collected samples that have exceeded the numeric action level (NAL) for total suspended solids (TSS). The NAL for TSS is 100 mg/L average and 400 mg/L instantaneous. The production source of TSS at the SJCEC is from uncovered horse manure in the production areas and non-production commingled water from uncovered paths and arenas. The equestrian center generates horse manure from covered stalls. The manure is collected into carts by raking and sweeping and placed in roll-off bins within the Manure and Stall Waste Bunker. Full bins are temporarily stored in the Manure Bin Storage Area prior to shipping.

There are many walking areas that are not part of the confined animal operation Production Area. These non-production areas include dirt roads and paths and arenas. Some of the non-production areas commingle with the discharge from Production Areas. Facility renovations have changed the drainage areas since samples exceeded the TSS NAL. Uncovered horse stalls were removed and roof runoff was diverted from the Production Areas. The sample location (Drainage Area A4; formerly DA6) that exceeded the TSS NAL was moved upgradient to collect a discharge directly from the Manure and Stall Waste Bunker. The Manure and Stall Waste Bunker has not discharged stormwater from the Facility since the Facility started coverage under the IGP.

The Manure Bin Storage Area (Drainage Area A3; formerly DA5) has not discharged stormwater at this facility. Runoff from Drainage Area A3 is directed to an earthen basin that has not discharged stormwater since the Facility started coverage under the IGP.

# 4    POLLUTION PREVENTION ALTERNATIVES ANALYSIS

**A.** The Manure and Stall Waste Bunker (Sump) maintains a grade separation to store the volume of storms since the IGP permit coverage began and has not discharged from the Facility. The Sump is partially concrete lined and partially earthen.

The Manure Bin Storage Area is used to store full manure storage bins until they are transported offsite for disposal. Stormwater form the Manure Bin Storage Area flows over a fiber roll check dam to an earthen basin.

The previous configuration of the Manure and Stall Waste Bunker and Manure Bin Storage Area had upgradient uncovered stalls that resulted in some production and non-production areas' stormwater commingling. Previous samples were collected of discharge downgradient from the Manure and Stall Waste Bunker (Drainage Area A4) after commingling with non-Production Area stormwater. Since there was never a discharge from Drainage Area A3, no samples have been collected from Drainage Area A3.

**B.** Additional sump storage has been considered and infiltration rates were checked at the site. Permeability testing indicated that infiltration was limited in areas. All uncovered horse stalls have been removed from the Facility and roof drains have been installed to divert roof water so it does not commingle with production stormwater and/or add to the volume of Production Area stormwater. The remaining uncovered Production Area for confined animals are the Manure and Stall Waste Bunker and the Manure Bin Storage Area. Because the drainage areas have been revised based on renovations, the Facility is recalculating the drainage areas and sump volumes to meet the compliance option in the IGP (NPDES No. CAS000001, Attachment I)

Based on the IGP Attachment I, Compliance Options, stormwater discharges from "*Production Areas*" covered under the IGP shall maintain the effective capacity to capture, infiltrate and/or evapotranspire the volume of runoff produced up to and during the 85th percentile 24-hour precipitation event based upon local, historical precipitation data and records.

**C.** Since the feasibility of the infiltration basins was limited, covering with storm-resistant shelters was evaluated. Renovations have already been made to the Facility. All uncovered horse stalls (previously production areas) were removed. This changed the production drainage areas. Covering the Manure Storage Bin Area with a storm-resistant shelter is part of the Facility's TSO plan.

**D.** The compliance option goal for this facility is expected to result in compliance with Attachment I of the IGP and limit exposure of manure.

3

# 5    IMPLEMENTATION PLAN

**A.** The evaluation of drainage areas and existing stormwater storage is underway. A permanent cover for the Manure Bin Storage Area with berms and roof drains diverting stormwater from this production area is being evaluated. Increasing the capture volume of the manure collection area sump is being evaluated along with the drainage area and storage volume evaluation. These evaluations and necessary design and construction are expected to take no more than two years.

**B.** Since no discharge has occurred in the Production Area (Drainage Areas A3 and A4). current BMPs will be implemented as described above. Additional evaluation of drainage areas and covers to meet the IGP Attachment I on-site Compliance Option will be conducted.

**C.** The evaluation of the Drainage Areas will take approximately 2.5 months. The evaluation of additional stormwater storage/infiltration area and the cover for the Manure Bin Storage Area is expected to take 3 months. It is expected to take another 5 months to design the stormwater storage areas or covers, if needed. These completed covers and additional covers will be completed by January 2027. The SWPPP will be revised along with the drainage areas as necessary based on renovations. The only remaining Production Area left will be the Manure and Stall Waste Bunker since the Manure Bin Storage Area will be covered with a storm-resistant shelter.

**D.** Once the Compliance Option is met, the site is not expected to discharge stormwater from the production areas for up to the 85th percentile storm. If there is discharge, sampling of overflow from the Manure and Stall Waste Bunker will be conducted. The Manure and Stall Waste Bunker is expected to hold water long enough to allow sedimentation such that TSS levels should be within NALs even if the sump were to overflow.

   i.    The production drainage areas will be monitored visually during rain events to ensure there is no discharge. Sampling supplies will be maintained at the Facility in case there is an overflow. Samples from the overflow will be collected and analyzed for TSS to compare to NALs.

   ii.   If there is no discharge for stormwater from the Production Area, the site will be considered to be in compliance.

**E.**   The proposed compliance option is not implementing any BMPs that are not already being implemented at the site in other areas. No additional media or cross media transfers are proposed. The stormwater discharges of production pollutants are minimized by covering production sources and capturing production stormwater in existing sumps.

**F.**   The Facility production pollutant source is horse manure which does not meet the definition of hazardous waste.

The SJCEC hereby requests a time schedule order to extend to January 2027 to complete the compliance option (CGP Attachment I).

**Figure 1 – Site Map with Existing Production Drainage Area**



SAN JUAN CAPISTRANO EQUESTRIAN CENTER
26282 OSO RD
SAN JUAN CAPISTRANO, CA 92675
CONCEPTUAL DRAINAGE EXHIBIT FOR IGP/ PRODUCTION AREAS
March 2025

15535 Sand Canyon Ave, Suite 100
Irvine, California 92618
949.471.1960                    fuscoe.com

SCALE:   1" = 100'
0'   50'   100'

## APPENDIX A

**TSO Schedule**

| Task | Begin | Complete |
|------|-------|----------|
| ERA Level 2 Action Plan | October 25, 2024 | January 2025 |
| SWPPP Amendment | January 1, 2025 | March 10, 2025 |
| Implement BMPs in amended SWPPP | January 1, 2025 | February 14, 2025 |
| Evaluate site drainage areas | March 14, 2025 | May 28, 2025 |
| Evaluate Site Stormwater Storage Areas | May 14, 2025 | May 28, 2025 |
| Evaluate additional cover(s) | May 28, 2026 | August 28, 2025 |
| Design additional cover(s) – includes client, RWQCB and Coast Keeper Review | August 31, 2025 | January 31, 2026 |
| ERA Level 2 Technical Report | October 30, 2025 | January 1, 2026 |
| Submit Compliance Option for local Approval | February 1, 2026 | March 25, 2026 |
| Construction of additional cover(s) | May 31, 2025 | November 31, 2026 |
| Compliance Option Revision to SWPPP | November 31, 2026 | January 1, 2027 |
| ERA Level 2 Technical Report with Compliance Option | November 31, 2026 | January 1, 2027 |
| SMARTS Submittals for Compliance Option | December 14, 2026 | January 1, 2027 |

# EXHIBIT D

# SAN JUAN CAPISTRANO EQUESTRIAN CENTER

## NUTRIENT MANAGEMENT PLAN (NMP)

### CITY OF SAN JUAN CAPISTRANO
### ORANGE COUNTY, CALIFORNIA

PREPARED FOR:
SAN JUAN CAPISTRANO EQUESTRIAN CENTER
26282 Oso Road, San Juan Capistrano, CA 92675
San Juan Capistrano, CA 92675

PREPARED BY:
M.S. HATCH CONSULTING, LLC
14252 Culver Drive Suite A, Mailbox #276
Irvine, CA  92604
949.981.3867
www.mshatch.com

DATE PREPARED: MARCH 16, 2023 (Revised June 12, 2023, March 10, 2025)

# Table of Contents

ACRONYMS AND ABBREVIATIONS ................................................................................................3

1   INTRODUCTION ...................................................................................................................4

1.1   SAN JUAN CAPIATRANO EQUESTRIAN CENTER CAFO REGULATORY REQUIREMENTS AND HORSE MANAGEMENT ..............................................................................................................4

1.2   DOCUMENT ORGANIZATION ...........................................................................................4

1.3   SITE DRAINAGE AND CAFO PRODUCTION AREAS .........................................................5

2   CAFO IMPROVEMENT PLAN DETAILS ..................................................................................6

2.1   CAFO IMPROVEMENT PLANS ...........................................................................................6

Table 1 Equestrian Runoff Concentrations from Similar Equestrian Facilities ................................7

3   MANURE MANAGEMENT OPERATIONS ...............................................................................7

4   PROCESS WASTEWATER MANAGEMENT ............................................................................9

5   MORTALITY MANAGEMENT ...............................................................................................9

6   CHEMICAL MANAGEMENT .................................................................................................9

7   CAFO OPERATIONS AND MAINTENANCE ........................................................................10

7.1   NONSTRUCTURAL BMPS ................................................................................................10

Table 2 Nonstructural Operations and Maintenance BMPs ......................................................11

7.2   STRUCTURAL BMPS ........................................................................................................13

Table 3 Structural Operations and Maintenance BMPs ............................................................13

8   RECORDKEEPING AND REPORTING .................................................................................13

Table 4 Annual Report Requirements & Applicability to the SJCEC ..........................................13

9   REFERENCES ....................................................................................................................15

Appendix A ............................................................................................................................16

Appendix B .............................................................................................................................22

**ACRONYMS AND ABBREVIATIONS**

| | |
|---|---|
| AFO | Animal Feeding Operation |
| BMP | Best Management Practice |
| CAFO | Concentrated Animal Feeding Operation |
| CFR | Code of Federal Regulations |
| MS4 | Municipal Separate Storm Sewer System |
| NMP | Nutrient Management Plan |
| SDRWQCB | Regional Water Quality Control Board, San Diego Region |
| SMARTS | Stormwater Multiple Application and Report Tracking System |

# 1   INTRODUCTION

This Nutrient Management Plan (NMP) was prepared in accordance with 40 Code of Federal Regulations (CFR) Section 122.42. For all areas covered under the Industrial General Permit (IGP), a detailed SWPPP in accordance with IGP requirements has been prepared and is being implemented. This NMP outlines operations and site-specific procedures implemented to minimize CAFO discharges from entering surface waters adjacent to the Facility. By implementing the BMPs outlined in this NMP, as well as following recommendations for future improvements, it is the goal to protect beneficial uses of nearby water resources. A table showing the NMP regulatory requirements in 40 C.F.R. § 122.42 and the corresponding sections of this document is provided in Appendix A.

## 1.1   SAN JUAN CAPIATRANO EQUESTRIAN CENTER CAFO REGULATORY REQUIREMENTS AND HORSE MANAGEMENT

SJCEC has been designated as a Medium CAFO by the San Diego Regional Water Quality Control Board (SDRWQCB) due to the number of horses present on-site. There are currently approximately 300 horses boarded at the Facility. As a result of being designated as a Medium CAFO, the SDRWQCB requires preparation of a Nutrient Management Plan (NMP).

As required by 40 C.F.R. § 122.42(e)(1)(iv), SJCEC will prevent the direct contact of confined animals with waters of the United States (US), which would include the Arroyo Trabuco Creek adjacent to the Facility. Most of the Facility is located above the Arroyo Trabuco Creek floodplain and the stable areas where the horses are confined are largely located outside the floodplain. In the event of a large storm event (100-year storm), horses would be removed in advance from the Facility to higher ground prior to coming into direct contact with waters of the US.

Once a facility is designated as a CAFO, it must also determine which portions of the site are within the "Production Area," defined in 40 C.F.R. § 122.23 as " part of an animal feeding operation (AFO) that includes the animal confinement area, the manure storage area, the raw materials storage area, and the waste containment areas." The Production Areas and Non-Production Areas have been identified in Figure 1 in Appendix B. The Production Areas are shown in teal and all other areas are Non-Production Areas.

## 1.2   DOCUMENT ORGANIZATION

This NMP provides the following information:

- Definition of the Production Area at the SJCEC (40 C.F.R. § 122.42.1.i);

4

- Description of how Production Areas will be disconnected from non-CAFO areas (40 C.F.R. §122.42.1.iii);
- Description of how manure, process wastewater, and mortalities will be managed and maintained onsite (40 C.F.R. § 122.42.1.i through ii, v through vi, viii, 5.i through 5.ii);
- Description of how structural and nonstructural BMPs will be implemented and maintained (40 C.F.R. § 122.42.1.iv); and
- Outline of how records will be maintained and how often reporting will be completed (40 C.F.R.§ 122.42.1.ix, 2.i through 2.ii, 3, 4.i through 4.viii. 6.i through 6.iv).

Also included in this NMP is the description of the CAFO Improvement Plan.

## 1.3    SITE DRAINAGE AND CAFO PRODUCTION AREAS

SJCEC includes two production areas (drainage areas A3 and A4), as shown in Figure 1: Existing Drainage Area and Production Area Map in Appendix B. The Existing Drainage Map shows the area layout, including the general site topography, drainage areas, and outfall locations.   The site generally slopes from north to south.   The elevation of the project site ranges from approximately 150.0 to 130.0 feet above mean sea level (msl). Surface drainage at the site currently flows south and west toward discharge locations along Arroyo Trabuco Creek.   Stormwater is conveyed primarily through surface runoff through the production areas to the floodplain of Arroyo Trabuco Creek. In addition, roof flows are piped directly to the creek. All horse stables and feeding and bedding storage areas throughout the entire site are fitted with Storm-Resistant Shelters.

Based on the requirements of the IGP, the Facility will be testing for the following constituents: pH (IGP requirement), Oil & Grease (IGP requirement), Total Suspended Solids (IGP requirement), E. Coli (303(d) impairment), Phosphorus (303(d) impairment), Nitrate & Nitrite as N (303(d) impairment), and Ammonia as N (303(d) impairment).

This section describes operations that occur in the CAFO Production Areas at the Facility.   As previously defined, "CAFO Production Areas" include animal confinement areas, manure storage areas, raw materials storage areas, and waste containment areas.

The following areas have been identified as CAFO Production Areas at San Juan Capistrano Equestrian Centers:

Drainage Area A3 (previously A5): facility This area consists of a 2.37-acre area in the north-central portion of the project site with uncovered Manure Bin Storage Area. Potential pollutants include sediment, nutrients, bacteria, and trash. The manure bin storage is approximately 0.07 acres within the drainage area. Under the proposed conditions, this drainage area will increase by 0.85 acres to accept diverted flows from A4.

Drainage Area A4 (previously A6): This area consists of a 2.76-acre area in the north-central portion of the project site that includes the Manure and Stall Waste Bunker. Potential pollutants include sediment, nutrients, bacteria, and trash. The Manure and Stall Waste Bunker is approximately 0.04 acres within the drainage area. Under the proposed conditions, a portion of this drainage area (0.85 acres) will be diverted to A3 to reduce the amount of runoff entering the manure and stall waste bunker.

The areas noted above are currently subject to the IGP and this NMP. Figure 1 has been prepared to identify the main site features (refer to Figure 1: Existing Drainage Area and Production Area Map in Appendix B).

## 2    CAFO IMPROVEMENT PLAN DETAILS

### 2.1    CAFO IMPROVEMENT PLANS

The existing infiltration BMPs were installed at the Facility to capture and infiltrate storm water from production and non-production areas. The locations of the existing infiltration BMPs are identified in Figure 1.

As part of the requirements of the NMP, clean water diversions are supported which remove non-CAFO runoff from the production area and divert the "clean water" to a different discharge point or route runoff around the production areas. For example, roof runoff is diverted away or around the production area which reduces the size of the required retention BMP for the Production Area. As part of the CAFO Improvements, a cover over the Manure Bin Storage Area is being installed.

When considering infiltration BMPs as the primary treatment for runoff from equestrian facilities, the SDRWQCB has expressed interest in the typical concentrations of Total Suspended Solids (TSS), phosphorus and nitrogen in equestrian runoff as it relates to potential groundwater

6

contamination concerns. Table 1 below summarizes the typical range of concentrations, as well as average concentrations, of the pollutants of interest in runoff leaving equestrian facilities based on stormwater monitoring data collected at two equestrian facilities located near the City of San Juan Capistrano.

**Table 1  Equestrian Runoff Concentrations from Similar Equestrian Facilities**

| Equestrian Runoff Concentrations from Similar Equestrian Facilities | | |
|---|---|---|
| Constituent | Concentration Range | Average Concentration |
| TSS (mg/L) | 150 – 4,140 | 650 |
| Phosphorus (mg/L) | 0.013 – 7.42 | 0.78 |
| Total Nitrogen (mg/L) | 0.11 – 21.9 | 3.1 |

Nitrate in groundwater has a Basin Plan objective for Nitrate at 45 mg/L. Based on the concentrations of Total Nitrogen at levels well below that, the ability of the soils through which the storm water is infiltrated to break down nitrogen compounds, and taking into consideration that nitrate is a sub-set of Total Nitrogen, groundwater impacts are not anticipated. The other pollutant concentrations related to TSS (which is removed by filtration through the soils, and Phosphorus did not raise any additional concerns for groundwater.

### 2.2    CAFO IMPROVEMENT PLAN IMPLEMENTATION

Facility drainage from non-Production Areas will be redirected so that the Manure and Stall Waste Bunker can accommodate hold the 85th percentile storm event. In addition, a cover over the Manure Bin Storage Area is being implemented.

### 3    MANURE MANAGEMENT OPERATIONS

SJCEC has three types of manure management practices throughout the calendar year:

- Immediate removal of manure in non-production areas;

- Daily stall cleaning and placement of Manure and Stall Waste into roll-off bins in Manaure and Stall Waste Bunker; and
- Full Bins are transferred to the Manure Bin Storage Area prior to Off-Site Shipping

At the Facility, manure observed in non-production areas is removed when observed by the Facility staff and transferred to waste containers. This process occurs on an ongoing basis. Daily, horse boarding stalls are cleaned, and the manure, soiled bedding, and straw are removed by the Facility staff or the horse's owner.   As part of the daily horse-keeping practices, boarders at the Facility are provided the necessary equipment to rake out the stalls and transfer all bedding, footing and waste material from the stalls to the temporary holding carts adjacent to the stalls, which is then managed by the Facility staff. Any boarder that is observed not following protocols is notified by Facility staff to follow proper procedures and policies for waste management.

The solid waste is transferred from the intermediary carts or directly to the large 40-yard metal commercial roll-off bins provided by the City of San Juan Capistrano's contracted solid waste hauler (CR&R) located in the Manure & Stall Waste Bunker. There are typically two commercial bins located in the Bunker. After being filled, the commercial bins are transferred to the Manure Bin Storage Area until they are removed by CR&R, which typically occurs 5-6 times per week.  There are typically 6 – 8 total commercial bins located on the site split between the Manure & Stall Waste Bunker and the Manure Bin Storage Area. Two are normally in the bunker, two are full waiting for removal by CR&R in the Manure Bin Storage Area, and 2 – 4 empty bins are in the Manure Bin Storage Area.  During holidays, up to 4 full bins may be on-site until CR&R picks them up. All roll-off bins that contain manure/shavings are covered by the Facility staff prior to storm events or are located within the below grade concrete bunkers with no outlets. They are also covered during times of high winds. Empty bins are stored in the Manure Bin Storage Area.

The solid waste materials are hauled offsite to a public landfill maintained by the City of San Juan Capistrano, the County of Orange, or to a CR&R facility that allows for reuse of the solid waste materials. SJCEC has solid waste disposal services provided by CR&R and the final waste disposal process is ultimately determined by CR&R. SJCEC tracks and documents manure disposal on a monthly basis.

Nutrient testing and analysis of the Facility manure is not required as part of the NMP because all manure is collected and hauled off-site by a certified waste hauler.

SJCEC creates approximately 475 tons of waste bedding materials (manure, wood shavings, hay) each month for off-site disposal by CR&R.

## 4    PROCESS WASTEWATER MANAGEMENT

The term "Process Wastewater" defined in 40 C.F.R. § 122 refers to "water directly or indirectly used in the operation of an AFO for any or all of the following: spillage or overflow from animal or poultry watering systems; washing, cleaning, or flushing pens, barns, manure pits, or other AFO facilities; direct contact swimming, washing or spray cooling of animals; or dust control. Process Wastewater also includes any water which comes into contact with any raw materials, products, or by-products including manure, litter, feed or bedding."

SJCEC does not practice land application of manure or process wastewater. The following practices at the SJCEC are implemented to eliminate the discharge of process wastewater from the property:

- Manure carts not actively being used for stall cleaning are kept under cover.
- Good housekeeping practices are implemented so that manure generated in the CAFO Production Area is removed before pollutants can be entrained in or transported by stormwater runoff.
- Stormwater runoff from Production Areas is collected in infiltration BMPs to the maximum extent feasible and infiltrated into the underlying soil.

Similar to manure management practices noted above, the management of process wastewater is handled solely by the Facility staff.

## 5   MORTALITY MANAGEMENT

Operations involving animals have associated risks concerning animal health and welfare. If an animal gets sick or injured, or animal mortality occurs onsite, the animal is removed from the SJCEC by the owner within 24 hours. Staff also clean and rinse any pen or stable where a diseased animal was kept. A water and disinfectant solution is used, and the wastewater is collected and discharged to the sanitary sewer system. At no point is a deceased animal at the SJCEC allowed to remain outside where it can be exposed to other animals, or to be left outside potentially in contact with stormwater discharges.

## 6   CHEMICAL MANAGEMENT

9

No chemicals are used for any on-site treatment processes.   All chemicals on-site are stored and used in accordance with the IGP SWPPP requirements.  Please refer to the SWPPP for any additional details.

## 7    CAFO OPERATIONS AND MAINTENANCE

This section summarizes  the operation and maintenance activities for BMPs within CAFO Production Areas at SJCEC.

### 7.1    NONSTRUCTURAL BMPS

Several nonstructural BMPs are in place as part of normal operations in CAFO Production Areas. Table 2 below provides a summary of these activities at the Production Areas, along with the associated pollutant(s), frequency, and inspection requirements.

**Table 2 Nonstructural Operations and Maintenance BMPs**

| Potential Pollution Source | Potential Pollutant(s) | Nonstructural BMP | Frequency of BMP implementation | Location of BMP | Procedures or Maintenance Instructions for BMP Implementation | Frequency for BMP Inspection |
|---|---|---|---|---|---|---|
| Raw Material Storage | Solids (TSS, settleable solids) | 1. Feed, hay and bedding are stored in covered areas and are not exposed to stormwater.<br>2. Storage areas are inspected for leaks, runoff, and proper storage techniques by staff. | 1. Ongoing, during storm events<br>2. Monthly | Storage Barn in DMA A3 and A4 | Bedding materials are stored in bags; hay and bedding are stored in covered barns. | Monthly |
| Horse Stalls (all with storm-resistant shelters) | Solids (TSS), Nutrients (nitrogen, phosphorus, pathogens | 1. Manure and waste bedding is removed from the stalls daily<br>2. Manure is picked up on a continuous basis when observed by staff, trainers, owners or other on-site personnel.<br>3. Collected manure and waste bedding are transported to bins within Manure and Stall Waste Bunker. | 1. Daily<br>2. Daily<br>3. Daily | Throughout the stable areas | Manure and bedding waste are stored in bins throughout the covered stalls. | Monthly |
| Manure and Waste Stall Bunker | Solids (TSS), Nutrients (nitrogen, phosphorus, pathogens | 1. Manure is placed in roll-off bins within the bunker.<br>2. Any manure that misses the bins is picked up.<br>3. Full bins are moved to Manure Bin Storage Area<br>4. Bunker is inspected during rain for overflow and sampled if discharging. | 1. Daily<br>2. Daily<br>3. Daily<br>4. During rain events | Manure and Stall Waste Bunker | Manure is placed in roll-off bins and when bins are full are moved to Manure Bin Storage Area | Monthly |
| Manure Bin Storage Area | Solids (TSS), Nutrients (nitrogen, phosphorus, pathogens | 1. Full manure bins are stored until picked up by waste transporter.<br>2. Bins are covered prior to rain<br>3. Bins are transported every 5-6 days for disposal. | 1. Daily<br>2. Prior to rain events,<br>3. As needed. | Manure Bin Storage Area | Manure in full bins is stored and covered prior to rain. Bins are transported offsite every 5-6 days. | Monthly |

## 7.2   STRUCTURAL BMPS

Structural BMPs in place as part of the NMP are summarized in Table 3 below.

**Table 3 Structural Operations and Maintenance BMPs**

| Structural BMP | Operation and Maintenance Activity | Operation and Maintenance Frequency |
|---|---|---|
| Infiltration BMPs in Production Area | 1. Identify eroded facility areas<br>2. Observe and record drawdown rate<br>3. Estimate degree of sediment accumulation in infiltration BMP<br>4. Identify any needed corrective maintenance that will require site-specific planning or design<br>5. Remove trash from the Facility<br>6. Excavate the entire facility, rehabilitate bottom and sides via over-excavation, and replace aggregate layers. | 1 – 4. Four times per year during wet season, including inspection just before the wet season and within 24 hours after two storm events ≥ 0.5 inches<br>5. Each visit, as needed<br>6. When ponding water is observed after the drawdown period (24-48 hours) |
| Manure & Stall Waste Bunker | 1.   Remove trash and fallen manure from the Facility. | 1.   Each visit, as needed |

## 8   RECORDKEEPING AND REPORTING

Records of BMP operations and maintenance activities will be maintained by SJCEC and documented in accordance with the IGP SWPPP requirements. Records will be kept onsite for a minimum of five years after creation of the record. Pursuant to annual reporting requirements under 40 C.F.R. § 122.42 described below, SJCEC keeps records of horse populations, manure management and removal, and is summarized each year. An Annual Report will be submitted according to requirements outlines in 40 C.F.R. § 122.42.  Some of the annual reporting requirements in 40 C.F.R. § 122.42 are not applicable to the SJCEC and will be marked as N/A within the annual report. Changes to NMP may also be required at the request of SDRWQCB and if deemed substantial, the NMP may undergo public review and comment.  The annual report requirements and applicability to the SJCEC are summarized in Table 4 below.

**Table 4 Annual Report Requirements & Applicability to the SJCEC**

13

| Annual Report Requirement | Applicable to San Juan Capistrano Equestrian Center? (Y/N) | Notes |
|---|---|---|
| The number and type of animals, whether in open confinement or housed under roof (beef cattle, broilers, layers, swine weighing 55 pounds or more, swine weighing less than 55 pounds, mature dairy cows, dairy heifers, veal calves, sheep and lambs, horses, ducks, turkeys, other); | Y | The number of horses confined will be reported each year. |
| Estimated amount of total manure, litter and process wastewater generated by the CAFO in the previous 12 months (tons/gallons); | Y | The estimated amount of total manure and process wastewater generated by the CAFO in the previous 12 months will be reported each year. |
| Estimated amount of total manure, litter and process wastewater transferred to other person by the CAFO in the previous 12 months (tons/gallons); | Y | The estimated amount of total manure and process wastewater transferred to other person by the CAFO will be reported each year. |
| Total number of acres for land application covered by the nutrient management plan | N | No land application of manure occurs at the Facility. |
| Total number of acres under control of the CAFO that were used for land application of manure, litter and process wastewater in the previous 12 months; | N | No land application of manure occurs at the Facility. |

14

| | | |
|---|---|---|
| Summary of all manure, litter and process wastewater discharges from the production area that have occurred in the previous 12 months, including, for each discharge, the date of discovery, duration of discharge, and approximate volume; | Y | Any discharges of manure or process wastewater from production areas will be reported each year. |
| A statement indicating whether the current version of the CAFO's nutrient management plan was developed or approved by a certified nutrient management planner; | N | There are no crops or land application of manure or process wastewater at the Facility. |
| The actual crop(s) planted and actual yield(s) for each field, the actual nitrogen and phosphorus content of the manure, litter, and process wastewater, the results of calculations conducted in accordance with paragraphs (e)(5)(i)(B) and (e)(5)(ii)(D) of this section, and the amount of manure, litter, and process wastewater applied to each field during the previous 12 months; and, for any CAFO that implements a nutrient management plan that addresses rates of application in accordance with paragraph (e)(5)(ii) of this section, the results of any soil testing for nitrogen and phosphorus taken during the preceding 12 months, the data used in calculations conducted in accordance with paragraph (e)(5)(ii)(D) of this section, and the amount of any supplemental fertilizer applied during the previous 12 months. | N | There are no crops or land application of manure or process wastewater at the Facility. |

## 9    REFERENCES

SDRWQCB. 2013. Waste Discharge Requirements for Discharges from the Municipal Separate Storm Sewer System (MS4s) Draining the Watersheds within the San Diego Region. Order No. R9-2013-0001, and as amended by R9-2015-0001 and R9-2015-0100. May 8, 2013.

## Appendix A

## 40 C.F.R. § 122.42 Requirements & Nutrient Management Plan Sections That Address Them

| 40 C.F.R. § 122.42 Provision | 40 C.F.R. § 122.42 Language | Section(s) in NMP |
|---|---|---|
| 1.i. through 1.ix. | (1) Requirement to implement a nutrient management plan. Any permit issued to a CAFO must include a requirement to implement a nutrient management plan that, at a minimum, contains best management practices necessary to meet the requirements of this paragraph and applicable effluent limitations and standards, including those specified in 40 CFR part 412. The nutrient management plan must, to the extent applicable: | 1 |
| | (i) Ensure adequate storage of manure, litter, and process wastewater, including procedures to ensure proper operation and maintenance of the storage facilities; | 2 |
| | (ii) Ensure proper management of mortalities (i.e., dead animals) to ensure that they are not disposed of in a liquid manure, storm water, or process wastewater storage or treatment system that is not specifically designed to treat animal mortalities; | 5 |
| | (iii) Ensure that clean water is diverted, as appropriate, from the production area; | 2.1 |
| | (iv) Prevent direct contact of confined animals with waters of the United States; | 1.1 |
| | (v) Ensure that chemicals and other contaminants handled on-site are not disposed of in any manure, litter, process wastewater, or storm water storage or treatment system unless specifically designed to treat such chemicals and other contaminants; | 5 |
| | (vi) Identify appropriate site specific conservation practices to be implemented, including as appropriate buffers or equivalent practices, to control runoff of pollutants to waters of the United States; | 2, 3, 4, 5, 6 |
| | (vii) Identify protocols for appropriate testing of manure, litter, process wastewater, and soil; | Not Applicable |
| | (viii) Establish protocols to land apply manure, litter or process wastewater in accordance with site-specific nutrient management practices that ensure appropriate agricultural utilization of the nutrients in the manure, litter or process wastewater; and | Not Applicable |
| | (ix) Identify specific records that will be maintained to document the implementation and management of the minimum elements described in paragraphs (e)(1)(i) through (e)(1)(viii) of this section. | 8 |
| 2.i. through 2.ii. | (2) Recordkeeping requirements.<br>(i) The permittee must create, maintain for five years, and make available to the Director, upon request, the following records:<br>(A) All applicable records identified pursuant to paragraph (e)(1)(ix) of this section;<br>(B) In addition, all CAFOs subject to 40 CFR part 412 must comply with record keeping requirements as specified in § 412.37(b) and (c) and § 412.47(b) and (c).<br>(ii) A copy of the CAFO's site-specific nutrient management plan must be maintained on site and made available to the Director upon request | 8 |
| 3 | (3) Requirements relating to transfer of manure or process wastewater to other persons. Prior to transferring manure, litter or process wastewater to other persons, Large CAFOs must provide the recipient of the manure, litter or process wastewater with the most current nutrient analysis. The analysis provided must be consistent with the requirements of 40 CFR part 412. Large CAFOs must retain for five years records of the date, recipient name and address, and approximate amount of manure, litter or process wastewater transferred to another person. | 8 |

| 40 C.F.R. § 122.42 Provision | 40 C.F.R. § 122.42 Language | Section(s) in NMP |
|---|---|---|
| 4.i. through 4.viii. | (4) Annual reporting requirements for CAFOs. The permittee must submit an annual report to the Director. The permittee must submit an annual report to the Director or initial recipient, as defined in 40 CFR 127.2(b), in compliance with this section and 40 CFR part 3 (including, in all cases, subpart D to part 3), § 122.22, and 40 CFR part 127. Part 127 is not intended to undo existing requirements for electronic reporting. Prior to this date, and independent of part 127, the permittee may be required to report electronically if specified by a particular permit or if required to do so by state law. The annual report must include:<br><br>(i) The number and type of animals, whether in open confinement or housed under roof (beef cattle, broilers, layers, swine weighing 55 pounds or more, swine weighing less than 55 pounds, mature dairy cows, dairy heifers, veal calves, sheep and lambs, horses, ducks, turkeys, other);<br><br>(ii) Estimated amount of total manure, litter and process wastewater generated by the CAFO in the previous 12 months (tons/gallons);<br><br>(iii) Estimated amount of total manure, litter and process wastewater transferred to other person by the CAFO in the previous 12 months (tons/gallons);<br><br>(iv) Total number of acres for land application covered by the nutrient management plan developed in accordance with paragraph (e)(1) of this section;<br><br>(v) Total number of acres under control of the CAFO that were used for land application of manure, litter and process wastewater in the previous 12 months;<br><br>(vi) Summary of all manure, litter and process wastewater discharges from the production area that have occurred in the previous 12 months, including, for each discharge, the date of discovery, duration of discharge, and approximate volume; and<br><br>(vii) A statement indicating whether the current version of the CAFO's nutrient management plan was developed or approved by a certified nutrient management planner; and<br><br>(viii) The actual crop(s) planted and actual yield(s) for each field, the actual nitrogen and phosphorus content of the manure, litter, and process wastewater, the results of calculations conducted in accordance with paragraphs (e)(5)(i)(B) and (e)(5)(ii)(D) of this section, and the amount of manure, litter, and process wastewater applied to each field during the previous 12 months; and, for any CAFO that implements a nutrient management plan that addresses rates of application in accordance with paragraph (e)(5)(ii) of this section, the results of any soil testing for nitrogen and phosphorus taken during the preceding 12 months, the data used in calculations conducted in accordance with paragraph (e)(5)(ii)(D) of this section, and the amount of any supplemental fertilizer applied during the previous 12 months. | 8 |

| 40 C.F.R. § 122.42 Provision | 40 C.F.R. § 122.42 Language | Section(s) in NMP |
|---|---|---|
| 5.i. through 5.ii. | (5) Terms of the nutrient management plan. Any permit issued to a CAFO must require compliance with the terms of the CAFO's site-specific nutrient management plan. The terms of the nutrient management plan are the information, protocols, best management practices, and other conditions in the nutrient management plan determined by the Director to be necessary to meet the requirements of paragraph (e)(1) of this section. The terms of the nutrient management plan, with respect to protocols for land application of manure, litter, or process wastewater required by paragraph (e)(1)(viii) of this section and, as applicable, 40 CFR 412.4(c), must include the fields available for land application; field-specific rates of application properly developed, as specified in paragraphs (e)(5)(i) through (ii) of this section, to ensure appropriate agricultural utilization of the nutrients in the manure, litter, or process wastewater; and any timing limitations identified in the nutrient management plan concerning land application on the fields available for land application. The terms must address rates of application using one of the following two approaches, unless the Director specifies that only one of these approaches may be used:

(i) Linear approach. An approach that expresses rates of application as pounds of nitrogen and phosphorus, according to the following specifications:

(A) The terms include maximum application rates from manure, litter, and process wastewater for each year of permit coverage, for each crop identified in the nutrient management plan, in chemical forms determined to be acceptable to the Director, in pounds per acre, per year, for each field to be used for land application, and certain factors necessary to determine such rates. At a minimum, the factors that are terms must include: the outcome of the field-specific assessment of the potential for nitrogen and phosphorus transport from each field; the crops to be planted in each field or any other uses of a field such as pasture or fallow fields; the realistic yield goal for each crop or use identified for each field; the nitrogen and phosphorus recommendations from sources specified by the Director for each crop or use identified for each field; credits for all nitrogen in the field that will be plant available; consideration of multi-year phosphorus application; and accounting for all other additions of plant available nitrogen and phosphorus to the field. In addition, the terms include the form and source of manure, litter, and process wastewater to be land-applied; the timing and method of land application; and the methodology by which the nutrient management plan accounts for the amount of nitrogen and phosphorus in the manure, litter, and process wastewater to be applied.

(B) Large CAFOs that use this approach must calculate the maximum amount of manure, litter, and process wastewater to be land applied at least once each year using the results of the most recent representative manure, litter, and process wastewater tests for nitrogen and phosphorus taken within 12 months of the date of land application;

or

(ii) Narrative rate approach. An approach that expresses rates of application as a narrative rate of application that results in the amount, in tons or gallons, of manure, litter, and process wastewater to be land applied, according to the following specifications:

(A) The terms include maximum amounts of nitrogen and phosphorus derived from all sources of nutrients, for each crop identified in the nutrient management plan, in chemical forms determined to be acceptable to the Director, in pounds per acre, for each field, and certain factors necessary to determine such amounts. At a minimum, the factors that are terms must include: the outcome of the field-specific assessment of the potential for nitrogen and phosphorus transport from each field; the crops to be planted in each field or any other uses such as pasture or fallow fields (including alternative crops identified in accordance with paragraph (e)(5)(ii)(B) of this section); the realistic yield goal for each crop or use identified for each field; and the nitrogen and phosphorus recommendations from sources specified by the Director for each crop or use identified for each field. In addition, the terms include the methodology by which the nutrient management plan accounts for the following factors when calculating the amounts of manure, litter, and process wastewater to be land applied: Results of soil tests conducted in accordance with protocols identified in the nutrient management plan, as required by paragraph (e)(1)(viii) of this section; credits for all nitrogen in the field that will be plant available; the amount of nitrogen and phosphorus in the manure, litter, and process wastewater to be applied; consideration of multi-year phosphorus application; accounting for all other additions of plant available nitrogen and phosphorus to the field; and the form and source of manure, litter, and process wastewater; the timing and method of land application; and volatilization of nitrogen and mineralization of organic nitrogen.

(B) The terms of the nutrient management plan include alternative crops identified in the CAFO's nutrient management plan that are not in the planned crop rotation. Where a CAFO includes alternative crops in its nutrient management plan, the crops must be listed by field, in addition to the crops identified in the planned crop rotation for that field, and the nutrient management plan must include realistic crop yield goals and the nitrogen and phosphorus recommendations from sources specified by the Director for each crop. Maximum amounts of nitrogen and phosphorus from all sources of nutrients and the amounts of manure, litter, and process wastewater to be applied must be determined in accordance with the methodology described in paragraph (e)(5)(ii)(A) of this section.

(C) For CAFOs using this approach, the following projections must be included in the nutrient management plan submitted to the Director, but are not terms of the nutrient management plan: The CAFO's planned crop rotations for each field for the period of permit coverage; the projected amount of manure, litter, or process wastewater to be applied; projected credits for all nitrogen in the field that will be plant available; consideration of multi-year phosphorus application; accounting for all other additions of plant available nitrogen and phosphorus to the field; and the predicted form, source, and method of application of manure, litter, and process wastewater for each crop. Timing of application for each field, insofar as it concerns the calculation of rates of application, is not a term of the nutrient management plan. | 1 |

19

| 40 C.F.R. § 122.42 Provision | 40 C.F.R. § 122.42 Language | Section(s) in NMP |
|---|---|---|
| 40 C.F.R. § 122.42 | (D) CAFOs that use this approach must calculate maximum amounts of manure, litter, and process wastewater to be land applied at least once each year using the methodology required in paragraph (e)(5)(ii)(A) of this section before land applying manure, litter, and process wastewater and must rely on the following data: <br><br> (1) A field-specific determination of soil levels of nitrogen and phosphorus, including, for nitrogen, a concurrent determination of nitrogen that will be plant available consistent with the methodology required by paragraph (e)(5)(ii)(A) of this section, and for phosphorus, the results of the most recent soil test conducted in accordance with soil testing requirements approved by the Director; and <br><br> (2) The results of most recent representative manure, litter, and process wastewater tests for nitrogen and phosphorus taken within 12 months of the date of land application, in order to determine the amount of nitrogen and phosphorus in the manure, litter, and process wastewater to be applied. | |

| 40 C.F.R. § 122.42 Provision | 40 C.F.R. § 122.42 Language | Section(s) in NMP |
|---|---|---|
| 6.i. through 6.iv. | (6) Changes to a nutrient management plan. Any permit issued to a CAFO must require the following procedures to apply when a CAFO owner or operator makes changes to the CAFO's nutrient management plan previously submitted to the Director:<br><br>(i) The CAFO owner or operator must provide the Director with the most current version of the CAFO's nutrient management plan and identify changes from the previous version, except that the results of calculations made in accordance with the requirements of paragraphs (e)(5)(i)(B) and (e)(5)(ii)(D) of this section are not subject to the requirements of paragraph (e)(6) of this section.<br><br>(ii) The Director must review the revised nutrient management plan to ensure that it meets the requirements of this section and applicable effluent limitations and standards, including those specified in 40 CFR part 412, and must determine whether the changes to the nutrient management plan necessitate revision to the terms of the nutrient management plan incorporated into the permit issued to the CAFO. If revision to the terms of the nutrient management plan is not necessary, the Director must notify the CAFO owner or operator and upon such notification the CAFO may implement the revised nutrient management plan. If revision to the terms of the nutrient management plan is necessary, the Director must determine whether such changes are substantial changes as described in paragraph (e)(6)(iii) of this section.<br><br>(A) If the Director determines that the changes to the terms of the nutrient management plan are not substantial, the Director must make the revised nutrient management plan publicly available and include it in the permit record, revise the terms of the nutrient management plan incorporated into the permit, and notify the owner or operator and inform the public of any changes to the terms of the nutrient management plan that are incorporated into the permit.<br><br>(B) If the Director determines that the changes to the terms of the nutrient management plan are substantial, the Director must notify the public and make the proposed changes and the information submitted by the CAFO owner or operator available for public review and comment. The process for public comments, hearing requests, and the hearing process, if a hearing is held must follow the procedures applicable to draft permits set forth in 40 CFR 124.11 through 124.13. The Director may establish, either by regulation or in the CAFO's permit, an appropriate period of time for the public to comment and request a hearing on the proposed changes that differs from the time period specified in 40 CFR 124.10. The Director must respond to all significant comments received during the comment period as provided in 40 CFR 124.17, and require the CAFO owner or operator to further revise the nutrient management plan if necessary, in order to approve the revision to the terms of the nutrient management plan incorporated into the CAFO's permit. Once the Director incorporates the revised terms of the nutrient management plan into the permit, the Director must notify the owner or operator and inform the public of the final decision concerning revisions to the terms and conditions of the permit.<br><br>(iii) Substantial changes to the terms of a nutrient management plan incorporated as terms and conditions of a permit include, but are not limited to:<br><br>(A) Addition of new land application areas not previously included in the CAFO's nutrient management plan. Except that if the land application area that is being added to the nutrient management plan is covered by terms of a nutrient management plan incorporated into an existing NPDES permit in accordance with the requirements of paragraph (e)(5) of this section, and the CAFO owner or operator applies manure, litter, or process wastewater on the newly added land application area in accordance with the existing field-specific permit terms applicable to the newly added land application area, such addition of new land would be a change to the new CAFO owner or operator's nutrient management plan but not a substantial change for purposes of this section;<br><br>(B) Any changes to the field-specific maximum annual rates for land application, as set forth in paragraphs (e)(5)(ii) of this section, and to the maximum amounts of nitrogen and phosphorus derived from all sources for each crop, as set forth in paragraph (e)(5)(ii) of this section;<br><br>(C) Addition of any crop or other uses not included in the terms of the CAFO's nutrient management plan and corresponding field-specific rates of application expressed in accordance with paragraph (e)(5) of this section; and<br><br>(D) Changes to site-specific components of the CAFO's nutrient management plan, where such changes are likely to increase the risk of nitrogen and phosphorus transport to waters of the U.S.<br><br>(iv) For EPA-issued permits only. Upon incorporation of the revised terms of the nutrient management plan into the permit, 40 CFR 124.19 specifies procedures for appeal of the permit decision. In addition to the procedures specified at 40 CFR 124.19, a person must have submitted comments or participated in the public hearing in order to appeal the permit decision. | 8 |

21

**Appendix B**
**Figure 1: Existing Drainage Area and Production Area Map**



SAN JUAN CAPISTRANO EQUESTRIAN CENTER
26282 OSO RD
SAN JUAN CAPISTRANO, CA 92675
CONCEPTUAL DRAINAGE EXHIBIT FOR IGP/ PRODUCTION AREAS
March 2025

FUSCOE
ENGINEERING

15535 Sand Canyon Ave, Suite 100
Irvine, California 92618
949.47.41.960

fuscoe.com